FILED

2016 Jun-02  AM 10:33
U.S. DISTRICT COURT
N.D. OF ALABAMA

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## EASTERN DIVISION

| | | |
|---|---|---|
| **ISHA DATES,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Case No.: 1:14-CV-1464-VEH** |
| | ) | |
| **FRANK NORTON, LLC d/b/a** | ) | |
| **MILO'S HAMBURGERS,** | ) | |
| | ) | |
| **Defendants.** | ) | |

## <u>MEMORANDUM OPINION AND ORDER</u>

This action was filed on July 28, 2014, by the Plaintiff, Isha Dates, against her former employer, Defendant Frank Norton, Inc., doing business as Milo's Hamburgers ("Milo's"). (Doc. 1). The Complaint sets out counts for: sexual harassment in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, *et seq.* ("Title VII") (Count One); disparate treatment in violation of 42 U.S.C. § 1981 ("Section 1981") (Count Two); retaliation in violation of Title VII (Count Three); retaliation in violation of Section 1981 (Count Four); and the Alabama state law tort of outrage (Count Five). All counts arise out of Dates's employment with, and eventual termination by, the Defendant.

The case comes before the Court on the Motion for Summary Judgment filed by the Defendant (doc. 29), and the Defendant's Motion for Sanctions Pursuant to

Rule 11 of the Federal Rules of Civil Procedure[1], contained within its reply brief to the Motion for Summary Judgment (doc. 43). For the reasons stated herein, the Motion for Summary Judgment will be **GRANTED in part** and **DENIED in part**. Additionally, new arguments are improper if presented for the first time in a reply brief, as they were in this case. *Herring v. Sec'y, Dep't of Corr.*, 397 F.3d 1338, 1342 (11th Cir. 2005); *Distrib. Res. Mgmt., Inc. v. Peacock*, No. 2:12-CV-00188-SLB, 2012 WL 2930787, at *2 (N.D. Ala. July 13, 2012). The Motion for Sanctions will be **DENIED**.

## I.    RULE 11 SANCTIONS

The Defendant argues:

> If this Court disagrees that Milo's has not met its summary-judgment burden of proof as to all of these claims, Milo's respectfully submits that its failure to be able to do so is the direct result of Dates' false testimony and bad-faith pursuit of her claims against Milo's. As clearly demonstrated by the Declarations of Annetta Datcher and Cora Datcher, Dates unsuccessfully attempted to bribe and suborn perjury from them. She then compounded her potentially criminal actions by denying them under oath in a Declaration filed in response to Milo's summary-judgment motion, thus perjuring herself.

> The irony should not be lost on this Court that Dates had not falsely testified about the Datcher's accusations of bribery and suborning perjury (because she had not been confronted with them when

---

[1] This motion is actually entitled "Milo's Motion to Dismiss Based on Dates'[s] Alleged Perjury, Suborning of Perjury[,] and Attempted Bribery." (Doc. 43 at 7). However, the sole basis for the motion is Rule 11.

under oath), until that Declaration was submitted to this Court on September 5, 2105 [sic].

Such behavior by Dates, if proven true, is inappropriate, illegal and potentially criminal. It is overwhelmingly evident that Dates has filed this lawsuit in bad faith for an improper purpose, in violation of Rule 11 of the Federal Rules of Civil Procedure and well-established precedent.

(Doc. 43 at 7). The Defendant then continues, for the next 6 pages of its brief, to

explain why Rule 11 mandates that Dates's claims should be dismissed as a sanction

for her alleged conduct. (Doc. 43 at 8-13).

Rule 11 provides:

A motion for sanctions must be made <u>separately from any other motion</u> and must describe the specific conduct that allegedly violates Rule 11(b). <u>The motion must be served under Rule 5, but it must not be filed or be presented to the court if the challenged paper, claim, defense, contention, or denial is withdrawn or appropriately corrected within 21 days after service or within another time the court sets.</u> If warranted, the court may award to the prevailing party the reasonable expenses, including attorney's fees, incurred for the motion.

FED. R. CIV. P. 11(c) (emphasis added). Not only is the motion not made "separately

from any other motion," there is no indication in the motion that the pre-filing service

described in the rule occurred. The motion is **DENIED**.[2]

---

[2] The Court does not mean to imply that perjury and fraud upon the Court, if it occurred in this case, should go unpunished. The Court merely notes that <u>procedurally</u> the issue has not been properly raised. Further, if the Defendant truly believes that a crime has been committed, there are other avenues it may pursue.

## II.    STANDARD SUMMARY JUDGMENT

Under Federal Rule of Civil Procedure 56, summary judgment is proper if there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law. FED. R. CIV. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986) ("[S]ummary judgment is proper if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.") (internal quotation marks and citation omitted). The party requesting summary judgment always bears the initial responsibility of informing the court of the basis for its motion and identifying those portions of the pleadings or filings that it believes demonstrate the absence of a genuine issue of material fact. *Celotex*, 477 U.S. at 323. Once the moving party has met its burden, Rule 56(e) requires the non-moving party to go beyond the pleadings in answering the movant. *Id.* at 324. By its own affidavits – or by the depositions, answers to interrogatories, and admissions on file – it must designate specific facts showing that there is a genuine issue for trial. *Id.*

The underlying substantive law identifies which facts are material and which are irrelevant. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). All reasonable doubts about the facts and all justifiable inferences are resolved in favor

of the non-movant. *Chapman*, 229 F.3d at 1023. Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. *Anderson*, 477 U.S. at 248. A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* If the evidence presented by the non-movant to rebut the moving party's evidence is merely colorable, or is not significantly probative, summary judgment may still be granted. *Id.* at 249.

How the movant may satisfy its initial evidentiary burden depends on whether that party bears the burden of proof on the given legal issues at trial. *Fitzpatrick v. City of Atlanta*, 2 F.3d 1112, 1115 (11th Cir. 1993). If the movant bears the burden of proof on the given issue or issues at trial, then it can only meet its burden on summary judgment by presenting *affirmative* evidence showing the absence of a genuine issue of material fact – that is, facts that would entitle it to a directed verdict if not controverted at trial. *Id.* (citation omitted). Once the moving party makes such an affirmative showing, the burden shifts to the non-moving party to produce "significant, probative *evidence* demonstrating the existence of a triable issue of fact." *Id.* (citation omitted) (emphasis added).

For issues on which the movant does not bear the burden of proof at trial, it can satisfy its initial burden on summary judgment in either of two ways. *Id.* at 1115-16.

5

First, the movant may simply show that there is an absence of evidence to support the non-movant's case on the particular issue at hand. *Id.* at 1116. In such an instance, the non-movant must rebut by either (1) showing that the record in fact contains supporting evidence sufficient to withstand a directed verdict motion, or (2) proffering evidence sufficient to withstand a directed verdict motion at trial based on the alleged evidentiary deficiency. *Id.* at 1116-17. When responding, the non-movant may no longer rest on mere allegations; instead, it must set forth evidence of specific facts. *Lewis v. Casey*, 518 U.S. 343, 358 (1996). The second method a movant in this position may use to discharge its burden is to provide affirmative *evidence* demonstrating that the non-moving party will be unable to prove its case at trial. *Fitzpatrick*, 2 F.3d at 1116. When this occurs, the non-movant must rebut by offering *evidence* sufficient to withstand a directed verdict at trial on the material fact sought to be negated. *Id.*

## III.   FACTS

### A.   <u>An Introductory Note</u>

In its reply brief, the Defendant did not respond to the facts proffered by Dates in opposition to the Motion for Summary Judgment.[3] This Court's Uniform Initial

---

[3]  The Defendant notes that Dates's response brief, along with Dates's declaration, were filed "after this Court's deadline."  (Doc. 43 at 7, n. 2).  The Defendant states that they should both be stricken and summary judgment granted to the Defendant "on that basis alone."  (Doc. 43

Order states:

> The reply submission, if any, shall consist of only the moving party's disputes, if any, with the non-moving party's additional claimed undisputed facts. The moving party's response to the non-moving party's additional claimed undisputed facts shall be in separately numbered paragraphs that coincide with those of the non-moving party's additional claimed undisputed facts. Any statements of fact that are disputed by the moving party must be followed by a specific reference to those portions of the evidentiary record upon which the disputation is based. *All additional material facts set forth in the statement required of the opposing parties will be deemed to be admitted for summary judgment purposes unless controverted by the statement of the movant.*

(Doc. 2 at 18-19) (emphasis in original). The Defendant's failure to reply to Dates's proffered facts means that all facts proffered by Dates <u>should</u> be deemed to be admitted for the purpose of ruling on the Motion for Summary judgment.

The Court also cannot ignore facts proffered in the Defendant's initial brief in support of its motion, and Dates's response to those facts. Dates admitted some of

---

at 7-8, n. 2).  In Dates's response brief, she notes:

> Plaintiff regrets exceeding the 50 page limit by one page. Counsel realized about two hours before the filing deadline that they had used a 0.89 in margin, inadvertently, which added five pages, when corrected. Last minute editing resulted in the filing of this Memorandum about half an hour late, as well.

(Doc. 39 at 53, n. 23).  The Court notes that the deadline to file the brief was September 4, 2015. (Doc. 38).  It was filed at 12:42 am, Central Standard Time, on September 5, 2015.  (Doc. 39–filing receipt). Considering the reason for the late filing, the fact that Dates recognized and apologized for the late filing at the time, Defendant's total failure to allege, much less show, any prejudice to it from the lateness of the filing, and the fact that the brief (and supporting evidence) were only <u>minutes</u> late, the court will not strike them.  The irony in the Defendant making this argument, when it has failed to follow this Court's Uniform Initial Order by failing to respond to Dates's proffered facts, is not lost on the Court.

those fact and denied others. Of course the Court must, and has, resolved any evidentiarily-supported factual disputes in the light most favorable to the non-movant.[4] This process sometimes creates an inconsistency with Dates's facts which are "deemed admitted." Further, many of the facts proffered by Dates lack context, making them difficult to mesh with the Defendant's facts. Also, some of Dates's facts contain color words and argument, which are inappropriate to deem as "admitted."

To resolve this problem, the Court first used the Defendant's proffered facts, resolved (if disputed) in the light most favorable to Dates, as a starting point. Then, the Court has incorporated the Plaintiff's "deemed admitted" facts where appropriate, omitting argument and color words. If such incorporation was impossible because an inconsistency was created, the Court ignored any "admission," examined all of the evidence cited, from scratch, and cast the facts in the light most favorable to Dates.[5]

### B.   <u>Dates's Hiring and the Managerial Hierarchy at Milo's</u>

Isha Dates began working as a cashier for the Defendant, at its Inverness

---

[4] To the extent that Dates disputed any of the Defendant's facts, the Court first examined whether the fact, as stated by the Defendant, was supported in the record by evidence cited by the Defendant.  If it was not, the fact was not included.  If it was, the Court then looked to see if the evidence cited by Dates in dispute of that fact supported the dispute.  If it did, the Court considered the fact, as it must, in the light most favorable to Dates.

[5] Unfortunately, merely examining the evidence leads to problems as well.  In particular, Dates's account of events is, to say the least, imprecise.  In her deposition, she has difficulty remembering specific dates and times, often cannot say for sure what happened in her interactions with individuals employed by the Defendant, and is not always consistent with her accounts of events.  Regardless, the court has "soldiered on."

location, on or about August 8, 2012. She reported to two Assistant Managers, Carmen Miles and Cornelius Jackson. Jackson reported to Al Tomlin, the Area Manager, who reported to Robert Litton, the Operations Manager. Louise McDaniel was the head of Human Resources. McDaniel reported to the CEO, Tom Dekle.

Miles had the authority to take tangible employment actions. She could reduce the number of hours the employees worked. Miles also had the authority to suspend employees, which not only reduced their compensation, but was a form of discipline.

### C.   Policy Acknowledgments

At the time Dates was hired, she signed an "Employee Sign Off Sheet." By doing so, she acknowledged that she read and understood the Defendant's "WHAT EVERY MILO'S EMPLOYEE SHOULD KNOW" handbook, outlining company policy on the prevention of a hostile work environment, among other things. This document clearly states:

> All employees are entitled to a hostile-free work environment. Bullying, threats, harassment, fighting and/or any other behavior that may cause or lead to a hostile work environment will not be tolerated and is immediate grounds for termination.

(Doc. 31-2 at 1).

By signing her "Employee Sign Off Sheet," Dates also acknowledged that she read and understood "Milo's Hamburgers Policy on the Prevention of Sexual

Harassment," and the Defendant's "Corporate Sexual Harassment Policy." These documents clearly state that the Defendant: "[p]rohibits any form of harassment of our employees, whether such harassment is lawful or unlawful. It is never justifiable to harass one of our employees because of the employee's race, color, sex, sexual orientation, weight, religion, national origin, age, disability or any other reason." (Doc. 31-4 at 1). The Defendant's Handbook also states:

> The Company will not tolerate you being harassed. You must not tolerate it either. If you believe you are being harassed, immediately report the matter to Louise McDaniel, Director of Operations / Marketing […]. If you should feel uncomfortable reporting the problem to McDaniel, then report it to Tom Dekle […]. The Management in the General Office will fairly and promptly investigate every sexual harassment complaint. Proven offenses will result in disciplinary action up to and including dismissal, and may lead to personal, legal and financial liability.

(Doc. 31-4 at 1).

### D. Miles's Alleged Harassment of Dates

Dates claims that Miles sexually harassed her beginning in September of 2012, and continuing approximately every other day. The harassment was both physical and verbal, with physical harassment sometimes accompanied by verbal harassment. Dates testified that there were "plenty" of incidents of harassment. She could not recount each and every one of them, but described multiple specific examples.

10

### 1.    *The "Catching Eyes" Call*

Dates claims her first incident with Miles occurred on September 3, 2012[6], when Dates, from a car, called in to work to see what time her shift started. Dates claims that, during that call, Miles told Dates that the other employees were telling each other that Dates and Miles had been "catching eyes." Dates interpreted this statement as Miles "coming on" to her. During that same conversation, Dates told Miles, in explicit terms, that she was not interested in women. According to Dates, LaKosha Posey was in the car with her when this conversation occurred, and should have overheard it. (Doc. 34-5 at 2(167)).[7] According to Dates, from that time on, Miles "started like rubbing up against me and saying little stuff like she wanted to take me out and . . . she would like rub against my breast." (Doc. 39-7 at 193).

### 2.    *The Freezer Incident*

Dates describes an incident with Miles which occurred in the Defendant's cooler/freezer a few days after the phone call between Dates and Miles.[8] Dates says she bent over in the cooler to pick up some tea and Miles walked by her and rubbed

---

[6]  This was about 1 month after Dates began working for the Defendant.

[7]  In her declaration, Posey states that she did not overhear any such conversation.  (Doc. 31-7 at 2, ¶10).

[8]  Dates testified that this incident occurred "at least 5 and probably less than 10" days after the initial "catching eyes" phone call.  (Doc. 39-7 at 216).

up against Dates's buttocks. Dates believed the contact to be both intentional and harassing because the cooler was not so small that the two had to come into contact, and because Miles looked back at Dates after she passed her by and smiled. When asked in her deposition if the smiles Dates received from Miles could be interpreted by others as something other than a "come on," Dates testified: "the rest of the girls . . . they probably did take it that way . . . as a joke not knowing that, you know, I'm serious about it, and I don't want to play like that because that's not what I come out there for." (Doc. 35-1 at 6(302)).

### 3.   *The Fry Station Incident*

Dates described another incident[9] which occurred at the fry station where Miles allegedly reached past Dates with a pair of tongs and her forearm brushed against Dates's breast. Dates believed the contact was also intentional and harassing because Miles smirked at her when it happened, and because there was enough room at the fry station so that contact should not have occurred. Dates claims Annetta Datcher was standing close by and saw the incident. (Doc. 34-6 at 6(223)).[10] Dates acknowledged

_____

[9]   The Defendant refers to this as the "next incident."  (Doc. 30 at 17).  In her deposition, the plaintiff does not refer to this as the "next incident."  Instead, when asked "When was the next thing that happened between you and Carmen?" she testified: "Like I say, I'm not going to be able to give you it in order," then began to describe the fry station incident.  (Doc. 34-6 at 5(218)).  The plaintiff testified: "Just like every other day, it was something." (Doc. 35-1 at 9(314)).

[10]   Annetta Datcher denies witnessing the incident. (Doc. 31-5 at 1, ¶6).

12

that the incident might have been caught on the restaurant's internal surveillance video, but that she never attempted to view or show anyone the tape. Dates also testified that this specific contact happened again, "several times." (Doc. 39-7 at 218).

### 4.    *The Parking Lot Incident*

Dates described another incident which allegedly occurred in the parking lot of the Defendant's store in Inverness. Dates, Miles, LaKosha Posey, and Cora Datcher were all walking to their cars. According to Dates, Miles was walking behind her and said loudly: "I'm going to still take you out. I'm going to come down there." (Doc. 39-7 at 235).

### 5.    *The Drive Through Incident*

While they were working at the drive-through, Miles brushed up against Dates. Dates testified: "[S]he come by and brushed up against me. And it was mainly, you know, she was just either rubbing up against me or from behind. It was uncomfortable [is] all I can say." (Doc. 39-7 at 239).[11]

### 6.    *Comments by Miles*

Dates also stated:

[Miles] did get around to saying that she wanted to take me out and do

---

[11]  Dates also admitted that other employees had brushed up against her in the kitchen because of the confined space, but Dates thought the situation with Miles "to be different." (Doc. 32-2 at 1).

13

all kinds -- you know, I want to take you out and I love you, you got a big butt and all this stuff. And that was very uncomfortable coming from a woman, and I got a steady boyfriend. And I wasn't comfortable with that at all.

(Doc. 39-7 at 163-164).

### 7.   *Witnesses*

Cornelius Jackson, Assistant Manager at the Inverness Milos, stated in his

declaration that he

> heard/witnessed manager Carmen Miles make inappropriate sexual comments/gestures to Ms. Dates on several occasions at work. I heard her repeatedly ask Ms. Dates to go out with her after work, witnessed Ms. Miles follow Ms. Dates into the cooler area and out to her car, even after Ms. Dates made it clear these comments were unwanted and made Ms. Dates feel very uncomfortable. I also saw Ms. Miles touch Ms. Dates['s] behind, on at least one occasion. Ms. Miles also made it known she was attracted to Ms. Dates "Isha is the type of girl I like, heavyset and big boned."

(Doc. 39-10 at 1, ¶3).[12]  Although she denied telling Dates that she liked <u>her</u> because

she was "big boned," Miles testified that she could have made a comment that she

liked big boned women. (Doc. 39-5 at 29).

Litton, in an interview he gave to the EEOC, was asked whether he had ever

seen Miles touch Dates. Litton responded "[t]here was a good chance I did[.]" (Doc.

39-11 at 2). Miles agreed that Litton may have seen her touch Dates. (Doc. 39-5 at

---

[12]  No objection to or motion to strike this declaration, or any part of it, has been made.

14

63-64).[13]

### 8. *The Cut in Hours*

After Dates had been subjected to the aforementioned conduct and indicated her lack of interest, her work hours began dropping. Miles admits she changed Dates's schedule and cut her hours. In her deposition, Miles denies retaliating against Dates, but testified:

> Q.     Okay. Did -- well, were Ms. Dates['s] hours shortened during the time of her employment at Milo's?
>
> A.     Yes.
>
> Q.     Okay. Do you have an understanding why that occurred?

---

[13] As noted, the Defendant failed to dispute <u>any</u> of the facts proffered by Dates. Instead, <u>in the argument section of its brief</u>, the Defendant writes:

> A close reading of her deposition testimony will reveal that Miles['s] statement that she liked a certain type of woman was taken out of context, as Miles was not admitting to making that statement to Dates, or in a derogatory manner. (Ex. 14, p. 29/8-23.)  Further, the summary by the EEOC of Rob Litton's statement that he "may have seen Miles touch Ms. Dates" was also taken out of context by Dates, as it was asked and answered in the context of describing the close quarters typical of any fast food restaurant and made in reference to Miles unintentionally touching Dates. (Ex. 14, 63/17-64/18; Dates' Ex. 11, EEOC Interview of Litton, 3-6-2014.)

(Doc. 43 at 16).  The Court has already noted the context in which Miles agreed to making the "big boned" comment.  Litton's statement, as written by the Court, speaks for itself.  The argument section of the Defendant's reply brief also addresses, but fails to dispute, Jackson's declaration.  It merely asks the Court to discount his declaration because he is allegedly "a known conspirator in the accusation of attempted bribery and suborning perjury by Annetta Datcher." (Doc. 43 at 15).  Yet, "[c]redibility determinations at the summary judgment stage are impermissible."  *Moorman v. UnumProvident Corp.*, 464 F.3d 1260, 1272 n. 1 (11th Cir. 2006).

A.      Yes.

Q.      And what is that?

A.      Her hours were shortened because she said that I was working her six days and she wasn't getting 40 hours. She had four kids and she could not longer work at night.

Q.      Did she specify after what hour of the day she could no longer work?

A.      She said she needed to be gone by 3 p.m.

Q.      Okay. Had she been working past 3 p.m. before that conversation?

A.      Yes.

Q.      Okay. And what did you do in response to that request by Ms. Dates?

A.      I changed her schedule.

Q.      Did you do so to retaliate against her for any reason?

A.      No.

(Doc. 39-5 at 54-55).

Dates states that she probably did ask to work fewer nights. (Doc. 35-1 at 2(287)). She explained in her deposition that, from time to time, she had been asked to help out on Wednesday nights, but, when her managers began to regularly schedule her on Wednesdays, she asked them not to do that. (Doc. 35-1 at 2(287)).

16

**E.**     **Dates's Complaints and the Defendant's Investigation**

    **1.**     *Complaints to Jackson*

Dates testified to telling Jackson "every time an incident [with Miles] happened." (Doc. 39-7 at 218; 39-7 at 234). Dates claims Jackson told her to keep a written record of any incidents that made Dates uncomfortable, but she did not.

On September 3, 2012, the same day that Miles made the "catching eyes" comment to Dates, Dates complained to Jackson about the comment.[14] She says that this complaint occurred shortly after the call, when Dates arrived at the store. Dates told Jackson because he was the only manager present. She told Jackson that she was "uncomfortable with what [Miles] had said." (Doc. 39-7 at 177). Jackson, consistent with the Defendant's policies, told Dates to complain to Al Tomlin, and Louise McDaniel.[15] Jackson did not address the issue with Miles or her superiors himself. Dates declined to report the matter to management beyond Jackson at the time because she was afraid she might lose her job.

Sometime between September 8th and September 13th, Dates also complained to Jackson when Miles touched her in the cooler. (Doc. 39-7 at 210). Dates testified:

---

[14] Dates says that she also complained that day to Cora Datcher and Annetta Datcher. Cora and Annetta Datcher are sisters, and they worked at the same store as Dates. She said that she told the Datchers because they were her friends.

[15] Dates stated: "[H]e told me to first talk to Al, then go to Ms. McDaniel." (Doc. 39-7 at 178-179).

He asked me was I serious. Did she do it again? I said, CJ, yes. Why
would I – I don't have a reason to sit up here and, you know, lie about
something that's going on and I'm uncomfortable with, you know. And,
I mean, and I told him, I was like, CJ, I'm going to have to do something
or either, you know, I'm going to have to find another job because I
don't want to get fired by saying anything to her out the way, and, I
mean.

(Doc. 39-7 at 210-211).    Dates stated that, in this conversation with Jackson, she was

concerned "not only about the way [she was] being treated, [but also] about the

consequences of opposing it." (Doc. 39-7 at 215).

Dates also reported to Jackson the incident in the parking lot where Miles

stated she was going to take Dates "out." (Doc. 39-7 at 236).

### 2.    *Complaints to Tomlin, McDaniel, and Dekle*

After complaining to Jackson, Dates complained about the alleged harassment

and cut in hours to Area Manager Al Tomlin, and to Louise McDaniel, the

Defendant's Director of Operations and its Chief Human Resources Officer. (Doc.

39-7 at 278; doc. 39-7 at 294). She also complained to CEO Tom Dekle.

At first, she could not remember to whom she complained first. (Doc. 39-7 at

278).  She then stated "it was Al [Tomlin] because he was, you know, he was at the

store more so. It was him, then Ms. McDaniel." (Doc. 39-7 at 278). Later, she

testified that she spoke to Tomlin <u>after</u> she spoke with McDaniel. (Doc. 39-7 at 294).

### a.   Tomlin

Dates cannot remember the date of her complaint to Tomlin. (Doc. 39-7 at 278). She does remember that her complaint to Tomlin was in person, "one morning that [Dates] was coming in." (Doc. 39-7 at 278). She did not remember whether she brought just one incident of harassment to his attention, or the harassment as a whole, but stated: "I know I did talk to him and mention to him what was going on and about my hours being cut because that's when my hours started dropping and stuff." (Doc. 39-7 at 279). She then testified that she "was complaining about the sexual harassment and [her] hours." (Doc. 39-7 at 280).

"[Tomlin] kind of really didn't want to hear it. He was trying to brush it off like it wasn't nothing, like for me just to leave it alone." (Doc. 39-7 at 275). The following exchange took place in Dates's deposition:

> Q.   I get the impression from your testimony that it's your belief that Mr. Tomlin, Al, kind of blew you off when you came to talk to him about Carmen?
>
> A.   And he did.

(Doc. 39-7 at 281-282). Dates later testified that Tomlin "really didn't want to hear it. He brushed [me] off." (Doc. 39-7 at 293).

### b.   McDaniel

#### (1)   The First Phone Call on September 27, 2012

Dates's initial communication with McDaniel was by phone on September 27, 2012. (Doc. 39-7 at 295; doc. 39-7 at 304).[16] Dates testified: "I told her what was going on about [Miles] sexually harassing me and about my hours being cut." (Doc. 39-7 at 295).[17] Dates told McDaniel that Miles was "rubbing up against" her. (Doc.

---

[16] The separate accounts of the interactions between Miles and Dates caused much of the difficulty in meshing the "deemed admitted" facts with those of the Defendant. Dates first testified that she did not remember the date she initially called McDaniel to complain about sexual harassment. (Doc. 39-7 at 295). After further questioning, she agreed that it was September 27, 2012. McDaniel remembers it occurring in "early October." (Doc. 39-9 at 35). Regardless, the Defendant's proffered fact number 39 states that this first call occurred on September 27, 2012. (Doc. 30 at 19). That fact was not disputed by Dates, despite the fact that the exchange in Dates's deposition indicates that this call was for an entirely different reason. In Dates's deposition, deposing counsel stated:

> Now I have a record that we have produced to your attorneys. It's dated September 27th of 2002. It says, Isha Dates just called wanted to speak to someone immediately about an incident that she just had at Inverness with [Tomlin] and [Miles]. She said that she and [Miles] had a disagreement, and [Tomlin] put her out of the store. She asked [Tomlin] if they could pull her drawer before she left so no one would accuse her of being over or short, but he just yelled and told her to get out. She said he was yelling and screaming at her in front of customers. And she wants to speak to someone at soon as possible. She was in the parking lot at Inverness when she called. Her phone number is 256-404-8846.

(Doc. 39-7 at 296). Dates agreed that there was a non-harassment related problem that day that she called about. (Doc. 39-7 at 296-297). Then, confusingly, she states that that call occurred "in the middle of [her] first EEOC." (Doc. 39-7 at 297). Still later, she could not recall whether her first call was to complain about sexual harassment. (Doc. 39-7 at 300).

[17] Dates testified that she "let [McDaniel] know about the sexual harassment and [she] had talked to, I think, [Jackson]. . . . [A]t the time I let her know also about my hours because, you know, like I said, she had told us if we had any problem, you know, to call and talk to her first." (Doc. 39-7 at 305-306). It is unclear why McDaniel would have already spoken to Jackson if this was Dates's first call about these issues.

35-1 at 7(306)).[18] Dates also testified that she specifically used the words "sexual harassment" when speaking with McDaniel. (Doc, 35-1 at 7(306)).[19] Dates told McDaniel that Dates had told Miles she was "not interested." (Doc. 39-7 at 309-310).

Dates states that McDaniel told her to speak to Miles directly. (Doc. 39-7 at 295). The following exchange took place in Dates's deposition:

> Q.     Okay. What did Ms. McDaniel tell you when you told her those things in the call?
>
> A.     She told me to talk to [Miles] myself. She was like, have you talked to [Miles]? And I said, well, I did tell her to stop, that I wasn't on that level. . . . And, you know, it was just like she wasn't going to even try to deal with [Miles] because she didn't say anything about it at the sometime [sic]. She told me to go and talk to [Miles]. That's just like add fuel to fire. I'm not going to do that, you know. And knowing me and this woman already having problems, you know, and it was just like – I don't know.

(Doc. 39-7 at 307-308; *see also* doc. 39-7 at 295 ("She told me to talk to [Miles].")).

McDaniel told Dates to call back if it ever happened again. (Doc. 39-7 at 308-309;

---

[18]   McDaniel testified: "I got a call from [Dates] that said that – she was complaining about her hours.  Also made  mention that [Miles] had <u>brushed up</u> against her – that was her only statement – in the drive-through."  (Doc. 32-1 at 9(35)) (emphasis added).  The following fact, proffered by Dates, was not disputed by the Defendant:

> 162.    McDaniel admits that [] Dates specifically told her about Miles <u>rubbing up</u> against [] Dates's buttocks. Ex. 7, 306/13-21; Ex. 9, 25/11-24.

(Doc. 39 at 18) (emphasis added).

[19]   McDaniel conceded that, by complaining to her, Dates correctly followed the reporting procedure set out in Defendant's sexual harassment policy.  (Doc. 39-9 at 59).

312).[20] The Defendant admits that, following this call, Dates's hours were further

reduced, and, within two days, Miles began again to touch and rub on Dates.[21]

### (2)    The Second Phone Call

Dates says she called McDaniel a second time on October 15, 2012.[22] When

asked what precipitated the second call, Dates stated: "Because once again, my hours

_____

[20]  The following fact, proffered by Dates, was not disputed by the Defendant:

163.    McDaniel asked [] Dates if she had asked Miles to stop. [] Dates replied
that she had. McDaniel told her to go talk to Miles again, herself.  Ex. 7,
295/13-20, 307/22-308/12. McDaniel simply told her to call back if it happened
again. Id. 308/18-309/2. Miles later told the EEOC that McDaniel had not
interviewed her about [] Dates's complaint.  Ex. 8.

(Doc. 39 at 18).

[21]   The following fact, proffered by Dates, was not disputed by the Defendant:

165.    Following the call, [] Dates['s] hours were further reduced, and within two
days, Miles continued to physically harass her: "she was still touching,
rubbing....she was - it didn't stop like at all." Ex. 7, 314/3-23.

(Doc. 39 at 19).

[22]  Dates agrees that her second phone call with McDaniel was October 15, 2012.  (Doc.
39-7 at 321-322; doc. 39-7 at 313-314; doc. 39-7 at 341).  McDaniel also testified to a second
phone call. (Doc. 39-9 at 37 – "Then she called after that.").  However, McDaniel contends that
the two actually met in person on October 15th.   (Doc. 39-9 at 38).  She stated:

And that's when she told me that she had witnesses then. She didn't have
witnesses the first conversation, but the second time she had Lakosha Posey and
Annetta Datcher as witnesses. And at that time, she had said in the drive-through,
but then she added to her story, which was different than the first, that it was in
the cooler.

(Doc. 39-9 at 38-39).  Dates denies having ever met McDaniel prior to October 22, 2012.  (Doc.
39-7 at 343) ("[T]he only time that I talked to Ms. McDaniel was at -- when she talked to all of
us that day.").

22

were going down and she was still touching, rubbing, or whatever the word we're

going to use, she was – it didn't stop like at all." (Doc. 39-7 at 314). When asked why

she waited two or three weeks [from September 27, 2012][23] to call McDaniel again,

despite the fact that harassment was occurring "every other day" (doc. 39-7 at 314),

Dates stated: "Because Ms. McDaniel was – because I called [CEO Tom Dekle]

thinking that Tom was going to call me, and I didn't hear anything from him." (Doc.

39-7 at 315). Also, Dates testified that she had tried to call McDaniel before this time

(and after the first call) but could not reach her.[24]

---

[23] Again, Dates stated that she first called McDaniel on this date.  McDaniel thinks it was
in early October.

[24] Dates then stated:

I called CEO. And I did call Ms. McDaniel back, but I did not get an answer from
her. That's when I start contacting [Dekle] because I was -- after, like, the first or
second time that I talked to Ms. McDaniel, she told -- I mean, when I called, it
was just like she wasn't -- I wasn't able to talk to her.

(Doc. 39-7 at 315). The following facts, proffered by Dates in opposition to the Motion for
Summary Judgment, were not disputed by the Defendant, and are therefore deemed admitted:

173.    [] Dates called McDaniel again but could not reach her. Ex. 7,
315/6-12, 308/18-309/5,  312/20-313/2.

174.    As Assistant Manger [sic] Jackson stated under oath:

Ms. Dates did call Ms. McDaniel several times, her calls
were not returned. I know this because I witnessed Ms. Dates
calling Ms. McDaniel once, and she told me she called her on a
few other occasions. . . .    Ex. 10 at  4

(Doc. 39 at 21).

Although Dates cannot specifically remember what she told McDaniel in that second phone call, she knew that it was pertaining to sexual harassment and hours being cut. (Doc. 39-7 at 322).   The following exchange took place in Dates's deposition:

Q.    Did she say anything different to you or what did she say to you?

A.    I don't remember what she said. All I know she wasn't very happy about it. And, like I said, she act like she didn't care, so, you know.

Q.    Ma'am, in what way did she act like she was not happy about it and didn't care?

A.    I mean, because she just -- the stuff that she was saying, I can't remember, but I know whatever it was, it kind of made me upset because it felt like I was -- the help that I thought that I would have from my job that I -- I didn't have it.

Q.    Got you. What I'm asking for is, give me the evidence, give me the proof. What did she say or what type of things did she say to create that impression in you that you weren't getting the help you were certainly entitled to?

A.    I mean, I can't recall what she said, Mister. And, I mean, I just don't remember what she said. But whatever she said, I know it made me feel as if my work didn't count for nothing, like I'm just talking, you know, and it wasn't anything like that.

(Doc. 39-7 at 324).

During this second phone call, Dates told McDaniel that Annetta Datcher was

a witness to the harassment. (Doc. 39-7 at 275-276).

### 3.   *Dekle*

The following facts, proffered by Dates in opposition to the Motion for Summary Judgment, were not disputed by the Defendant and are therefore deemed to be admitted:

176.   [] Dates testified that "[Jackson] gave me Tom [Dekle]'s number after I talked to Ms. Louise [McDaniel] and Al [Tomlin] and all that stuff." Ex. 7, 192/6-8.[]

177.   [] Dates called Tom Dekle, Defendant's CEO, several times. She first left him a voicemail (produced by Milo's), on or about October 8, 2012, stating in pertinent part:

> I need to talk to you about something that has been going on in the store. When you get my message, can you please please call me back, cause I been tryin' to reach you for about a week, but I just got your number. So if you can please give me a call as soon as possible . . . Ex. 7, 315/1-21; 277/2-10; Ex. 9, 36/7-9.

178.   [] Dates called Dekle a second time from her coworker LaKosha Posey's telephone to see if he would pick up, but he did not answer or return her calls. Ex. 7, 317/2-23, 319/18-320/1.

179.   CEO Dekle told McDaniel about the voicemails []. Ex. 9, 36/7-9 ("Q.· · ·Were you aware that she also left a voicemail for Mr. Dekle about having issues? A.· · ·Yes.").

180.   McDaniel testified that it was uncommon for crew members to call Mr. Dekle, Ex. 9, 36/10-15 [].

(Doc. 39 at 21-22).

## F.      The Investigation[25]

Dates agrees that McDaniel immediately began her investigation after the first

phone call.[26] After either the first or second call from Dates[27], McDaniel immediately

––––––––––––––––––––––

[25]   The nature and timing of what occurred during the investigation is unclear because, as previously stated, McDaniel, the main source of facts regarding the investigation, remembers first contact between her and Dates differently than Dates does.  McDaniel testified that her first contact with Dates on this issue was "[i]n early October."  (Doc. 39-9 at 35).  McDaniel testified:

> I was going to set up a meeting, I think it was like October 11th, with Isha. She had requested that her call initially was my hours and about the bumping up [sic]. And I asked her at that time were there witnesses. And she said she didn't know. She hadn't really talked to anyone about that. I told her I would talk to [Miles], talk to the area manager, and look at tape to see if I could see anything. And advised her to please let me know immediately should it happen again, time frames, because we could focus in on that with the video. And that, you know, I would certainly let her know the outcome of that investigation. . . . I started the preliminary investigation of – had, you know, had [Tomlin] looking at the tapes and also looking about her hours as well to see what had happened there, which I knew she had already complained about her hours before. Not to me, but from others.

(Doc. 32-1 at 10(37)).  According to McDaniel, she and Dates met on the 11th (doc. 39-9 at 40), but Dates "failed to get there on time and I had another meeting that I had to go to. So I said let's [re-]schedule" (doc. 39-9 at 37).  McDaniel says Dates "was going to let me know when we could meet again. So she called."  (Doc. 39–9 at 40).  McDaniel says they "couldn't schedule that again until, I think, somewhere around the 15th."  (Doc. 39-9 at 37-38).

[26]   The Court is aware of the following exchange which took place in Dates's deposition:

> Q.      Is it your belief and your testimony as you sit here today that after your first complaint to Ms. McDaniel, she did nothing?

> A.      She did nothing.

(Doc. 39-7 at 325).  However, the Defendant has proffered the following fact in support of its motion:

> 41.      McDaniel immediately began her investigation into Dates'[s] allegation of Miles'[s] "brushing up against her." (Ex. 11, p. 37, 16-18.)

spoke to Annetta Datcher by phone.[28] McDaniel then set up interviews with

---

(Doc. 30 at 19).  Dates only disputed the "brush[ing] up against her" phrasing used by the Defendant.  (Doc. 39 at 6, 7).  Instead, Dates contended that she complained of "rubbing" against her and "sexual harassment."  (*Id.*)  Dates did not dispute that the investigation immediately began.  Further, Dates's unsubstantiated "belief" as to whether McDaniel did anything is not probative of whether McDaniel actually did anything.

That having been said, this "admission" is difficult to mesh with the fact that Dates, in her deposition, agreed to the following chronology:

– On October 15, 2012, she called McDaniel for the second time.
– On October 16, 2012, McDaniel started interviewing witnesses.
– On October 22, 2012, McDaniel completed her investigation and spoke with Dates.

(Doc. 39-7 at 341).  As will be shown, this chronology is also inconsistent with McDaniel's undisputed testimony about how she conducted her investigation after the first call.

[27]  Again, the parties have not been clear on these issues.

[28]  Dates testified

I talked to Ms. McDaniel on the phone finally one morning at work and she was like, just go talk to [Miles] and tell her this. I was like, well, Ms. McDaniel, I have already told [Miles] to leave me alone, that I'm not interested, that's not what I want. And so it was just like, okay. And I told her that Annetta [Datcher] knew, so immediately she hung up with me. I went back in the store.  She called the store. [Jackson] answered the phone. And she talked to Annetta or either [Jackson].

(Doc. 39-7 at 275-276).  Dates testified that McDaniel

was saying that she was going to go in and – that she was going to call Annetta [Datcher] or [Jackson] and ask them something. Like immediately when I hung up, she called them and said something. I mean, I know they were in the office because, you know, we was sitting there and all stepped out so they could talk or whatever. But I don't know what was said.

(Doc. 39-7 at 310-311).  When she was asked how she knew that McDaniel called, Dates testified:

Because [Jackson] was in the office. And I went in there and told him, I was like, well, Ms. McDaniel said she's fixing to call and set up a conference with Annetta [Datcher]. She wanted to talk to everybody separate. And she called immediately.

witnesses. (Doc. 39-9 at 40).[29]

### 1.   *Personal Interview with Annetta Datcher*

McDaniel says she met with Annetta Datcher on October 16, 2012[30], who

_____

> I told Annetta, I said, Ms. McDaniel fixing to call you. So she called. And she
> went in there, and she talked to her.

(Doc. 39-7 at 311).  Dates stated that at that moment it was only Annetta Datcher to whom
McDaniel spoke.  (Doc. 39-7 at 311-312).

[29]  As noted previously, in her deposition, Dates agreed to the following chronology,
which was suggested by the Defendant's counsel:

> – On October 15, 2012, Dates called McDaniel for the second time.
> – On October 16, 2012, McDaniel started interviewing witnesses.
> – On October 22, 2012, McDaniel completed her investigation and spoke with Dates.

(Doc. 39-7 at 341).    This chronology is inconsistent with McDaniel having interviewed
witnesses after the <u>first</u> phone call.

The court also notes that the transcript from Dates's deposition, in which this chronology
was first suggested by counsel for the Defendant, actually has "October 27" as the date the
investigation was completed and McDaniel spoke with Dates.  However, in light of the other
evidence in the case, this appears to be an error.  Dates agrees that the meeting with McDaniel
took place the same day she filed her EEOC charge–October 22. She also agreed that the
investigation was completed a week after she complained the second time.

[30]  Dates testified that "a couple [of] days [after her call to McDaniel, McDaniel] came
down [in person] and talked to . . . the three girls that I was letting you know about."   (Doc. 39-7
at 276)  The following exchange took place in Dates's deposition:

> Q.      . . . You have the conversation with her on the phone. Then she comes out
>         and she actually speaks to folks at Inverness. Do you remember how much
>         time passed between the two things, the two events?
>
> A.      I don't.
>
> Q.      Days, weeks, months?
>
> A.      It may have been days or weeks.

28

advised she had "never" seen Miles say or do anything inappropriate. Datcher's recollection of that interview is consistent with McDaniel's recollection and memorialization in her Investigation Summary Memorandum. Datcher further stated Miles was a "by the book" manager and expected everyone to follow policies and procedures, and when this did not happen, she professionally advised the employee she would take appropriate disciplinary action when needed. Datcher also stated that Dates had a problem with authority and frequently acted insubordinate at work, creating a disruptive environment. Datcher also advised McDaniel that she was friends with Dates but she "will not lie for even my friend to get someone in trouble." (Doc. 32-1 at 11(42)).

### 2. *Personal Interview with Lakosha Posey*

McDaniel met with Lakosha Posey, who indicated she saw Miles brush up

---

Q.   Okay. Do you have any reason to disagree with Ms. McDaniel's recollection that it was the next day after y'all spoke on the phone, October 16th of 2012?

A.   I don't recall. I don't remember.

Q.   You're in no position to disagree with that because you don't remember?

A.   I don't remember.

(Doc. 39-7 at 328).

against Dates one time, several weeks before, at the front drink counter.[31] Posey could not say if it was accidental or intentional, but she had never seen such action occur before the event or subsequent to it. Posey had also never heard anything inappropriate said between Dates and Miles.

### 3.    *Personal Interview with Sarah Rourke*

Sarah Rourke, another of the Defendant's employees, said she never saw or heard anything inappropriate between Miles and Dates.

### 4.    *No Interview with Carmen Miles or Other Potential Witnesses*

The record contains a typewritten, unsworn document, dated October 22, 2012, which is entitled "Summary of Investigation Regarding Isha Dates." (Doc. 32-2 at 1). This document, apparently prepared by McDaniel, contains the following language: "I spoke with [Miles], and she assured me nothing inappropriate had happened. I talked with the other managers, including Area Manager, Al Tomlin, and no one had ever witnessed anything inappropriate. (Doc. 32-2 at 1).[32] Interview notes from the

---

[31] McDaniel stated that "it was like, I think, on the 15th and 16th that I interviewed Annetta and [Lakosha], and then I met with Isha on the 22nd." (Doc. 39-9 at 57).

[32] Dates states that the "sole support" for these facts are "unsworn, non-contemporaneous . . . notes." (Doc. 39 at 7). Rule 56(c)(2) provides that "[a] party may object that the material cited to support or dispute a fact cannot be presented in a form that would be admissible in evidence." FED. R. CIV. P. 56(c)(2). Dates's response stops short of <u>objecting to</u>, or otherwise moving to strike this evidence. Further, it would be unfair to the Defendant to treat these vague statements as "objections" when the Defendant was not clearly put on notice that it needed to respond. Clear notice would have been given by a separately filed motion to strike. No such

EEOC's "On Site Investigation" interview with Miles recount that Miles states that she was not interviewed as part of the investigation of this incident. (Doc. 39-8 at 2).[33] The Defendant admits that there were other employees who could have been interviewed, but were not.[34]

_____

motion was filed.

[33] Ironically (*see* footnote 32), this fact, proffered by Dates, <u>cites unsworn notes</u>.  No objection to these notes has been made by the Defendant.  McDaniel stated that she <u>did</u> interview Miles.  She testified:

> The first conversation with Ms. Miles was when Isha [Dates] called first week of October or whatever and talked about her hours and talked about the first brushing, touching, bumping incident. And I advised Carmen [Miles]. I think Carmen and I actually met that day at the store. I'm not sure about that. And told her about the allegations. And reminded her as I would, you know, with anyone else that things can happen in the drive-through or anywhere in the store, even in the cooler or whatever, accidentally.  You just need to always apologize for that.  So, because it can be, I'm sure, uncomfortable sometimes when you've got five people in that drive-through window. So yes, we did meet then. And then after Isha called me back and said she had witnesses, I did all the investigation with that. Then I went back to Carmen, and I told Carmen initially that there would be, you know, an investigation but this was early on like that first week, long  before Carmen and I met on the 15th when she gave me the other witnesses. So yes, we did have that conversation initially. And I told her that I would get back with her once the investigation was done. And then after the interviews, then we had another conversation.

(Doc. 39-9 at 54-55).

[34] Dates proffers the following fact, which was not disputed by the Defendant:

> 169.    Even though these were far from the only employees who worked with Miles and [] Dates, McDaniel did not interview any other coworkers to find out what they had seen; at her deposition, she admitted she "can't say for certainty" [sic] that she talked with anyone else besides Al Tomlin, and "probably just asked [] general questions" of a couple trainee managers, "and was not specific[.]" Ex. 9, 47/9-20, 48/11-15.

31

### 5.    *Review of Surveillance Video*

McDaniel and Tomlin reviewed video footage from the restaurant to see if they could find video evidence of the conduct Dates complained about, but found none. As to what video footage she reviewed regarding these incidents, McDaniel testified

(Doc. 39 at 20).    The following exchange took place in McDaniel's deposition:

> Q.    So you testified that you interviewed Ms. Datcher and Ms. Posey. Was anyone else interviewed -- well, you spoke with Ms. Dates as well. Was there anyone else interviewed?
>
> A.    No. Al, Al Tomlin, I did interview him. And I really can't say for certainty if I talked -- we had a couple of trainee managers there at the time. And Jim Barnett was one of them. And Rhonda.  And Rhonda's last name has escaped me, so I apologize for that.
>
>        MR. PIERCE: Haynes.
>
> A.    Hayes.  Okay. If I interviewed them because, again, I asked Isha [Dates] were there any managers that she had spoken with.

(Doc. 39-9 at 47).  Dates argues that this testimony is evidence of McDaniel "admitt[ing] under oath" that she is not sure whether she talked to anyone other than Tomlin.  (Doc. 39 at 7). In light of the other evidence in this case, and the phrasing of the particular question McDaniel was asked in her deposition, the Court disagrees.

> Further, the Defendant has not disputed the following "fact" offered by Dates:
>
> 172.    McDaniel [] had already decided she was firing [] Dates. Posey had told her that she saw Miles brush against [] Dates, and could not say it was accidental. Miles was ready to admit to "making a comment that [I] liked thick and big boned women," if McDaniel had interviewed the harasser, which is standard operating procedure. The Operations Manager, Rob Litton, told the EEOC he probably witnessed Miles touch Dates. All McDaniel had to do was to ask questions, and then listen to the answers.

(Doc. 39 at 20).  However, in contravention of this Court's Uniform Initial Order, this paragraph contains no citation to the record.  (*See,* doc. 2 at 18).  Further, it is purely argument.  The paragraph will not be included in the Court's version of the facts.

that she and Tomlin

> . . . looked at their scheduled [sic] of when they worked together because she could not give me any times. And, you know, you can imagine with all that, there's a lot of footage. But we randomly looked through the times that they worked together focusing on that drive-through camera and not observing.

> Q.      So is it possible that since you were picking at random times that you missed the time that Ms. Miles was coming into physical contact with Ms. Dates?

> A.      Probably. It could be, sure.

(Doc. 39-9 at 44). The footage now no longer exists.[35]

---

[35]   The following facts, proffered by Dates in opposition to the motion for summary judgment, were not disputed by the Defendant, and are therefore deemed to be admitted:

> 170.    McDaniel also testified that she allowed security video to be destroyed, although she knew it "probably" captured the physical contact:

>> Q.      So is it possible that since you were picking at random times that you missed the time that Ms. Miles was coming into physical contact with Ms. Dates?

>> A.      Probably. It could be, sure.   Ex. 9, 44/17-21.

> 171.    She did not give [] Dates the opportunity to review the footage.  Ex. 9, 45/10-13. McDaniel willfully allowed it to be destroyed:

>> Q.      And the footage that you reviewed in this investigation, to your knowledge, does it still exist?

>> A.      No, it does not.  No, not to my knowledge.  Id.  44/22-45/5.

>> Q:      Do you know why that videotape does not exist?

>> A.      . . . most all the systems had a two week loop.[]  Id. 70/14-19.

### 6. *Final Meeting with Witnesses and Dates*

Dates testified that, on October 22, 2016, McDaniel met with only her, Annetta Datcher, and Lakosha Posey, in the back of the Inverness Milo's, in the corner. (Doc. 39-7 at 331-332). Dates was the last one to speak with McDaniel. (Doc. 39-7 at 332, 341). Davis testified:

> A.      I believe it was after hours because I was actually in my car about [to] leave. Me and Kosha. She called Cora and talked to Cora, then she talked to Kosha.[36] And she -- I was the last one that she talked to.

(Doc. 39-7 at 329-330). "[S]he was telling me that if I said anything [to] [Lakosha] or Annetta or Cora about what we had talked about that I would lose my job." (Doc. 39-7 at 330).[37]

---

(Doc. 39 at 20).  However, the Court will not deem as undisputed argumentative, color language indicating that McDaniel "willfully" allowed the footage to be destroyed.  The admitted facts <u>do</u> establish that McDaniel knew that, if there <u>was</u> contact, the footage would show it, and that McDaniel made no effort to preserve it.

[36]  The parties and witnesses sometimes refer to Lakosha Posey as "Kosha."

[37]  Dates admits that she spoke with the interviewees about what they said.  The following exchange took place in her deposition:

> Q.      Did you talk with Ms. Posey or Ms. Datcher about what they told Ms. McDaniel?
>
> A.      I mean, they told me that Ms. McDaniel asked them what was going on. And  whatever was going on, I can't actually remember, but I know that they were telling me that Ms. McDaniel said that if we said anything, that we would be fired and all that.

(Doc. 39-7 at 337).  Dates testified that

McDaniel assured Dates if she had any problems in the future to notify McDaniel immediately so she could investigate it. McDaniel further advised Dates that, if she could tell McDaniel the exact times of any recurrent behavior by Miles, the restaurant's security video footage could be reviewed. McDaniel explained to Dates the justification for her reduction in hours, specifically her understanding that it was because Dates advised management she could not work nights.

Dates states:

> And that's when she was being sassy telling me what could we do to help -- what can we do to make it better.[38] I'm like, I just want her to leave me alone. I'm not asking to be moved. I'm not asking to be fired. I just want Ms. Miles to leave me alone. She was being mean about it like she was trying to intimidate me. And like I was just going to back up. She was basically trying to get me to drop the whole thing so it could be forgot about, and that's how she was.

(Doc. 39-7 at 325).[39] Dates testified that McDaniel "was basically saying that they

---

> whatever Ms. McDaniel told them not to repeat, they came right back and told me. And I know that they told me like the same story that she said to me about we're going to get fired if we mention anything amongst each other. But just as quick as she got through talking to them, whatever was talked about, you know what I'm saying, we -- it was discussed.

(Doc. 39-7 at 325). Dates admits that she does not know what Posey said to McDaniel because she was not there. (Doc. 39-7 at 337-338).

[38]  McDaniel agrees that she asked Dates "what can we do to make this better?" (Doc. 35-2 at 3(329-330)).

[39]  When asked in her deposition whether it was her belief that McDaniel did nothing after this second call, Dates testified:

were not agreeing with what I said and all this. She was basically telling me that I was lying and that they weren't, you know." (Doc. 39-7 at 333). Dates could not remember McDaniel using any particular word to imply that Dates was being untruthful, but she did remember "her saying is that what could we do to make this right like she just wanted me to forget about it." (Doc. 39-7 at 333). Dates testified that she "told her 'y'all can just tell Carmen [Miles] to leave me alone.'" (Doc. 39-7 at 334). McDaniel told her not to talk about the harassment or she would lose her job.[40] Dates then told McDaniel "if we're done . . . , my lawyer will be contacting

---

> She did nothing. But she did come a couple of weeks, maybe later, and, like I said, she did a little investigation. And that's when she was being sassy telling me what could we do to help -- what can we do to make it better. I'm like, I just want her to leave me alone. I'm not asking to be moved. I'm not asking to be fired. I just want Ms. Miles to leave me alone. She was being mean about it like she was trying to intimidate me. And like I was just going to back up. She was basically trying to get me to drop the whole thing so it could be forgot about, and that's how she was.

(Doc. 39-7 at 325).

[40] McDaniel testified:

> I told [Dates] the same thing that, you know, as I had told Carmen [Miles] that the two witnesses that she gave me, they could not support any of her allegations. And that the case was really being closed. And advised her the same thing I did the first time. That, you know, of course, I always give everyone my business card, my cell phone, and call me immediately with anything so we could address, if there was anything that goes on in the future, we could monitor that on a minute-by-minute basis on the tape.  And then we would go from there. I asked her if she was comfortable in continuing to work with Carmen. And if not, we could make some changes. If she  did not want to work in the store any longer, we could look at that. And she said that she was fine. I did the same thing with Carmen. I told her what the allegations were, and there was nothing to support that. And reminded her again the sexual harassment policy and the consideration

36

you." (Doc. 35-2 at 3(330)).

The Defendant admits that Miles was never disciplined, remained the Assistant Manager at Dates's store, and that, following Dates's complaints to Defendant, the sexual harassment simply continued until Dates was fired.[41]

McDaniel also met with Miles on October 22, 2012, and advised her the investigation had been finalized. McDaniel stated that she

> reminded her as I would, you know, with anyone else that things can happen in the drive-through or anywhere in the store, even in the cooler or whatever, accidentally. You just need to always apologize for that. So, because it can be, I'm sure, uncomfortable sometimes when you've got five people in that drive-through window.

(Doc. 32-1 at 14(54-55)). She additionally advised Miles that she should not retaliate against Dates and to treat her like all of the other employees. Miles assured McDaniel there was no problem in doing so.

### G.    Dates's EEOC Charge

On October 22, 2012, Dates filed an EEOC Charge. Dates attempted to persuade Annetta Datcher to ride with her, Cornelius Jackson, and LaKosha Posey

---

we need to give to people and there might be an accidental incident. And if she wanted to move, we would look at doing that, obviously.

(Doc. 32-1 at 15(57-58)).

[41]    *See*, Plaintiff's proffered facts numbers 182, 183, and 189, <u>which were not disputed by the Defendant</u>.   (Doc. 39 at 23).

to the EEOC office that day, in order to offer support for her charge. Datcher refused

to go. In her declaration, Datcher states that she refused because:

> Dates and Cornelius Jackson admitted to me that they were going to "scam" Milo's with a false sexual harassment claim by Ms. Dates against Carmen Miles. In addition, Ms. Dates offered me a portion of her settlement money if I would support her false allegations against Ms. Miles. I declined her offer as I judged it wrong and I was not going to lie for anyone, even a friend like Ms. Dates.

(Doc. 31-5 at 1, ¶10). Dates stated in her declaration:

> I never told Annetta Datcher that we were going to "scam" Milo's with a false claim of sexual harassment against Carmen Miles, and I have never heard Cornelius Jackson make such a statement. . . . I never offered Annetta Datcher any money to support my complaint of sexual harassment against Carmen Miles.

(Doc. 39-2 at 1, ¶¶3, 4).

In her EEOC Charge, Dates alleged "the store manager has felt on my buttock, my breast and at every opportunity that presents it's self [sic], she will rub her body against mine." (Doc. 1-3.) Dates further alleges that, "once I complained about being sexually harassed the store manager reduced my hours from at least 40 hours per week down to 24 hours per week, which I protested." (Doc. 1-3.)

Dates's Charge was mailed to the Inverness Milo's P.O. Box. Tomlin physically received the charge on December 18, 2012, when he did his periodic check of the store's mail box. The following facts, proffered by Dates in opposition to the

Motion for Summary Judgment, were not disputed by the Defendant and are therefore deemed to be admitted:

184.   Out of frustration, [] Dates turned to the EEOC on October 22, the same day McDaniel told her the evidence did not support her allegations. Ex. 6. Milo's learned of her EEOC filing the very day she filed, not after it later terminated her on November 21.

185.   On October 22, [Dates] explained to her coworker Annetta Datcher that she was late to work because she was coming from filing an EEOC charge. Ex. 7, 361/22-362/9.

186.   [] Datcher has stated under oath that she passed this information on to Area Manager Al Tomlin supervisor that same day, and that Assistant Manger [sic] Cornelius Jackson was already aware of her filing, because he had advised her to file. Def's Ex. 8.

187.   Someone who wanted to conceal the fact that Defendant knew about Dates'[s] filing the day it was made, not after she was terminated, prepared a declaration for Annetta Datcher to sign. Typewritten paragraphs 7-8 read as follows:

> 7. I understand that Isha Dates testified in her deposition that I told Al Tomlin and Cornelius Jackson that she had filed a charge with the EEOC on the day that she filed it.

> 8. However, this testimony is not truthful, as I did not tell Mr. Tomlin or Mr. Jackson that Ms. Dates filed a charge with the EEOC. Def.'s Ex. 8.

188.   However, [] Datcher has stricken through the name "Cornelius Jackson," and handwritten on the face of the Declaration:

> I told Al Tomlin but I didn't have to tell Cornelius Jackson cause [sic] he was the one telling her what to do!   Def.'s Ex. 8.

(Doc. 39 at 23-24).

### H.     **The Defendant Tried To Find a Reason To Fire Dates**

The following fact, proffered by Dates in opposition to the Motion for

Summary Judgment, was not disputed by the Defendant and is therefore deemed to

be admitted:

> 175.   Milo's became fed up with [] Dates's complaints. McDaniel
> instructed Milo's supervisors to look for a pretext to terminate [] Dates.
> Jackson states:
>
>> I was present on a phone meeting with Ms. McDaniel, area
>> manager Al [Tomlin], . . . Carmen Miles, and area manager
>> Rob [Litton], where Ms. McDaniel said we should find any
>> little thing we can on Isha [Dates] to get rid of her.
>>
>> There was a second meeting a few weeks later with myself,
>> Carmen, Al, and Rob to follow up if we had found
>> anything to fire Ms. Dates for. After this meeting, I advised
>> Ms. Dates to call the owner directly. Ex. 10 at 6-7.

(Doc. 39 at 21).

### I.     **The Failure To Follow Company Policy**

If a manager saw physical touching occur in the workplace, the Defendant's

sexual harassment policy required them to report it to McDaniel or Dekle. Litton

admitted that Miles's statement about "big boned women," as well as Miles's making

contact with Dates's breast, would violate the Defendant's sexual harassment policy.

(Doc. 39-1 at 35-36).  McDaniel admitted that she never received a report from Litton

about Miles touching [] Dates.  (Doc. 39-9 at 51).

The follow facts, proffered by Dates, were not disputed by the Defendant and

are therefore deemed to be admitted:

155.   McDaniel . . . had herself failed to follow Defendant's sexual harassment policy: using her work email account, she forwarded an email of "Very Brave Man Jokes" containing extremely offensive sexist "humor" including:

3 - Why is the space between a woman's breasts and her hips called a waist?
Because you could easily fit another pair of tits in there . . . .

6 - What do you say to a woman with 2 black eyes?
Nothing, she's been told twice already.

7 - If your wife keeps coming out of the kitchen to nag at you, what have you done wrong?
Made her chain too long

*See* Ex. 13, Email from Louise McDaniel to Jeff Morrison.

156.   At her deposition, McDaniel admitted that the jokes in the email would violate Defendant's sexual harassment policy if spoken aloud. Ex. 9, 64/15-65/5. In other words, the person charged with enforcing Defendant's purported anti-harassment policy was violating that policy.

(Doc. 39 at 16-17).

## J.   <u>Dates's Admissions that Miles's Alleged Harassment Was Not Motivated by Race</u>

Dates was asked if she thought Miles sexually harassed her because she was

African American. Dates responded, "No." Dates was asked if she had any evidence to support a conclusion that the Defendant is discriminatory toward African Americans. Dates responded, "No." Dates was asked if she felt that she would have been harassed if she were white. Dates responded that there would have been no difference in the harassment.

### K.    Dates's Termination on November 21, 2012

Dates's termination on November 21, 2012, arose from an incident several days before, when Dates allegedly "choked" another employee, Sarah Rourke. On that date, Dates and her co-workers and friends, LaKosha Posey and Cora Datcher, were outside the Inverness Milo's. Dates was attempting to "swap hours" with another employee. Tomlin instructed Dates, Posey, and Datcher to return to work and Dates was informed that Rourke "snitched" on them to Tomlin.[42]

Annetta Datcher has stated in her declaration that she was present on

---

[42]  Rourke testified:

Ms. Dates and a couple of other employees went outside to try to talk to another employee and our manager, Al Tomlin, was looking for them and he asked me where they were, and I just told him that they went outside to talk to the other employee. And then when they came back in, another employee told them that I snitched on them and that I told Al where they were, which was true. But then that day and for, like, the next, I believe, like, four days following that, it was just like little tauntings, like you're a rat, don't snitch. And then on, I believe it was a Saturday, me and Ms. Dates were standing in the drivethrough and she put her hands around my neck and said, "Don't snitch on me again."

(Doc. 30-1 at 7-8).

"numerous occasions" prior to Dates's termination when Dates called Rourke a "snitch." (Doc. 31-5 at 2, ¶13). Datcher also states that Dates also threatened to "whip her ass," referring to Rourke, if she met Rourke outside of work. *Id.* Dates testified that she never called Rourke a "rat" or a "snitch" more than once. (Doc. 39-7 at 412).[43] In her declaration, Dates states that she "never threatened to 'whip her ass' if I caught Sarah Rourke out of work." (Doc. 39-2 at 1, ¶5).

Further, it is admitted that Dates never touched Rourke, but merely made a choking gesture with her hands near her neck. (Doc. 39-7 at 392).[44] When asked in her deposition if that gesture could have been interpreted as a threat, Dates testified: "I don't want to say. I'm just going to say horseplay and leave it at that. I know it was

---

[43]  Based on the context of the testimony in the deposition, it appears that Dates testified that the one occasion was at the time she put her hands around Rourke's throat. Thereafter, the following exchange took place in her deposition:

Q.    Do you think you said snitch or rat before the time you put your hands around her throat?

A.    If I said it, me, Kosha, and Cora, we was in the lobby.

(Doc. 39-7 at 413).

[44]  Dates has proffered the following fact, which has not been disputed by the Defendant:

190.    In mid-November, 2012, [] Dates put her hands around coworker Sarah Rourke's neck, without touching her, and teasingly said something to the effect "this is what happens to snitches." Ex. 7, 400/9-16.

(Doc. 39 at 24).

a joke. It was no harm meant by it." (Doc. 39-7 at 396). Regardless, it is undisputed

that the group was joking amongst each other, and that Sarah Rourke was laughing.[45]

Rourke admits that coworker Cora Datcher called her a "snitch" as well.[46] LaKosha

Posey also joked to Rourke that she was a "snitch."

---

[45] *See*, Dates's proffered fact number 191, which was not disputed by the Defendant. Rourke testified that she felt "threatened and scared. I was shocked. It was awkward." (Doc. 30-1 at 9). Rourke testified:

Q.      Why would you feel threatened by that?

A.      I was a lot younger, smaller. I wasn't used to, like, that kind of environment really. Never encountered anything like that before.

Q.      Why didn't you interpret that as something other than a threat? A playful gesture or something like that.

A.      Because I -- I didn't know what she could have done. I didn't know what could have continued to happen, what might possibly still happen. I just didn't know what extent it would go to.

Q.      Did you interpret that gesture and those words as a threat?

A.      Yeah. I felt threatened by that. Yes.

Q.      She wasn't laughing when she did it?

A.      Not that I remember.

Q.      Or smiling?

A.      Not that I recall.

(Doc. 30-1 at 9).

[46]  It is undisputed that Datcher's actions were never reported to management, by Rourke or anyone else.

Rourke's co-worker, Miranda Smith, the only other eyewitness to the alleged choking incident, brought it to the attention of management. Smith informed her immediate supervisor, Miles, who then informed Tomlin. Tomlin notified his immediate supervisor, Litton, about this incident. It was Litton's responsibility to investigate disciplinary issues and ensure that all policies and procedures were followed correctly. It is undisputed that Miles, Tomlin, and Litton were all part of the conference call where McDaniel said that they should find a reason to fire Dates.[47]

Litton began his investigation by contacting Rourke, who confirmed that Dates put her hands around Rourke's throat and told her "don't snitch on me again." Litton testified that Rourke "was obviously scared," based on her statements, body language and demeanor. (Doc. 30-1 at 109-110). Still, Rourke continued to work with Dates in the days after this incident.[48] Litton then met in person with Smith, and secured written statements from Rourke and Smith. The internal security camera footage of

---

[47] *See*, Dates's proffered fact number 193, which was not disputed by the Defendant. (Doc. 39 at 25).

[48] The Defendant proffers: "102. Rourke took Dates['s] threat seriously enough that she did not want to work with her any more. (Ex. 1, p. 14, 3-8.)." (Doc. 30 at 28). The citation does not support the proffered fact. It will not be included. Also, Dates proffers the following fact, which was not disputed by the Defendant, and so it is deemed to be admitted:

> 192.  Rourke continued to work with [] Dates after these events. Ex. 7, 408/23-409/12. []

(Doc. 39 at 25).

this incident was also reviewed, but it no longer exists.[49]

Tomlin and Litton confronted Dates about the incident on November 21, 2012. In that meeting, Dates denied ever touching Rourke, but agreed that she did gesture like she was choking her. (Doc. 33-2 at 19). Litton testified:

> She said that she had put her hands around Sarah's neck, but was not going to choke her. But she had said she had put her hands around her neck and that's when I said that that was, you know, totally inappropriate behavior that was threatening, that we – you know, I told her, I said, I've looked at the video, you know, I've got the statements from a witness and based on that, you know, I'm going to have no choice but to terminate your employment due to the guidelines that we have posted that we have all employees sign.
>
> Q. (BY MR. PIERCE:) You're referring to Plaintiff's Exhibit 2?
>
> A. Correct.

---

[49]   The Defendant proffers:

> 109.   While not showing the actual altercation between Dates and Rourke, [the security footage]  did show Smith's "shocked" reaction to it, further corroborating Rourke's story. (Ex. 1, p. 101, 15-25, p. 110, 16-25, p. 111, 1-13.) (Ex. 15, p. 19, 10-20.)

(Doc. 30 at 29).  In response, Dates writes:

> 109. Contrary to Defendant's assertion that the tape showed Smith having a "shocked" reaction, Litton admitted that he intentionally allowed this tape to be destroyed, choosing not to preserve it. Ex.1, 21/4-15, 23/10-14, 29/1-6. This spoliation permits an inference that the tape did not show what Litton now claims.

(Doc. 39 at 10).  Because the Court holds that there is direct evidence of discrimination in this case, it is irrelevant what the video showed.  Accordingly, whether there should be an adverse inference against the Defendant due to its destruction will not be addressed in this opinion.

46

Q. The hostile work environment policy?

A. Correct.

(Doc. 30-1 at 114).

**L.   Litton's Reasons for the Termination and the Destruction of the Video Footage of the "Choking"**

The following facts, proffered by Dates, were not disputed by the Defendant

and are therefore deemed to be admitted:

196.   Litton testified he intentionally allowed the video of those events to be overwritten:

> Q.   So at the time you told her it was based on the video, could you have taken actions then to save the video?
>
> A.   Yes.
>
> Q.   And you chose not to?
>
> A.   Yes.  Ex. 1, 29/1-29/6.

197.   At his deposition, Litton [testified]:

> Q.   So the only record we have currently in this deposition of what happened in that video is based on your untrained interpretation of some other people in the video?
>
> A.   Correct. But my decision wasn't made based on the video.
>
> Q.   But you told Ms. Dates that it was based on the video?

A.     Yes.

Q.     So why did you tell Ms. Dates it was based on the video if it was not based on the video?

A.   Because she had already admitted to doing it.   Ex. 1, 27/20-28/20.

. . .

199.   Ultimately Milo's provided four separate explanations for terminating [] Dates: horseplay, what it saw on the video (the expression of a coworker), what [] Dates admitted, and violation of Milo's anti-harassment policy.

200.   Litton destroyed the video about two weeks after he viewed it. Ex. 1, 19/22-21/3. He knew [] Dates had complained about Miles sexually harassing her. Id. 21/4-15, 23/10-14, 29/1-6.

(Doc. 39 at 25-27).

Dates cannot provide any examples of an employee putting their hands around another co-employee's throat accompanied by a verbal threat. Tomlin and Litton both testified that any such conduct, if brought to their attention, would result in termination. Dates even agreed that employers should not tolerate threatened violence in the workplace.

Dates testified that her perspective as to the appropriateness of her conduct towards Rourke could be very different if she had been on the receiving end. (Doc.

30-1 at 43).[50]

### M.      The Unemployment Compensation Proceedings

Dates filed for and was denied unemployment compensation after she was fired by the Defendant. (Doc. 33-3 at 2). The reason for Dates's disqualification was that the alleged "choking" incident "constitutes misconduct committed in connection with work." (Doc. 33-3 at 2).[51] Dates appealed, and a telephonic hearing was held. Dates testified during her UC telephonic hearing that she never physically touched Rourke, and that Rourke would testify to that. Instead, she claimed to have merely hugged Rourke after putting her hands near Rourke's throat. After the hearing, Administrative Hearing Officer Linda F. West reversed the initial determination, and determined that Dates had merely tried to "hug" Rourke, and that "the incident of the claimant hugging an employee was [not] an act of misconduct." (Doc. 33-3 at 4, 7). That reversal was affirmed by the Board of Appeals. (Doc. 33-3 at 14).

The Defendant appealed to the Circuit Court of Talladega County, Alabama.

---

[50] The Defendant proffers: "128.Dates now finally acknowledges that Rourke interpreted her gesture as a threat. (Ex. 3, p. 396, 18-13, p. 397, 1-4.)." (Doc. 30 at 32). The citations do not support this fact. It will not be included.

[51] Pursuant to Ala. Code § 25-4-78(3):

An individual shall be disqualified for total or partial unemployment . . . [i]f he was discharged from his most recent bona fide work for misconduct connected with his work

Ala. Code § 25-4-78(3)(c).

(Doc. 33-4 at 1). Circuit Judge Julian M. King held a trial *de novo* on the matter and

then issued a written order finding, in pertinent part:

> 6. . . . that Dates subjected Rourke to physical contact and clearly threatened her at the work place. Dates bullied and harassed Rourke and Dates committed misconduct at her workplace as a result of these actions.[52]

> 8.    This Court specifically finds that Dates engaged in violent and threatening acts directed specifically towards Rourke who was a co-employee. Her action clearly amounted to employee misconduct and was a clear violation of company policy that justified termination of employment. These acts also amount to harassment that also justified termination of employment.[53]

> 9.     . . . The actions of Dates against Rourke in this case . . . even rise to the level of the elements of what the Alabama Legislature says is harassment in the criminal code. The Court finds that Dates intended to harass, annoy and/or alarm Rourke and subjected her to physical contact in the neck and throat area. Threats were made that were verbal that escalated to carrying out the intent by the physical contact. Rourke as a reasonable person was the target of the threats and testified that she felt threatened and was fearful of Dates.

> 10.    . . . The Court finds that . . . Dates[] in not entitled to unemployment compensation benefits because she committed misconduct that amounts to disqualification of benefits in accordance with Title 25, Chapter 4, Section 78(3)(a).

(Doc. 30-3 at 4-5).

---

[52] Judge King also found that Dates had read company policies which stated that "bullying, threats, harassment, fighting and or other behavior that may cause or lead to a hostile environment [is] grounds for termination."  (Doc. 30-3 at 2).

[53] Judge King also found that Dates had "signed off" on a sheet acknowledging that "harassment" was prohibited.  (Doc. 30-3 at 2).

### N.    **Dates's Post-Termination Actions**

Dates filed her second EEOC Charge on November 27, 2012.

Cora Datcher states in her declaration that, as early as November 2012, and as recently as January 2013, Dates offered her a portion of her settlement money if Datcher would support her false allegations against Miles. (Doc. 31-6 at 1, ¶10). Datcher recalls declining to accept Dates's offer despite the fact that Dates has made that offer of money to "go against Milo's" three or four times. (Doc. 31-6 at 1, ¶10). Dates states in her declaration: "I never offered Cora Datcher any money to support my complaint of sexual harassment against Carmen Miles, nor did I ever offer her any money to act as a witness or to 'go against Milo's.'" (Doc. 39-2 at 1, ¶6).[54]

The following facts, proffered by Dates in opposition to the Motion for Summary Judgment, were not disputed by the Defendant:

201.   [] Dates never stopped challenging the retaliatory and

---

[54] Interestingly, Cora Datcher states in her declaration:

3.    On January 7, 2013, I signed a statement written in my own handwriting at Ms. Dates'[s] request purporting to memorialize a conversation that I had with Sarah Rourke.  Specifically, my statement says, "Sarah told me Isha [Dates] didn't choke her.  She said Isha [sic] hands didn't touch her neck."

4.    . . . Ms. Rourke . . . only made the first statement: "Sarah told me Isha [Dates] didn't choke her."  As Ms. Dates'[s] request, I added the second sentence, even though Ms. Rourke did not state [those] words[.]

(Doc. 31-6 at 1, ¶¶ 3,4).

discriminatory firing. On November 29, 2012, Dekle received another voice message, which he produced, telling him "there are some serious things going down in your store." Ex. 14, Ex. 15.

202.   McDaniel, Head of HR, also engaged in spoliation of evidence, which she conceded "probably" showed Miles was touching Dates.

203.   While Sara Rourke was still attending high school (Ex. 4, 32/2-13), Milo's gave her an affidavit to sign which falsely stated that [] Dates had "attempted to persuade [her] to change [her] story . . . so that Ms. Dates can receive unemployment, but I have refused to do so, because it would be untrue . . . ." Ex. 3. During the unemployment proceedings, Milo's offered the affidavit.

204.   Milo's had significant leverage over its student employees. As Rourke acknowledged, in her senior year of high school when she worked for Milo's, "I was getting class credit . . . I had to do well to get a good grade." Ex. 4, 52/5-7.

205.   Rourke testified:

> Q.   Did you know ahead of time that they were creating this affidavit before they brought it to you?

> A.   No.

> Q.   Do you remember where you were when they brought you the affidavit?

> A.   I was at work.   Ex. 4, 32/16-23.

206.   Rourke admitted at her deposition that she . . . had lied under oath in her affidavit: "No, Ms. Dates never spoke to me about changing my story." Ex. 4, 36/15-18.

207.   Annetta Datcher, Cora Datcher and Lakosha Posey were 16 years old when [] Dates was terminated. Defendant has done everything it can

to coerce them into recanting statements, or giving perjured testimony, which is highly probative of guilty knowledge.

208.   Annetta Datcher was working at Milo's when [] Dates was deposed. Def's Ex. 8 at 15. In an affidavit which was written for her, she has come forward now, for the first time-coincidentally just prior to Defendant's motion-to say that [] Dates offered her money to implicate Miles. *Id.* at 10.

209.   In that affidavit she crossed out the testimony scripted for her, and stated that she told Al Tomlin [] Dates had filed an EEOC charge the day she filed, and that Assistant Store Manager Jackson was already aware of it. Def's Ex. 8.

210.   Cora Datcher also came forward unexpectedly, just before Milo's moved for summary judgment, and accused [] Dates of offering her money to lie about Miles back in 2012. Def's Ex. 9 at 10. In her affidavit, she recants a previous written statement she made in 2013, shortly after [] Dates's termination, in which she stated that [] Dates never touched Rourke. Id. 3. She spends much of four paragraphs denying that Milo's pressured her into lying, claiming her statements are voluntary, notwithstanding that she still works at Milo's. Id. 6, 8, 9, 11.

211.   Milo's also drafted an affidavit for LaKosha Posey, in which she coincidentally recants, for the first time, the written statement she provided in February 2013, in which she said that Miles verbally and physically harassed [] Dates on "numerous occasions." Def's Ex. 10 6, 8. Like Annetta Datcher, she had to insert a denial of the testimony scripted for her. *Id.* at 5.

212.   [] Dates's alleged offer to bribe Annetta and Cora Datcher, and request for a written statement from LaKosha Posey, supposedly occurred before [] Dates was terminated in November 2012. Nonetheless, [] Dates was not asked about any of these allegations at her deposition in June 2015.

(Doc. 39 at 27-29).

## IV.   ANALYSIS

### A.   <u>Alleged Violations of 42 U.S.C. § 1981 – Counts Two and Four</u>

Summary Judgment is appropriate as to Dates's race discrimination claims in Counts Two and Four, which are brought pursuant to 42 U.S.C. § 1981 ("Section 1981"). "'[S]ection 1981 prohibits intentional <u>race</u> discrimination in the making and enforcement of public and private contracts, including employment contracts.'" *Blow v. Virginia Coll.*, 619 F. App'x 859, 861 (11th Cir. 2015) (quoting *Ferrill v. Parker Grp., Inc.*, 168 F.3d 468, 472 (11th Cir.1999)) (emphasis added). In her brief, Dates makes no argument that any actions were taken against her because of her race. Further, Dates either admits, or has no evidence of, racially motivated harassment or retaliation.[55] Dates's claims in Counts Two and Four will be dismissed with prejudice.[56]

---

[55] Dates was asked in her deposition if she thought Miles sexually harassed her because she was African American. Dates responded, "No." (Doc. 39-7 at 417). Dates was asked if she had any evidence to support a conclusion that the Defendant is discriminatory toward African Americans. Dates responded, "No." (Doc. 39-7 at 438). Dates was asked if she felt that she would have been harassed if she were white. Dates responded that there would have been no difference in the harassment. (Doc. 39-7 at 417-418).

[56] There is only one disparate treatment claim in this case–the Section 1981 claim in Count Two. In addressing that claim, a claim which, as shown, can only be based on the <u>race</u> of Dates, the Defendant argues that "Dates must show [that] white <u>and male</u> employees received favorable treatment." (Doc. 30 at 51) (emphasis added). Because the court has ruled as it does, there is no need to address this misplaced argument. (*See* doc. 30 at 50-51).

**B.**     **Title VII Hostile Work Environment Claim – Count One**

Dates claims that the Defendant "engaged in illegal, intentional discrimination

on the basis of sex and race, by creating a hostile work environment." (Doc. 1 at 17).

As noted in the Court's discussion of the Section 1981 claims, Dates has presented

no evidence, or argument, that she was discriminated against based upon her race. To

the extent that Count One makes such a claim, summary judgment is appropriate.

Dates <u>does</u> present evidence and argument regarding her claim that she was subjected

to a hostile work environment based upon sex. The Court will now address that claim.

 The Eleventh Circuit has stated:

> "To establish a hostile work environment claim under Title VII,
> the plaintiff must show that the workplace is permeated with
> discriminatory intimidation, ridicule, and insult, that is sufficiently
> severe or pervasive to alter the conditions of the victim's employment
> and create an abusive working environment." *Gowski v. Peake*, 682 F.3d
> 1299, 1311 (11th Cir.2012) (*quoting Harris v. Forklift Sys., Inc.*, 510
> U.S. 17, 21, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993)) (internal quotations
> omitted). Specifically, to prove a prima facie case, a plaintiff must show
> that: (1) she belongs to a protected group; (2) she was subjected to
> unwelcome harassment; (3) the harassment was based on a protected
> characteristic of the employee; (4) the harassment was sufficiently
> severe or pervasive to alter the terms and conditions of employment and
> create a discriminatorily abusive working environment; and (5) the
> employer is responsible for such environment under either a theory of
> vicarious or of direct liability. *Edwards v. Prime, Inc.*, 602 F.3d 1276,
> 1300 (11th Cir.2010).    To make out a sex-based hostile work
> environment claim, one need not show that the environment was hostile
> in a sexual manner, but merely that it was hostile because of the
> plaintiff's gender. *See, e.g., Oncale v. Sundowner Offshore Servs., Inc.*,

523 U.S. 75, 80, 118 S.Ct. 998, 140 L.Ed.2d 201 (1998) (holding that a woman may establish non-sexual, gender-based harassment by showing that the plaintiff is harassed in sex-specific and derogatory terms as to make it clear that the harasser is motivated by general hostility to the presence of women in the workplace).

The requirement that the harassment be "severe or pervasive" contains an objective and subjective element. The behavior must result in an environment "that a reasonable person would find hostile or abusive," and one which the victim "subjectively perceive[s] ... to be abusive." *Miller v. Kenworth of Dothan, Inc.*, 277 F.3d 1269, 1276 (11th Cir.2002). In evaluating the severity of the harassment, we consider the totality of the circumstances, including the frequency and severity of the conduct, whether the conduct is physically threatening or humiliating or a mere offensive utterance, and whether the conduct unreasonably interferes with the employee's job performance. *Id.* Instances of alleged harassment are considered cumulatively rather than in isolation. *Reeves v. C.H. Robinson Worldwide, Inc.*, 594 F.3d 798, 808 (11th Cir.2010).

*Clark v. S. Broward Hosp. Dist.*, 601 F. App'x 886, 898-99 (11th Cir. 2015).

### 1.    *The Severity and Pervasiveness of the Conduct*

The Defendant attacks only the fourth element of Dates's claim, arguing only

that the

allegations of statements and contact between Miles and [Dates] (supra, ¶ 13-16, 23-34, and elsewhere above), simply do not rise to the level of severity or frequency required by well-established case law. *See e.g. Johnson v. Booker T. Washington Broadcasting Service, Inc.*, 234 F.3d 501 (11th Cir. 2000); *Hulsey v. Pride Restaurants, LLC*, 367 F.3d 1238 (11th Cir. 2004); *Leeth v. Tyson Foods, Inc.*, 449 Fed. Appx. 849, 2011 U.S. App. LEXIS 25225 (11th Cir. 2011) (unpublished opinion); *Guthrie v. Waffle House, Inc.*, 460 Fed. Appx. 803, 2012 U.S. App. LEXIS 2256 (11th Cir. 2012) (unpublished opinion).

(Doc. 30 at 49). It continues:

> This is especially true in light of the testimony from Annetta Datcher, Cora Datcher [sic] and LaKosha Posey, Dates'[s] own witnesses, that they did not see nor hear any statements or actions that could be interpreted as sexual harassment during their entire tenure of employment with Dates. (Ex. 8, ¶ 3-6; Ex. 9, ¶ 7; and Ex. 10, ¶ 3,6-7, 9-14.). Finally, it is undisputed that [the Defendant] complied with its duty to conduct a prompt and thorough investigation of Dates'[s] sexual harassment claim and found no evidence to support it.

(Doc. 30 at 50). Other than to generally set out the law regarding hostile work environment claims (doc. 30 at 48-49), this is the Defendant's <u>only</u> argument on this claim in its initial brief.[57]

The first paragraph of the Defendant's argument fails to provide any support for its motion. As the Eleventh Circuit has noted:

> A party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the record that demonstrate an absence of a genuine issue of material fact. "Only when that burden has been met does the burden shift to the non-moving party to demonstrate there is indeed a material issue of fact that precludes summary judgment."

*Mosley v. Alabama Unified Judicial Sys., Admin. Office of Courts*, 562 F. App'x 862, 864 (11th Cir. 2014) (*quoting Coats & Clark, Inc.*, 929 F.2d 604, 608 (11th

---

[57] The Court will not consider the Defendant's extended discussion of this claim in its reply brief. (Doc. 43 at 18-21). "[A]rguments raised for the first time in a reply brief are not properly before a reviewing court." *Herring v. Sec'y, Dep't of Corr.*, 397 F.3d 1338, 1342 (11th Cir. 2005); *Distrib. Res. Mgmt., Inc. v. Peacock*, No. 2:12-CV-00188-SLB, 2012 WL 2930787, at *2 (N.D. Ala. July 13, 2012) (same). *See also*, Uniform Initial Order, Appendix II, doc. 2 at 14 (setting out procedure for summary judgment briefing before this Court).

Cir.1991)). The Eleventh Circuit has also noted that

> [t]here is no burden upon the district court to distill every potential argument that could be made based upon the materials before it on summary judgment. *Blue Cross & Blue Shield v. Weitz*, 913 F.2d 1544, 1550 (11th Cir.1990). Rather, the onus is upon the parties to formulate arguments; grounds alleged in the complaint but not relied upon in summary judgment are deemed abandoned. *Road Sprinkler Fitters Local Union No. 669 v. Indep. Sprinkler Corp.*, 10 F.3d 1563, 1568 (11th Cir.1994) (*citing Lazzara v. Howard A. Esser, Inc.*, 802 F.2d 260, 269 (7th Cir.1986)), cert. denied, —— U.S. ——, 115 S.Ct. 189, 130 L.Ed.2d 122 (1994).

*Resolution Trust Corp. v. Dunmar Corp.*, 43 F.3d 587, 599 (11th Cir. 1995).

The Defendant, citing the specific facts of *Mosley*, argues in its <u>reply brief</u> that it has satisfied its burden in this case because it moved for summary judgment on all of Dates's claims, and

> cited to the specific law and the portions of the record on which its claim was based, stating "Dates'[s] allegations of statements and contact between Miles and herself (supra, ¶ 13-16, 23-34, and elsewhere above), simply do not rise to the level of severity or frequency required by well-established case law." (Milo's Mem. 48.)

(Doc. 43 at 17; *see also generally* doc. 43 at 16-18). The Defendant is incorrect. Its initial briefing argument is not specific as to whether the Defendant attacks the subjective or objective portion of the "severity" element. It makes no attempt to examine the evidence in this case in the context of the authority cited. Further, although the Defendant specifically points to <u>some</u> evidence, its vague reference to

evidence cited "elsewhere above," gives the court, and Dates, no direction. Dates should not be expected to craft a response to such a vague and underdeveloped argument.

The second paragraph of the Defendant's argument, which is also similarly underdeveloped, begins by asking the court to weigh the evidence–something it cannot do at the summary judgment stage. *See, Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255, 106 S. Ct. 2505, 2513, 91 L. Ed. 2d 202 (1986) ("Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge, whether he is ruling on a motion for summary judgment or for a directed verdict. The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor."). The last part of this paragraph fails to explain <u>how</u> "Milo's complied with its duty to conduct a prompt and thorough investigation of Dates'[s] sexual harassment claim," and why, even if it did so, that would matter to the court's analysis of this claim.

Because the Defendant fails to satisfy its initial burden, summary judgment is inappropriate as to Dates's claims for sexual harassment as set out in Count One.[58]

---

[58]  Because the court reaches the conclusion it does, it will not address Dates's argument that the alleged harassment <u>was</u> severe and pervasive (doc. 39 at 29-32), or that the Defendant is vicariously liable for said harassment (doc. 39 at 32-34).  The court notes that, in its reply brief,

### 2.    The "Because of Sex" Non-Argument

In its initial brief, the Defendant, in a cursory manner, states:

Title VII prohibits discrimination, including harassment that discriminates based on a protected category such as sex. Because a claim of sexual harassment under Title VII is a claim of disparate treatment, in order to prevail a plaintiff must show that similarly-situated persons not of her sex were treated differently and better. *Baldwin v. Blue Cross/Blue Shield of Alabama*, 480 F.3d 1287, 1301-02 (11th Cir. 2007).

(Doc. 30 at 48-49).  An argument is <u>implied</u> here; that is not enough.  Only in its <u>reply</u> brief does the Defendant argue that "Dates cannot meet [her] burden" of demonstrating that she was harassed because of her sex.  (Doc. 43 at 14-15, and facts discussed therein).  Dates does not discuss this issue in her response to the motion. However, in light of the fact that the Defendant made no actual argument on this point in its initial brief, the Court holds that she was not on actual notice that this portion of her claim was being attacked.  For that reason alone, summary judgment is inappropriate on the issue of whether Dates was treated differently because of her sex.  Further, the conduct in this case, which consisted of sexually suggestive touching, and comments regarding "taking Dates out," all done by a manager who

---

the Defendant "does not dispute [Dates's] arguments . . . as to Milo's vicarious liability."  (Doc. 43 at 6-7, n. 1).

testified that she "exclusively date[s] women" (doc. 39-5 at 24), appears to be based

on Dates's sex.[59]

---

[59]   In the Defendant's reply brief, it references the following "facts" set out in its initial brief:

> 85.   Dates also alleged that Miles apparently did not discriminate in her sexual harassment based on the gender of her co-workers. Dates claims that co-worker Kevin Allen told her that Miles had also "touched" him. (Ex. 3, p. 373, 22-23, p. 374, 1-2.).

> 86.   Allen allegedly told Dates that he had been standing at the grill and Miles walked by and rubbed his "thing." (Ex. 3, p. 374, 19-23, p. 375, 1-3.)

(Doc. 43 at 15, citing doc. 30 at 26).  Neither fact was disputed by Dates.  However the Court does not deem as "admitted" the purely argumentative statement that "Dates also alleged that Miles apparently did not discriminate in her sexual harassment based on the gender of her co-workers."  The Court did the same for the Defendant when it failed to dispute any of Dates's proffered facts.

       The Court notes that, even considering the fact that Miles touched Allen, a male employee, one time, "[t]he mere fact that men and women are both exposed to the same offensive circumstances on the job site . . . does not mean that, as a matter of law, their work conditions are necessarily equally harsh."  *Petrosino v. Bell Atl.*, 385 F.3d 210, 221 (2d Cir. 2004); *see, e.g., Smith v. Pefanis,* 652 F. Supp. 2d 1308, 1325 (N.D. Ga. 2009) ("While there is evidence that Pefanis regularly groped both male and female employees, his alleged harassment of plaintiff was of a different character.").  "The critical issue, Title VII's text indicates, is whether members of one sex are exposed to disadvantageous terms or conditions of employment to which members of the other sex are not exposed." *Oncale v. Sundowner Offshore Servs., Inc.,* 523 U.S. 75, 80, 118 S. Ct. 998, 1002, 140 L. Ed. 2d 201 (1998) (internal quotations and citation omitted).  Without more evidence as to the nature of the "touching" of Allen, and his reaction to it, the Court cannot say the evidence of this one time event proves that Miles's conduct <u>towards</u> <u>Dates</u> was <u>not</u> based on Dates's sex.  Indeed, because it is undisputed that Miles is sexually attracted to women, a jury could reasonably infer that her touching of Dates was "of a different character" than her touching of Allen.

C.      **Title VII Retaliation – Count Three**

The Eleventh Circuit has noted:

> Title VII makes it illegal for "an employer to discriminate against any of his employees ... because he has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter." 42 U.S.C. § 2000e–3(a). . . . To establish a prima facie case of retaliation, plaintiffs must prove that: (1) they engaged in statutorily protected conduct; (2) they suffered an adverse employment action; and (3) the adverse action was causally related to the protected expression. *Butler v. Ala. Dep't of Transp.*, 536 F.3d 1209, 1212–13 (11th Cir.2008).

*Trask v. Sec'y, Dep't of Veterans Affairs*, No. 15-11709, 2016 WL 1319748, at *10 (11th Cir. Apr. 5, 2016). Dates's *prima facie* case can be proven by either "direct" or "circumstantial" evidence of retaliation. *Wilson v. B/E Aerospace, Inc.*, 376 F.3d 1079, 1086 (11th Cir. 2004).

"'Where the non-movant presents direct evidence that, if believed by the jury, would be sufficient to win at trial, summary judgment is not appropriate even where the movant presents conflicting evidence.'" *Merritt v. Dillard Paper Co.*, 120 F.3d 1181, 1189 (11th Cir. 1997) (*quoting Mize v. Jefferson City Bd. of Educ.*, 93 F.3d 739, 742 (11th Cir.1996)); *see also, Bass v. Bd. of Cty. Comm'rs, Orange Cty., Fla.*, 256 F.3d 1095, 1112 (11th Cir. 2001) (same); *Shackelford v. Publix Super Markets, Inc.*, No. 7:12-CV-03581-MHH, 2014 WL 5148461, at *11 (N.D. Ala. Oct. 14, 2014)

(same); *Vinson v. Dep't of Corr., Florida*, 672 F. Supp. 2d 1247, 1253 (N.D. Fla. 2009) (same). Direct evidence is

> "evidence which reflects 'a discriminatory or retaliatory attitude correlating to the discrimination or retaliation complained of by the employee.'" [*Damon v. Fleming Supermarkets Of Florida, Inc.*, 196 F.3d 1354, 1358 (11th Cir. 1999)] (*quoting Carter v. Three Springs Residential Treatment*, 132 F.3d 635, 641 (11th Cir.1998)). Direct evidence is "evidence, that, if believed, proves [the] existence of [a] fact without inference or presumption." *Burrell v. Bd. of Trs. of Ga. Military Coll.*, 125 F.3d 1390, 1393 (11th Cir.1997). As our precedent illustrates, "only the most blatant remarks, whose intent could mean nothing other than to discriminate on the basis of" some impermissible factor constitute direct evidence of discrimination. *Rojas v. Florida*, 285 F.3d 1339, 1342 n. 2 (11th Cir.2002) (*quoting* [*Schoenfeld v. Babbitt*, 168 F.3d 1257, 1266 (11th Cir. 1999) (citations and quotations omitted); *see Carter v. City of Miami*, 870 F.2d 578, 582 (11th Cir.1989). If the alleged statement suggests, but does not prove, a discriminatory motive, then it is circumstantial evidence. *See Burrell*, 125 F.3d at 1393.

*Wilson*, 376 F.3d at 1086.

> "In the absence of direct evidence, Title VII discrimination and retaliation claims may be proven using circumstantial evidence and applying the burden shifting framework established in *McDonnell Douglas Corporation v. Green*, 411 U.S. 792, 802-04, 93 S.Ct. 1817, 1824-25, 36 L.Ed.2d 668 (1973)." *Harrison v. Int'l Bus. Machines (IBM) Corp.*, 378 F. App'x 950, 954 (11th Cir. 2010). Under that framework

> "[o]nce a plaintiff has established a prima facie case, the employer then has an opportunity to articulate a legitimate, non-retaliatory reason for

the challenged employment action." *Pennington v. City of Huntsville*, 261 F.3d 1262, 1266 (11th Cir.2001). "The ultimate burden of proving by a preponderance of the evidence that the reason provided by the employer is a pretext for prohibited, retaliatory conduct remains on the plaintiff." *Id.*

*Trask v. Sec'y, Dep't of Veterans Affairs*, No. 15-11709, 2016 WL 1319748, at *10 (11th Cir. Apr. 5, 2016).

In this case, Dates claims that the Defendant retaliated against her: 1) by reducing her hours after she began complaining about Miles's actions; and 2) by firing her after she complained about Miles's actions.[60] The Defendant makes no real attack on Dates's *prima facie* case as to either basis for this claim.[61] Accordingly, the

---

[60]   The Complaint also mentions "issuing a bogus write-up," and "suspending" Dates. There is no evidence in the record to support either allegation, and no argument has been made that either event occurred.

[61]   The following constitutes the Defendant's entire attack on Dates's *prima facie* case: "There is no casual [sic] connection between Dates'[s] protected activity (reporting alleged sexual harassment) and her adverse employment action (hours reduction/termination)."  (Doc. 30 at 47).  There appears, elsewhere in the Defendant's brief, another argument which <u>could</u> be construed as an attack on the "causation" element of this claim.  The Defendant argues:

> Litton testified that Dates'[s] sexual harassment complaint, which he was not even yet aware had been filed with the Equal Employment Opportunity Commission, played no role in his investigation into or termination of Dates. As stated by both Tomlin and Litton, if Rourke had acted this way towards Dates, and admitted doing so, she would have been terminated instead.

(Doc. 30 at 37).  Regardless of Litton's knowledge of the EEOC charge, he testified in his deposition that he knew that a sexual harassment complaint had been made by Dates to McDaniel <u>at the time it was made</u>.  (Doc. 33-1 at 4(14); *see also,* doc. 39 at 27–Plaintiff's proffered fact 200).  Therefore, at the time he conducted his investigation of the choking incident, Litton knew about Dates's complaint to McDaniel.  That complaint was protected conduct under Title VII. Further, it is admitted that the Defendant learned of Dates's EEOC filing on October 22, 2012.

Court will focus on: 1) whether the Defendant has articulated a legitimate, non-retaliatory reason for the challenged employment action; and 2) whether Dates has demonstrated that the articulated reason given by the Defendant is a mere pretext for discrimination.

### 1.  *The Reduction in Hours*

The Defendant has articulated the following legitimate non-discriminatory reason for Dates's reduction in hours: "Her working-hours were reduced at her own request by her own admission." (Doc. 30 at 47). The burden now shifts to Dates to show that this reason is actually a pretext for retaliation.

The Eleventh Circuit has stated:

> A legitimate nondiscriminatory reason proffered by the employer is not a pretext for prohibited conduct unless it is shown that the reason was false and that the real reason was impermissible retaliation or discrimination. *St. Mary's Honor Center v. Hicks,* 509 U.S. 502, 515, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993). If the proffered reason is one that might motivate a reasonable employer, a plaintiff cannot merely recast the reason, but must meet it "head on and rebut it." *Chapman v. AI Transport,* 229 F.3d 1012, 1030 (11th Cir.2000) (*en banc* ). Conclusory allegations or unsupported assertions of discrimination,

---

(See doc. 39 at 23–Plaintiff's proffered fact 184).  It is also admitted that Area Manager Al Tomlin and Assistant Manager Cornelius Jackson were aware of her filing that same day.  (See doc. 39 at 23-24–Plaintiff's proffered fact 186).  The Defendant fails to address why the knowledge of these individuals should not be imputed to Litton when it is undisputed that Tomlin was present with Litton when they interviewed Dates about the "choking" incident.  (*See*, doc. 30 at 30–Defendant's proffered fact 110).

> without more, "are not sufficient to raise an inference of pretext."
> *Mayfield v. Patterson Pump Co.,* 101 F.3d 1371, 1376 (11th Cir.1996)
> (quotation omitted).

*Worley v. City of Lilburn*, 408 F. App'x 248, 251 (11th Cir. 2011). To show pretext,

a plaintiff must "produce sufficient evidence to allow a reasonable finder of fact to

conclude that the . . . articulated reasons were not believable. She could do this by

pointing to weaknesses, implausibilities, inconsistencies, incoherencies, or

contradictions in the proffered explanation." *Brooks v. Cty. Comm'n of Jefferson Cty.,*

*Ala.*, 446 F.3d 1160, 1163 (11th Cir. 2006) (internal quotations and citations omitted).

In the instant case, the evidence provided by Dates demonstrates that the

proffered reason was a pretext for retaliation. First, the challenged employment

action, the reduction in hours, occurred almost immediately after Dates began

complaining about Miles's conduct.[62] Of course, while temporal proximity can be

used to show pretext, "temporal proximity alone does not establish pretext." *Jackson*

---

[62]   The harassing conduct began on September 3, 2012.  The cut in hours must have occurred prior to September 27, 2012, since the evidence, construed in the light most favorable to Dates, establishes that she complained, on the 27th, to McDaniel about her hours being cut. Further, it is undisputed that her hours continued to be cut after her complaints to McDaniel.   As noted previously, the following fact, proffered by Dates, was not disputed by the Defendant:

> 165.    Following the call, [] Dates['s] hours were further reduced, and within two days, Miles continued to physically harass her: "she was still touching, rubbing....she was - it didn't stop like at all."  Ex. 7, 314/3-23.

(Doc. 39 at 19).

*v. Hennessy Auto*, 190 F. App'x 765, 768 (11th Cir. 2006) (*citing Wascura v. City of South Miami*, 257 F.3d 1238, 1244–45 (11th Cir.2001)). However, in this case, there is more. The Defendant admits that Dates's hours were "further reduced after she called McDaniel the first time."[63] Further, the sole evidentiary basis for the Defendant's proffered reason is the testimony of Miles, the alleged harasser in this case, and about whom Dates had complained.[64] Finally, Dates disputes Miles's account, insisting instead that what actually happened was that, from time to time, she had been asked to help out on Wednesday nights, but, when her managers began to regularly schedule her on Wednesdays, she asked them not to do that. (Doc. 35-1 at 2(287)). In other words, Dates says she asked for a change in schedule, not a reduction in hours.

For these reasons, the court determines that Dates has demonstrated pretext as to the stated reason for her cut in hours.[65]

---

[63] *See* note 62.

[64] Miles testified that Dates's hours were shortened "because she said that [Miles] was working her six days and she wasn't getting 40 hours. She had four kids and she could no longer work at night." (Doc. 39-5 at 54-55). Miles stated that Dates had previously been working after 3 p.m., but now "said she needed to be gone by 3 p.m." (Doc. 39-5 at 55).

[65] Importantly, the Eleventh Circuit has

recognized that the *McDonnell Douglas* framework "is not the exclusive means" of prevailing on a Title VII claim based on circumstantial evidence. *Vessels v. Atlanta Indep. Sch. Sys.*, 408 F.3d 763, 768 n.3 (11th Cir. 2005). A plaintiff's claim will also survive summary judgment if he otherwise presents "enough

## 2.   *Termination*

It is undisputed that McDaniel instructed the Defendant's supervisors to look for a reason to terminate Dates. Jackson states that he was present at two meetings where McDaniel said "we should find any little thing we can on Isha [Dates] to get rid of her," and later followed up to see if the managers had found any basis to fire Dates. Litton, the person who terminated Dates, was part of those meetings. (Doc. 39 at 21–Plaintiff's proffered fact 175).

Litton testified that McDaniel was his supervisor, who "would ultimately make any decisions on the outcome of any investigations usually." (Doc. 33-1 at 3(10)). He continued that "she was involved in all [decisions] to a certain degree usually." (Doc. 33-1 at 3(11)). But he would decide some cases on his own if they were "clear cut." (Doc. 33-1 at 3(12)). McDaniel apparently accepted Litton's decision on the matter, despite the fact that she seemingly had the "ultimate" authority.  The fact that Litton, who fired Dates, knew about Dates's complaints of harassment, and received an

---

circumstantial evidence to raise a reasonable inference" that an adverse action was taken against him in violation of Title VII. [*Hamilton v. Southland Christian Sch., Inc.*, 680 F.3d 1316, 1320 (11th Cir. 2012)].

*Long v. Ala. Dep't Human Resources, et al.,*, No. 15-10856, slip op. at 27 (11th Cir. May 31, 2016).  In addition to showing pretext, the fact that Dates's hours were shortened, by her alleged harasser, within a short period of time after Dates complained about the harassment, creates a reasonable inference of retaliation.  *See*, *Long*, at 27-28 (evidence sufficient to raise inference of retaliation where, within a month of protected conduct, investigation of plaintiff began, which ultimately led to her termination).

order, from his supervisor (to whom the complaints had been made), to find "any basis" to terminate Dates, is direct evidence of discrimination.  Even if it were not, the timing of these events, coming so soon after the complaints of harassment, creates a reasonable inference of retaliation.  *See, Long*, at 27-28.[66]

### a.    Collateral Estoppel

The Defendant argues that "Judge King's well-reasoned and unequivocal ruling that Dates's termination was justifiable should bar her claims of retaliatory discharge under Count Three and Count Four of Dates'[s] Complaint." (Doc. 30 at 39). More specifically, the Defendant insists that this Court should apply "collateral estoppel" to bar these claims because of this state court ruling. (Doc. 30 at 39-40).

As noted in *Rawlinson v. Whitney Nat. Bank*, 416 F. Supp. 2d 1263 (M.D. Ala. 2005), one of the cases cited by the Defendant:

> To invoke collateral estoppel or issue preclusion properly, [[a party] must show three prerequisites: "(1) the issue at stake must be identical to the one alleged in the prior litigation; (2) the issue must have been actually litigated in the prior litigation; and (3) the determination of the issue in the prior litigation must have been a critical and necessary part of the judgment in that earlier action. In addition, the party against

---

[66]  The first five pages of the Defendant's argument discuss: whether Dates's conduct was a "terminable offense;" whether Miles played any part in Dates's termination; and whether Dates was terminated based on her own admissions.  (Doc. 30 at 33-37).  No legal authority is cited or discussed in this portion of the Defendant's brief.  The court is unclear as to what point the Defendant is trying to make in this portion of its brief.  Regardless, there are genuine issues of material fact surrounding all of these arguments.  They provide no basis for granting summary judgment to the Defendant.

whom the earlier decision is asserted must have had a full and fair opportunity to litigate the issue in the earlier proceeding." *Nobles v. Rural Cmty. Ins. Servs.*, 303 F.Supp.2d 1292 (M.D.Ala.2004) (Thompson, J.), *aff'd*, 2004 WL 2155796, 116 Fed.Appx. 253 (11th Cir.2004) (table).

*Rawlinson v. Whitney Nat. Bank*, 416 F. Supp. 2d 1263, 1272 (M.D. Ala. 2005); *see also, Nationwide Mut. Ins. Co. v. Sharif*, 554 F. App'x 807, 810 (11th Cir. 2014) ("Under Alabama law, collateral estoppel requires (1) the issue in each proceeding be identical, (2) the issue have been actually litigated in the prior proceeding, (3) that the resolution of the issue was necessary to the prior court's final judgment, and (4) that either the litigant being estopped or a person in privity with that litigant have been a party to the prior proceeding.").[67]

---

[67] In another case cited by the Defendant, *Mitchell v. Humana Hosp.-Shoals*, 942 F.2d 1581 (11th Cir. 1991), the Eleventh Circuit wrote:

A federal court in a Title VII case is to accord a prior state court judgment the same preclusive effect as would courts of the state issuing the judgment. . . . We thus turn to Alabama preclusion law to answer the question whether Mitchell's unemployment benefits case precludes her retaliatory discharge claim.

Collateral estoppel operates to prevent the relitigation of issues already decided in an earlier case. Alabama requires four elements before resolution of an issue in a subsequent suit will be precluded by an earlier judgment: 1. The party claiming the benefit of the prior judgment is one who would have been prejudiced by a contrary decision in the earlier case. 2. The party sought to be estopped was either a party or in privity with a party to the earlier case. 3. The latter suit must have involved an issue identical to one actually litigated and decided in the earlier case. 4. Resolution of the identical issue must have been necessary to the earlier judgment.

*Mitchell v. Humana Hosp.-Shoals*, 942 F.2d 1581, 1582-83 (11th Cir. 1991) (internal citations omitted).  Fairly recently, it has been noted:

In 10 pages of its brief, the Defendant sets out case after case as examples of where state court decisions, such as the one in the instant case, have been used to collaterally estop a Plaintiff from relitigating certain issues in a later federal court proceeding. (Doc. 30 at 37-46). The Defendant then states:

> Consistent with the opinions cited above and Judge King's detailed Final Judgment, the state court's finding that [the Defendant] fired Dates for misconduct bars her from successfully pursuing her retaliatory discharge claims. Dates argued in state court that she was not

---

Under the Full Faith and Credit Act, 28 U.S.C. § 1738, federal courts must give a state court judgment preclusive effect if the state's courts would do the same. As a necessary corollary, federal courts must look to state law to see whether a state court decision will preclude issues or claims brought in federal court. More specifically, "[a] state court's decision upholding an administrative body's findings has preclusive effect in a subsequent federal court proceeding if: (1) the courts of that state would be bound by the decision; and (2) the state proceedings that produced the decision comported with the requirements of due process." *Maniccia v. Brown*, 171 F.3d 1364, 1368 (11th Cir.1999) (*citing Kremer v. Chem. Constr. Corp.*, 456 U.S. 461, 482 (1982)).

In Alabama, for the doctrine of collateral estoppel to apply, the following elements must be established before the resolution of an issue in an earlier proceeding will preclude relitigation in a later one: 1) there is identity of the parties/their privies; 2) there is identity of issues; 3) the parties had an adequate opportunity to litigate the issues in the administrative proceeding; 4) the issues to be estopped were actually litigated and determined in the administrative proceeding; and 5) the findings on the issues to be estopped were necessary to the administrative decision. *See, e.g., Wal–Mart Stores, Inc. v. Smitherman*, 743 So.2d 442, 445 (Ala.1999), *overruled on other grounds by Ex parte Rogers*, 68 So .3d 773 (Ala.2010); *Lee L. Saad Const. Co., Inc. v. DPF Arch., P.C.*, 851 So.2d 507, 520 (Ala.2002). "The burden is on the party asserting collateral estoppel to prove that the issue it is seeking to bar was determined in the prior adjudication." *Lee L. Saad*, 851 So.2d at 520.

*Chase v. Ace Hardware Corp.*, No. CIV.A. 13-00077-KD-M, 2014 WL 517488, at *8 (S.D. Ala. Feb. 7, 2014) (Dubose, J.) (also citing other factors to be considered in the determination as to whether the plaintiff had an adequate or "full and fair" opportunity to litigate the issues below).

really terminated for misconduct but instead because of her sexual harassment claim. If she had shown that Milo's fired her for that reason, she would have won on her claim for UC benefits. Yet she failed to prevail in her argument that Milo's proffered reason for firing her amounted to pretext used to conceal retaliation.

In this case, the Court has been provided a copy of Judge King's Final Judgment that Dates was justifiably terminated for misconduct. In his ruling, Judge King set forth factual findings regarding the events surrounding Dates'[s] termination. Accordingly, in this case . . . the Court has been provided the factual basis and reasoning of an Alabama Judge's determination that Dates was terminated for good cause for misconduct. The elements of collateral estoppel have been met in this case. Dates, therefore, has failed to meet her burden to create a genuine issue of material fact for trial on the issue of retaliation as it pertains to her termination.

(Doc. 30 at 46). As noted in Dates's response to the motion (*see* doc. 39 at 41-43), this conclusory argument fails to even set out the elements of collateral estoppel, much less make a showing that those elements have been satisfied. Since the Defendant has not carried its burden, the application of the doctrine of collateral estoppel is not appropriate.[68, 69]

---

[68] The Court also notes that a recent Eleventh Circuit opinion affirmed the denial of an award of "prevailing party" attorney's fees for such proceedings, which included an appeal to an Alabama circuit court, because they were not "necessary" or "related" to a plaintiff's Title VII proceedings. *See Maner v. Linkan LLC*, 602 F. App'x 489, 491-92 (11th Cir. 2015) (affirming district court's exclusion of time attorneys spent litigating matters related to plaintiff's application for state unemployment benefits, because those hours "concerned a discrete state administrative proceeding and not her federal Title VII lawsuit," and were not "necessary" or "related" to her federal litigation).

[69] Dates argues:

In a roundabout way, [the Defendant] argues that Ms Dates'[s] retaliation

## D.   Outrage – Count Five

The Supreme Court of Alabama has stated

As this Court has . . . held:

> " 'The tort of outrage is an extremely limited cause of action. It is so limited that this Court has recognized it in regard to only three kinds of conduct: (1) wrongful conduct in the family-burial context, *Whitt v. Hulsey*, 519 So.2d 901 (Ala.1987); (2) barbaric methods employed to coerce an insurance settlement, *National Sec. Fire & Cas. Co. v. Bowen*, 447 So.2d 133 (Ala.1983); and (3) egregious sexual harassment, *Busby v. Truswal Sys. Corp.*, 551 So.2d 322 (Ala.1989). *See also Michael L. Roberts and Gregory S. Cusimano, Alabama Tort Law*, § 23.0 (2d ed.1996). In order to recover, a plaintiff must demonstrate that the defendant's conduct "(1) was intentional or reckless; (2) was extreme and outrageous; and (3) caused emotional distress so severe that no reasonable person could be expected to endure it." *Green Tree Acceptance, Inc. v. Standridge*, 565 So.2d 38, 44 (Ala.1990) (citing American Road Service Co. v. Inmon [, 394 So.2d 361 (Ala.1980)]).' "

*Potts v. Hayes*, 771 So.2d 462, 465 (Ala.2000). That is not to say,

---

claim is precluded by the unemployment determination. Defendant appears to contend that Dates must prove that retaliation was the sole cause of her discharge, which she cannot do because, it argues, since the Alabama Circuit Court already concluded that [] Dates had engaged in misconduct. However, the decision of the Alabama Circuit Court on [] Dates'[s] unemployment does not doom [] Dates'[s] retaliation claim because "but for" does not mean "sole cause," and therefore any factual finding by the Circuit Court as to Dates'[s] conduct at Milos does not preclude a jury from finding that Milos would not have terminated her "but for" her protected activity.

(Doc. 39 at 37; *see also* doc. 39 at 38-41).  In light of the court's determination that the Defendant has failed to carry its burden, it will not address this argument.

73

however, that the tort of outrage is viable in only the three circumstances noted in *Potts*. Recently, this Court affirmed a judgment on a tort-of-outrage claim asserted against a family physician who, when asked by a teenage boy's mother to counsel the boy concerning his stress over his parents' divorce, instead began exchanging addictive prescription drugs for homosexual sex for a number of years, resulting in the boy's drug addiction. *See O'Rear v. B.H.*, 69 So.3d 106 (Ala.2011). It is clear, however, that the tort of outrage is viable only when the conduct is " 'so outrageous in character and so extreme in degree as to go beyond all possible bounds of decency, and to be regarded as atrocious and utterly intolerable in a civilized society.' " *Horne v. TGM Assocs., L.P.*, 56 So.3d 615, 631 (Ala.2010) (quoting *Inmon*, 394 So.2d at 365)."

*Ex parte Bole*, 103 So. 3d 40, 52-53 (Ala. 2012).

Dates claims that the Defendant

committed [the] tort of outrage by (1) for example, brushing up against Plaintiff's breasts, asking Plaintiff out for dinner, and frequently and regularly rubbing up against Plaintiff's behind, and (2) telling Plaintiff to "shut up" and handle the harassment herself when Plaintiff on several occasions complained about the harassment.

(Doc. 1 at 18-19). Accordingly, this claim is limited to facts pertaining <u>only</u> to the

alleged <u>harassment</u> by Miles, and <u>what McDaniel said</u> during the first complaint by

Dates on September 27, 2014.[70]

---

[70] The court has held the Defendant to a strict standard regarding the manner in which it has presented its arguments, noting at times that Dates should not be required to craft responses to vague and underdeveloped arguments.  Similarly, because the Complaint has limited the outrage claim to these facts, it would be unfair to require the Defendant to move for Summary Judgment as to that claim based on conduct other than that specifically identified in the Complaint.

1.     *The Harassment by Miles*

a.     **Whether the Conduct in Question Was Egregious**

"Alabama courts do recognize the tort of outrage for sexual harassment . . . cases, but only in particularly egregious cases." *K.M. v. Alabama Dep't of Youth Servs.*, 360 F. Supp. 2d 1253, 1260 (M.D. Ala. 2005). The Defendant argues first that the conduct in this case is not the type of conduct that the Alabama Supreme Court has found to be egregious. (Doc. 30 at 53). It cites only *McIsaac v. WZEW-FM Corp.*, 495 So. 2d 649, 650-51 (Ala. 1986) in support of this argument.

In *McIsaac*, the plaintiff testified that her boss tried to kiss her, asked her to have an affair with him, gave her suggestive "looks," asked her to dinner, asked her to visit him on trips out of town, touched her arm and put his arm around her, and ultimately fired Dates for refusing his advances. The Alabama Supreme Court held that "even assuming all of [the plaintiff's] assertions . . . we find that, as a matter of law, she has failed to establish any evidence of extreme and outrageous conduct on the part of the defendants." *Id.* at 651. That court wrote:

> [t]he most that can be said, viewing the evidence most favorable to [the plaintiff], is that [her boss's] behavior extended to "mere insults, indignities, threats [or] annoyances," for which the law will not hold one liable in tort. Restatement (Second) of Torts § 46, Comment d., (1965); *Logan v. Sears, Roebuck & Co.*, 466 So.2d 121 (Ala.1985). The trial court correctly granted summary judgment on this claim.

*McIsaac*, 495 So. 2d at 651.

The Defendant fails, however, to discuss, explain, or distinguish later cases such as *Busby v. Truswal Sys. Corp.*, 551 So. 2d 322, 324 (Ala. 1989), where the Alabama Supreme Court held that inappropriate and/or lewd invitations, remarks, actions, invitations, etc. was "evidence from which a jury could reasonably determine that [the] conduct rose to [the level of the tort of outrage]." *Id.*; *see also*, *Henry v. Georgia Pac. Corp.*, 730 So. 2d 119, 121 (Ala. 1998) (noting *Busby* as a case where repeatedly subjecting an employee to sexually harassing comments could be egregious sexual harassment); *Cunningham v. Dabbs*, 703 So. 2d 979, 982 (Ala. Civ. App. 1997) ("offensive behavior . . . including sexual propositions and inappropriate physical contact," "exceeded the bounds of decency established by civilized society.").

Fairly recently, Judge Steele, in a very persuasive opinion from the Southern District of Alabama, wrote:

> Ever since the inception of outrage doctrine, Alabama courts have recognized the viability of such claims in the employment context in appropriate circumstances. Indeed, the law is clear that "an employer, by virtue of his position, possesses no roving license to treat his employee in an extreme and outrageous manner, whether before, during, or after their relationship." *American Road Service Co. v. Inmon*, 394 So.2d 361, 364 (1981). That said, Alabama courts have taken pains to emphasize that an outrage claim will not lie in a mere run-of-the-mill employment dispute arising from dismissal of an employee at will. *See* [*Wal-Mart*

*Stores, Inc. v. Smitherman*, 872 So. 2d 833, 840 (Ala. 2003)] ("It would be intolerable in a civilized society to hold that an employer is guilty of outrageous conduct for merely discharging an employee at will.") (*quoting Harrell v. Reynolds Metals Co.*, 495 So.2d 1381, 1387 (Ala.1986)).

Review of pertinent Alabama authorities reveals that the line of demarcation between non-actionable outrage claims and actionable outrage claims in the employment arena is found in the determination of whether the termination is for reasons that contravene public policy. Where a plaintiff complains that her discharge contravenes public policy, particularly if the discharge was the culmination of a protracted pattern of discrimination in violation of public policy, she may properly pursue a claim of outrage because the violation of public policy furnishes the requisite "sound of fury" to accompany the termination. *Smitherman*, 872 So.2d at 840 (outrage claim not cognizable if termination is "not for a reason which contravenes public policy," and if termination was not accompanied with "sound of fury") (quoting *Harrell*, 495 So.2d at 1387); *see also Wyatt v. BellSouth, Inc.*, 998 F.Supp. 1303, 1312 (M.D.Ala.1998) (under Alabama law, "the discharge of an employee rises to the level of the tort of outrage only if the discharge violates public policy"). Alabama courts have construed this standard to authorize outrage claims where a plaintiff is complaining about discrimination in retaliation for exercising the fundamental right to marry, or about intrusion on her federally protected right to be free from gender discrimination. *See Rice v. United Ins. Co. of America*, 465 So.2d 1100, 1102 (Ala.1984) (trial court erred in dismissing outrage claim where pregnant employee claimed employer discriminated because of her pregnancy by engaging in a pattern of conduct over a period of several months aimed at forcing her to leave her job, thereby violating plaintiff's federally protected right to be free from discrimination based on sex); *Cunningham v. Dabbs*, 703 So.2d 979, 983 (Ala.Civ.App.1997) (finding jury question on outrage claim where plaintiff did not claim wrongful discharge of at-will employee, but instead alleged a pattern of harassment and a termination of employment in violation of her fundamental right to marry).

*Lees v. Sea Breeze Health Care Ctr., Inc.*, 391 F. Supp. 2d 1103, 1107-08 (S.D. Ala. 2005) (Steele, J.) (footnotes omitted).

Title VII establishes that it is against public policy to create a hostile work environment. In its initial brief, the Defendant makes no attempt to explain why, under the authority cited by Judge Steele, the conduct alleged in the instant case does not amount to outrageous conduct.[71]

Be that as it may, after considering the evidence in the light most favorable to Dates, and pertinent authority on this issue, the court holds that the few instances of comments and touching Dates described do not amount to the type of "particularly egregious" sexual harassment which would support a claim of outrage under Alabama

---

[71] The Defendant does discuss *Lees* in its reply brief after <u>Dates</u> cited the case in her response brief.  However, by focusing on the fact that *Lees* was decided in the context of a motion to dismiss, as opposed to a motion for summary judgment, the Defendant misses the point.  The <u>legal</u> principals regarding what conduct constitutes outrage, which are set out in *Lees*, apply in <u>either</u> context.  Further, the Defendant only makes a half-hearted attempt to address those principles.  It states:

> Dates is required to show that her termination was for reasons that contravene public policy. *See Lees*, 391 F. Supp. 2d at 1108. Judge King in the unemployment compensation hearing determined Dates was terminated for misconduct, not in violation of public policy. (Ex. 2.) Therefore, Dates cannot establish the requisite "sound of fury" required to ultimately prove the outrageousness element of her claim. Dates['s] claim for outrage should be dismissed.

(Doc. 43 at 30).  As noted previously, the Defendant has failed to demonstrate why this Court should give any weight to Judge King's decision.

law.[72]  Summary judgment will be granted as to this basis for the outrage claim.

### 2.    *McDaniel's Comments to Dates during the September 27, 2012, Call*

Nothing that occurred during the call between McDaniel and Dates could reasonably be considered "so outrageous in character and so extreme in degree as to go beyond all possible bounds of decency, and to be regarded as atrocious and utterly intolerable in a civilized society." Summary judgment will also be granted as to this basis for the outrage claim.

## V.    CONCLUSION

For the reasons stated herein, the Motion for Rule 11 Sanctions is **DENIED**. In addition, for the reasons stated herein, the Defendant's Motion for Summary Judgment is **GRANTED in part** and **DENIED in part**. It is hereby **ORDERED, ADJUDGED**, and **DECREED** as follows:

1.    Summary Judgment is hereby **GRANTED** in favor of the Defendant, and against Dates, as to Count One, to the extent that it is based on discrimination based upon Dates's race. Count One, to the extent that it alleges discrimination based upon Dates's race, is hereby **DISMISSED with prejudice**. In all other

---

[72]  The Defendant argues that Dates's claim should fail because she has not established that the Defendant should be held responsible for Miles's conduct.  In light of this Court's holding, this argument will not be addressed.

respects, Summary Judgment is **DENIED** as to Count One.

2.   Summary judgment is hereby **GRANTED** in favor of the Defendant and against Dates as to Counts Two and Four.  Those counts are hereby **DISMISSED with prejudice**.

3.   Summary judgment is hereby **DENIED** as to Count Three.

4.   Summary judgment is hereby **GRANTED** in favor of the Defendant and against Dates as to Count Five.   That Count is hereby **DISMISSED with prejudice**.

5.   By separate order, the Court will set this case for a Final Pretrial Conference.

**DONE** and **ORDERED** this 2nd day of June, 2016.

**VIRGINIA EMERSON HOPKINS**
United States District Judge