FILED
2016 Nov-14  PM 04:34
U.S. DISTRICT COURT
N.D. OF ALABAMA

# EXHIBIT 2

Case 1:14-cv-01464-VEH   Document 73-2   Filed 11/14/16   Page 2 of 32

ROBERT GOLDSTEIN M.D.                                    August 25, 2015
Dates vs. Norton                                                   1–5

**Page 1**

```
1    IN THE UNITED STATES DISTRICT COURT
     FOR THE NORTHERN DISTRICT OF ALABAMA
2    SOUTHERN DIVISION

3    ------------------------------------------

     ISHA DATES,
4
                  Plaintiff,
5
          -v-        Civil Action No. 1:14-CV-01464-VEH
6
     FRANK NORTON, LLC, d/b/a MILO'S HAMBURGERS,
7
                  Defendant.
8
     ------------------------------------------
9
          DEPOSITION OF ROBERT GOLDSTEIN, M.D., a Witness
10   herein, taken by the Defendant, at the offices of
     ESQUIRE DEPOSITION SERVICES, 1394 Broadway, New York,
11   New York 10018, on Tuesday, August 25, 2015, at 1:00
     p.m., before Jeffrey Shapiro, a Shorthand Reporter and
12   notary public, within and for the State of New York.
13
14
15
16
17
18
19
20
21
22
23
24
25
```

**Page 3**

```
1    A P P E A R A N C E S :

     CARR ALLISON
3    Attorneys for the Defendant
     100 Vestavia Parkway
4    Birmingham, Alabama 35216
5       BY:  SEAN C. PIERCE, ESQ.
6
7
     EFFAT HUSSAIN
8    1050 Seven Oaks Lane
     Attorney for the Plaintiff
9    Mamaroneck, New York 10543
10
11
                     ***
12
13
14
15
16
17
18
19
20
21
22
23
24
25
                                                    2
```

**Page 4**

```
1    Whereupon,
2         ROBERT L. GOLDSTEIN, M.D.,
3    after having been first duly sworn, was examined and
4    testified as follows:
5         DIRECT EXAMINATION
6    BY MR. PIERCE:
7    Q.   State your name for the record.
8    A.   Robert Goldstein, M.D.
9    Q.   What is your address?
10   A.   ████████████████████████
11   ████████████████████
12   Q.   Doctor, just not that I'm going to
13   refer to you as anything but Dr. Goldstein today.
14   You go by Robert, Bob, Lloyd or something else?
15   A.   Bob.
16   Q.   Bob.  All right.  Thank you, Dr.
17   Goldstein.
18   Do you understand why you're here today?
19   A.   Yes.
20   Q.   And can you explain to me why you are
21   here today?
22   A.   I'm here to be deposed in this
23   lawsuit.
24   Q.   In what capacity, Dr. Goldstein?
25   A.   As a psychiatric expert.
```

**Page 5**

```
1         Goldstein
2    Q.   Is there a particular type of
3    psychiatric expert you are or that in the capacity
4    that you are testifying today?
5    A.   I suppose I'm in the category of the
6    psychiatric expert who had to submit a Rule 26
7    report and may be called to testify at trial.
8    Q.   And thank you for that, Doctor.
9    I have heard of psychiatrists and I have
10   heard of forensic psychiatrists, Dr. Goldstein.
11   Are you one or the other or something else?
12   A.   I regard myself as general
13   psychiatrist.
14   Q.   So it is your understanding that you
15   are not testifying in the capacity as an expert
16   forensic psychiatrist in this case?
17   A.   Correct.
18   Q.   Okay.  Thank you, Doctor.
19   Doctor, I have been provided several
20   documents by the attorney who retained you in this
21   case, Joshua Friedman.
22   Are you acquainted with Mr. Friedman?
23   A.   Yes.
24   Q.   Have you worked with Mr. Friedman
25   before?
```



ROBERT GOLDSTEIN M.D.                                    August 25, 2015
Dates vs. Norton                                               6—9

Page 6

1          Goldstein
2       A.   Yes.
3       Q.   How many times have you worked with
4   Mr. Friedman before?
5       A.   Over the years, I think it probably
6   goes back about twelve or maybe more years.  I've
7   worked with him on probably a couple dozen cases
8   over the years.
9       Q.   We're going to come back to that
10  point.  I want to go through some records with
11  you, Doctor.  One of the things that was provided
12  to us by Mr. Friedman, which I assume originated
13  with you, is what's been marked as Defendant's
14  Exhibit 1.
15          (Indicating.)
16          Can you explain to me what that is?
17      A.   This I would call a -- a kind of
18  short form resume.  I think there is a word for
19  this.  I think it's called a biopic, B-I-O-P-I-C,
20  but essentially it's a condensed short form CV.
21      Q.   Sure.  And I have your resume at 20
22  pages, when including presentations and
23  publications.  So obviously, that is a summary --
24      A.   Yes.
25      Q.   -- a very concise summary of what's

Page 7

1          Goldstein
2   found?
3       Doctor, I will hand you what's marked as
4   Defendant's Exhibit 2.
5          (Indicating.)
6       That is the CV that I had been provided for
7   you.  It does not, as far as I can tell, Dr.
8   Goldstein, have a date on it.
9       Can you tell whether that is the most recent
10  or current version of your CV?
11      A.   This is the next to most current
12  version.  There's a word for that, "penultimate."
13      Q.   Penultimate, I think that's a very
14  good use.
15      A.   This was probably replaced within the
16  last six months.
17      Q.   Do you have a more recent version of
18  your CV with you today?
19      A.   Not with me, but I can supply it.
20      Q.   If you would supply it to the
21  attorneys who have retained you in this case and
22  they can provide it to me, I would appreciate it,
23  Doctor.
24      One thing that jumps out at me, Doctor, in
25  your resume, is there are quite a few

Page 8

1          Goldstein
2   presentations -- I believe these fall in the
3   category of presentations, entitled "The
4   Psychiatrist's Role in Sexual Harassment Cases."
5          (Indicating.)
6       A.   I have talked about that -- not sure
7   how many times.
8       Q.   Multiple times?
9       A.   Yeah.  Yes.
10      Q.   Is that a presentation that you give?
11      A.   It's a part of a program curriculum
12  of a -- there's a one-year forensic psychiatry
13  post-graduate fellowship.
14      Q.   I see that.
15      A.   And there are various topics that are
16  brought up to, not entirely a lecture, but a kind
17  of colloquium with the fellows.  So somebody like
18  myself who has a fair amount of experience with a
19  certain area will talk to them and exchange
20  information and experiences on that particular
21  issue.
22      Q.   Okay.  Why sexual harassment as
23  opposed to race discrimination or retaliation or
24  some other civil cause of action?
25      A.   I guess only because somebody wiser

Page 9

1          Goldstein
2   than me makes up the curriculum and that was my
3   assignment, the many topics I could have dealt
4   with, a number of different topics.  That's what I
5   was assigned.
6       Q.   The centurion told you to talk and
7   you talked on sexual harassment?
8       A.   Yes.  I've been involved in a number
9   of cases that are in litigation -- that were in
10  litigation.
11      Q.   Can you put any estimate on the
12  number of sexual harassment cases you've been
13  involved in?
14      A.   I'd have to guess.
15      Q.   A range would be fine.
16      A.   Yes.  Maybe a dozen or so.  Maybe two
17  dozen over the last fifteen years.
18      Q.   The psychiatrist's role in sexual
19  harassment cases colloquium is mentioned several
20  times on your extended CV.
21      Would those have been the same presentations
22  given to a different class of students or would
23  those have been different presentations with
24  different content in them?
25      A.   Probably the content is not uniform.



Page 10

Goldstein

1     I open it up for discussion.  Some of the people
2     in the room have read about the subject or even
3     had cases, forensic cases involving the subject,
4     so it's not the same lecture or the same
5     presentation every time.
6          Q.   Is there a syllabus or outline notes
7     or something that you have or that you created for
8     that presentation, that colloquium?
9          A.   There may be somewhere.  I don't
10    know.  I haven't looked at it in a number of
11    years.  I may have maybe even outlined what I
12    wanted to talk about and tried to follow that in
13    subsequent classes.
14         Q.   Sure.
15         Then I would ask, Doctor, I've got the most
16    recent listing on this CV as May 25, 2011.  Now
17    that was four years ago.
18         Would you please go back and see what notes,
19    what syllabus, what outlines you have?  I don't
20    really care what your students may have submitted
21    or provided.  I want to see what Dr. Goldstein
22    taught them or guided them in a colloquium on that
23    particular subject.
24         A.   Sure.  It wouldn't be anything fancy
25

Page 11

Goldstein

1     with the -- maybe half-a-dozen handwritten pages
2     on a pad.
3          Q.   Is your handwriting legible?
4          A.   I think so, but most people don't
5     agree with me.
6          Q.   Do you have a secretary?
7          A.   Not now.
8          Q.   Has she worked for you for 20 years
9     because no one else can read your handwriting?
10         A.   A few people can read it.  There are
11    a few very talented people who can read it.
12         Q.   Doctor, on a related note, for
13    instance, Number 35 on the list of presentations
14    is entitled "Preparation of the Psychiatric Expert
15    Witness in Sexual Harassment Cases."
16         Now, this was an NYU Law School presentation
17    in March of 2000.  Would there be an outline or
18    notes or syllabus?  I guess in 2000 predates
19    PowerPoint, something else that you either worked
20    off of or actually originated on that subject.
21         A.   I'm sorry.  Where was that?
22         Q.   Number 35 on the list.  It was at NYU
23    Law School.
24         A.   Oh, the New York Law School.  Yeah,

Page 12

Goldstein

1     NYU Law School and New York Law School are quite
2     different.
3          Q.   I apologize to whoever I may have
4     offended with that remark, then.
5          A.   With all due respect.
6          Q.   Do you know if you would still have
7     materials from that presentation?
8          A.   I don't think there were any
9     materials.  It was kind of a free form workshop.
10    I was a psychiatrist who had, back then, that was
11    fifteen years ago, maybe had worked on one or two
12    cases, and the law students looked up to my great
13    experience and wanted to discuss how I functioned
14    in those cases.  Basically that was it.
15         Q.   If you still have any notes from it,
16    I appreciate you attempting to locate those.
17         A.   Sure.
18         Q.   And I appreciate you doing so.
19         A.   Okay.
20         Q.   I'll stop torturing you on past
21    presentations now.
22         There are some papers you have written that
23    I would suggest are related to the testimony you
24    are going to be providing or I assume you are

Page 13

Goldstein

1     going to be providing in this particular case.
2          Either you or Mr. Friedman did us the
3     courtesy of presenting us with "Psychiatrist in
4     the hot seat, discrediting doctors by impeachment
5     of their credibility."
6          Is that something you always produce or was
7     there some reason you produced it specifically in
8     this case?
9          A.   I don't believe I produced anything.
10    I wasn't asked for anything.  I'm always happy
11    that people still read some of these old -- what
12    is it, about 20 years old?  I'm really surprised.
13         Q.   '88.  Closer to 30.  You were a young
14    man when you wrote it.
15         A.   Is that still in print?
16         Q.   That brings me to my very point,
17    Doctor.  For that which are listed as
18    presentations on your CV -- I've got that on 14
19    pages -- do you keep copies of those past
20    articles, that you can access and provide us with?
21         A.   I don't believe I have anything from,
22    you know, presentations per se.  I do have some
23    many reprints, because when you publish something
24    they often send you like a hundred reprints.



ROBERT GOLDSTEIN M.D.                                    August 25, 2015
Dates vs. Norton                                                14–17

Page 14

1                       Goldstein
2       Q.    Exactly.
3       A.    And I --
4       Q.    They go on my shelves and gather
5    dust.
6       A.    Yeah, and I'm waiting for someone --
7    no.  Occasionally, someone asks for a reprint.
8    But these days, they can just download it.  You
9    know, for a number of years now, so I never get
10   requests anymore.  It just costs a lot of money to
11   download all these old articles.
12      Q.    Not to mention I can't get one that's
13   autographed by you.
14      So I guess my question is, specific to the
15   subject matters on which you will be testifying,
16   for instance, Number 39, "The Lawyer's Complete
17   Guide to Post-Traumatic Psychiatric Injuries
18   Resulting From Sexual Assaults and Other Criminal
19   Acts."
20      There was one that was specific to -- and I
21   took my tab off and I apologize -- there was one
22   that was specific to sexual harassment cases,
23   "Hiring the Hired Gun, Lawyers and Their
24   Psychiatric Experts."
25      A.    That was a publication.

Page 15

1                       Goldstein
2       Q.    And I'm sorry, I was going to correct
3    you on that.
4       You referred to presentations earlier.  I've
5    moved on to publications.  Do you have access to
6    your publications?
7       A.    As I said, I probably have reprints
8    of most of them, not all, but most of them; if
9    they can be retrieved from my various packed file
10   cabinets.
11      Q.    Would it be easier, Doctor, if I sent
12   you a list through the attorneys who have retained
13   you of the specific ones I would like rather than
14   pulling teeth in this particular setting?
15      A.    Absolutely.
16      Q.    Okay.  And I will trust you will find
17   the ones you can find and send it to me.  If you
18   can't find them, just let the attorneys know that
19   and they can let me know that.
20      A.    Some of them may be very yellowed
21   paper; ready to disintegrate.
22      Q.    We will digitize them and send you a
23   copy back so that you have them in perpetuity.
24      A.    Great.
25      Q.    All right.  You're not just a medical

Page 16

1                       Goldstein
2    doctor, are you, Dr. Goldstein?
3       A.    No.
4       Q.    What particular credentials or
5    qualifications qualify you to testify as an expert
6    witness in this case?
7       A.    I'm a psychiatrist, a medical doctor
8    who is board certified in psychiatry.  I have,
9    over the years, had a great deal of experience
10   working with patients would who have been
11   subjected to traumatic stress of various kinds.
12      For five or six years, I was the director of
13   outpatient psychiatry at the Manhattan VA where I
14   treated, supervised the treatment of -- and that's
15   five or six years -- thousands of veterans who
16   were suffering from posttraumatic stress disorder,
17   PTSD function.
18      I have seen many, in my private treatment
19   practice, I have seen many patients with
20   posttraumatic stress disorder; not solely from a
21   military context, but in civilian context
22   including sexual assaults, serious injuries,
23   robberies, being mugged in New York -- although
24   that hardly happens anymore -- motor vehicle
25   accidents where people would sustain serious

Page 17

1                       Goldstein
2    injuries.
3       And in more recent times, a lot of patients
4    I've seen have been suffering from some kind of
5    psychological reaction to stress in the workplace.
6    And many of these are, you could say some kind of
7    discrimination, not necessarily sexual harassment,
8    the age discrimination, national background,
9    ethnic, some of them sexual harassment.
10      I have been, as I said earlier, retained in
11   a few dozen cases over the years to evaluate
12   litigants for one side or the other.
13      Q.    By that you mean in an expert
14   capacity?
15      A.    In an expert --
16      Q.    As opposed to a treater capacity?
17      A.    Yes.
18      Q.    Thank you, Doctor.  I didn't mean to
19   interrupt you.
20      A.    So I have seen employment
21   discrimination cases, sexual discrimination or
22   sexual harassment cases in which I have been
23   involved as a psychiatric expert who might be
24   called to testify.
25      Q.    You also have a law degree; is that

ROBERT GOLDSTEIN M.D.                                              August 25, 2015
Dates vs. Norton                                                         18–21

Page 18

1                    Goldstein
2    correct?
3        A.   Yes.
4        Q.   How did it come to be that you are
5    both an MD and a JD, Dr. Goldstein?
6        A.   My work experience over the years
7    involved -- although I don't consider myself a
8    forensic psychiatrist because I always emphasized
9    clinical psychiatry.
10       (Brief discussion off the record.)
11   BY MR. PIERCE:
12       Q.   Over the years in my work capacity, I
13   have held positions that had something to do with
14   the legal system.  I was director of the court
15   clinic down at the Supreme Court in Manhattan.  I
16   was the deputy director of the Bellevue Forensic
17   Psychiatry Service.
18       And over the years, I developed an interest
19   in legal matters and, as you can see from my CV,
20   most of my publications had something to do with
21   law and psychiatry, some aspect of law and
22   psychiatry.
23       And so, at some point, I thought I would go
24   to law school and perhaps get the kind of specific
25   training that would equip me to become more

Page 19

1                    Goldstein
2    successful.
3        (Brief discussion off the record.)
4        THE WITNESS:  As I was saying, over the
5    years being in that environment where I'm working
6    with -- in the Court setting, meeting judges and
7    lawyers, working on the forensic service where
8    people were doing research, I thought it would be
9    a -- it would help my academic career, such as it
10   was at the time.
11       So I did go to law school and it actually
12   did help my academic career because, upon
13   graduating law school, immediately, I was
14   recruited to come to the Columbia Medical College
15   of Physicians and Surgeons, department of
16   psychiatry, and teach there, join the faculty.  I
17   immediately got a promotion from assistant
18   professor to full clinical professor of
19   psychiatry.  And for a number of years, maybe 20,
20   25 years, ran their program for residence in legal
21   and ethical issues in psychiatry.
22       So in fact, it did have that impact on my
23   career, although you don't get paid for that.
24   It's not a -- in fact, they instituted something
25   new this year.  Voluntary faculty that donate

Page 20

1                    Goldstein
2    their services, such as myself, have to pay them a
3    yearly fee of $500.  It was creative.
4        Q.   The privilege of --
5        A.   Donating your time.
6        Q.   -- of doing good for them?
7        A.   It started this year.
8        Q.   What year did you finish from
9    Columbia Law School?
10       A.   I graduated in '84.
11       Q.   And what year did you finish from
12   Chicago's medical school?
13       A.   '65.
14       Q.   About twenty year gap?
15       A.   Yes.  Twenty years is -- old doctor,
16   young lawyer.
17       Q.   You got more out of your JD as I
18   would say -- but have you ever practiced as a
19   lawyer, Dr. Goldstein?
20       A.   I guess technically yes, because in
21   my senior year I was doing some project for a law
22   firm that handled various malpractice and products
23   liability cases.  After I graduated, I worked for
24   them for about maybe a year, ten hours a week,
25   fifteen hours a week sometimes, doing various

Page 21

1                    Goldstein
2    things, finishing up some of the work, maybe
3    helping some of the lawyers with some of their
4    tasks.  So technically, I guess I was a member of
5    the firm for about your year.
6        Q.   Any since then, which would put that
7    around '84 or '85, have you done any legal work
8    since 1985?
9        A.   No.  I haven't practiced law in any
10   capacity.
11       Q.   Do you maintain a bar license in the
12   State of New York or elsewhere?
13       A.   I'm still officially a member of the
14   bar in good standing, but I don't practice.
15       Q.   It's not inactive or some other
16   status?
17       A.   I wish they had a category --
18       Q.   They don't have that category, don't
19   they?
20       A.   Yes.
21       You're either a lawyer or member of the bar
22   or you're not.  You can retire any time.
23       Q.   Who pays for you to maintain that law
24   degree?
25       A.   I do.

ROBERT GOLDSTEIN M.D.                                           August 25, 2015
Dates vs. Norton                                                        22–25

1                  Goldstein
2      Q.   I assumed so, but I don't know.
3      Do you pay to maintain your medical
4  licensure --
5      A.   Sure, yes.
6      Q.   -- or Columbia?
7      A.   Columbia pays for nothing.
8      Q.   You pay them for the privilege;
9  right?
10      Let's clear it for the record.
11      What is your current position at Columbia,
12  Doctor?
13      A.   I'm on the faculty, what's called a
14  visiting faculty.  I have the rank of clinical
15  professor of psychiatry.  And during the course of
16  -- over an academic year I give a lecture, two or
17  three, or presentation or supervision of some
18  kind.
19      Q.   It's considered an active position at
20  Columbia?
21      A.   Yes.
22      Q.   How many hours per week do you
23  dedicate to that part of your career?
24      A.   It's not something I do every week.
25  It's probably, the actual lectures and teaching

1                  Goldstein
2  that's probably maybe six or eight hours during
3  the whole year.  There are other things, some
4  writing, some projects peripherally involved in,
5  so it's not a substantial commitment of time at
6  this point.
7      Q.   Let me stop being so obtuse and ask a
8  clear question.
9      You have the work that you do at Columbia
10  University, Dr. Goldstein.  That's one of the
11  things that occupies your professional time?
12      A.   Yes.
13      Q.   You are also in private practice?
14      A.   Yes.
15      Q.   As a practicing medical doctor
16  specializing in psychiatry --
17      A.   Correct.
18      Q.   -- you also have a third box in your
19  capacity as an expert witness in civil and
20  criminal cases; is that correct?
21      A.   Yes.
22      Q.   Are there any other boxes that occupy
23  your professional time?  And that would include
24  volunteer work, I don't mean to suggest only paid.
25      A.   I'm involved in a number of writing

1                  Goldstein
2  projects that are not under the aegis of Columbia.
3  I'm a section editor for this textbook of forensic
4  psychiatry which is now coming out with a third
5  edition, in which my section has about ten authors
6  with their chapters that I have to edit and
7  proofread and so forth; of which I myself have
8  authored about four out of those ten chapters,
9  sometimes with coauthors.
10      And there is another textbook, I guess,
11  could being called, some kind of authoritative --
12  called "The International Handbook of Psychopathy
13  and the Law," which is coming out with its second
14  edition, and I've been recruited to write --
15  invited to write a chapter for that book.  So I
16  think it's a textbook, so there are writing
17  projects here and there.
18      Q.   Sure.
19      A.   There's some kind of ongoing research
20  that has been neglected.  My coauthor moved to
21  Connecticut and we haven't been able to keep in
22  touch that much.  That may be picked up at some
23  point.  So there's a lot of writing and research
24  projects that are pending.
25      Q.   I have drawn four boxes on my

1                  Goldstein
2  notepad, Doctor.  For those categories, are those
3  all the ways in which you spend your professional
4  time?
5      A.   Yes.
6      Q.   How much of your time would you
7  estimate you spend in private practice?
8      A.   I would say between 85 and 90
9  percent, let's say roughly 85 percent.
10      Q.   Fair enough.
11      How did you allocate your time spent at
12  Columbia?
13      A.   My time, everything else would be the
14  remainder, let's say 15 percent, and I guess the
15  forensic, you know, purely expert forensic work
16  would probably be 10 percent or perhaps less.  So
17  the nonforensic and nonprivate clinical practice
18  of psychiatry would be somewhat less than 5
19  percent.  That would be Columbia now and all the
20  other stuff I mentioned.
21      Q.   I'm not going to ask what you earn
22  these days, but I am going to ask kind of the same
23  question financially.
24      When it comes to your compensation or your
25  earnings, how are they allocated amongst the work



ROBERT GOLDSTEIN M.D.                                    August 25, 2015
Dates vs. Norton                                                      26–29

Page 26

Goldstein

1
2  you do?  I'm guessing, writing -- well, I
3  shouldn't say that.  I still get a royalty from my
4  mother's articles written in the 1970s so.
5       Let's start with in your private practice.
6       A.   I would say that 90 percent or
7  greater of financial compensation comes from
8  private practice.
9       Q.   Even with insurers these days?
10      A.   Psychiatry works somewhat
11 differently.
12      Q.   Okay.
13      A.   Most patients are self-payers.  There
14 are very few insurance coverage available for
15 psychiatric treatment unfortunately.
16      Q.   Is that what the Board of Psychiatry
17 and Neurology markets to get their future
18 residents?
19      A.   You know, it's usually most policies
20 are limited to six sessions or ten sessions, and
21 it's a paperwork nightmare.  So I have patients
22 who are paying themselves, self-paid, and not
23 through insurance carriers.
24      Q.   Understood.  It's a good way to do it
25 if you can.

Page 27

Goldstein

1
2       Do you see those patients at your apartment
3  or do you have a different office or do you see
4  them someplace else?
5       A.   I have an office in my apartment
6  where I see them.  I used to have a second office
7  not too far away, but I stopped using that about
8  five or six years ago.
9       Q.   How much of your income
10 proportionally comes from testifying in a expert
11 or consulting in an expert capacity?
12      A.   Again, about ten percent or less.
13      Q.   In other words, not getting squat
14 from Columbia or from your authorship?
15      A.   No, actually the other way around.
16 It's a debit, not a credit.
17      Q.   How long would you estimate that you
18 had that, let's say, 90 to 10 or 85 to 15 split
19 between private practice and your other endeavors?
20 Is that a recent development?  Has that been your
21 professional state for the last 20 years?
22      A.   I would say it's been several years
23 at that level.  There may have been a time perhaps
24 before I went to law school or while I was in law
25 school that I was doing more forensic work and

Page 28

Goldstein

1
2  less clinical work because I didn't have, you
3  know, going to law school could be very time
4  intensive, and so I cut back on my clinical
5  practice and patient care.  So that was 25-plus
6  years ago.
7       Q.   Fair enough.
8       Help me out with semantics, Doctor.  I think
9  I understand what, but I want to make darn sure
10 that I do.
11      What is the difference between a clinical
12 psychiatrist and forensic psychiatrist?
13      A.   Well, forensic -- in my estimation,
14 and I've been involved in that scene for many
15 years.  A forensic psychiatrist is someone who the
16 majority of their professional time is spent in
17 some forensic context.  It may be working for a
18 court clinic.  It may be working in a correction
19 institution, providing mental healthcare to
20 inmates.  It may be working for some insurance
21 carrier as a -- some psychiatrists I know even
22 work in a law office as a kind of in-house general
23 advisor about medical matters.
24      And then there are some who are kind of the
25 outcasts of the profession, who are professional

Page 29

Goldstein

1
2  witnesses, who do nothing else, who have no
3  academic affiliations, no research, no writing, no
4  patient care.  They are just participating as
5  experts in litigation.  They are regarded -- they
6  are referred to as "hired guns" because they are
7  regarded as not keeping up a standard of
8  professionalism.  And I've written a few articles
9  criticizing that deficiency and professional level
10 of care or standard of care.
11      Q.   What differentiates Dr. Bob Goldstein
12 from those hired guns out there?
13      A.   I'd say that the structure and
14 content of my professional work, mainly clinical,
15 patient care, academic, research, publications, et
16 cetera.
17      Another element of it is that I work civil
18 cases and criminal cases for both sides.  In other
19 words, probably 50/50 actually in most areas that
20 I will work civil cases for defendants and for
21 plaintiffs or in criminal cases, which I don't do
22 that many of them any more, I would work for the
23 prosecution or the defense, playing no favorites.
24      So I think that's an important element of a
25 so-called hired gun.  They usually are part of a



ROBERT GOLDSTEIN M.D.                                    August 25, 2015
Dates vs. Norton                                                      30–33

1               Goldstein
2    stable of experts that are maintained by the
3    plaintiffs bar or defense bar, and people know how
4    they are generally going to their findings, their
5    testimony, et cetera, do not shine with neutrality
6    and objectivity.
7        Q.   You estimated, and this was
8    definitely one of my questions, a 50/50
9    approximate split between testifying on behalf of
10   plaintiffs and testifying on behalf of defendants
11   in civil cases, if I understand you correctly?
12       A.   Yes.
13       Q.   What proportional split is there
14   between your criminal work on behalf of the
15   prosecution and on behalf of the defense?
16       A.   Well, it used to be that varies,
17   fluctuates, let's say.  In probably more than 50
18   percent of the time in criminal cases I was
19   retained by the defense.
20       Q.   Okay.
21       A.   And then there was a time it swung
22   the other way, but if you aggregate a 20-year
23   period, probably over that long period I was --
24   seen more cases for defense than for prosecution.
25       Q.   So there had been trends --

1               Goldstein
2        A.   Yes.
3        Q.   -- over the years?
4        A.   Right.
5        But I'm not that interested in criminal
6    cases anymore.
7        Q.   That was going to be one of my
8    questions.
9        You mentioned that you were not doing as
10   many criminal cases as before.  Is there a reason
11   for that?  Too messy?  Don't have to?
12       A.   I just don't find it that stimulating
13   or interesting anymore.  You know, the issues are
14   usually kind of limited to maybe two or three
15   issues, and sometimes it could get inconvenient to
16   have to travel to a correctional institution, to
17   drive upstate somewhere or see somebody at Riker's
18   Island or other correctional facilities.  I just
19   became less involved with it because I found it
20   for a number of reasons to be less attractive.
21       Q.   Did one of those reasons have to do
22   with the honesty or lack thereof you found amongst
23   criminal defendants?
24       A.   (Laughing.)
25       Q.   Lawyers get tired of being lied to,

1               Goldstein
2    for instance.  I wonder if psychiatrists do as
3    well.
4        A.   Well, that's what I meant when I said
5    the issues are -- become somewhat limited.
6        Q.   Right.
7        A.   The lawyers in the criminal arena are
8    not that concerned whether someone is truly
9    culpable or not, they still feel their duty is to
10   provide a vigorous zealous defense, even for
11   someone that may be guilty or probably is guilty.
12       I guess part of it is, I'm just not that
13   interested in working with criminals or
14   psychopaths or antisocial personality disorder
15   types.  I don't find them that interesting
16   anymore.
17       Q.   Is that the privilege of experience
18   and -- I don't want to say age -- experience and
19   credentials that you don't have to do that work
20   anymore?  Or have you, for some reason been
21   excluded from -- it sounds like your departure
22   from doing criminal work is wholly voluntary.
23       A.   Yes, I've turned down many cases.  I
24   guess word gets around and people are no longer
25   knocking on my door for prosecution or Legal Aid

1               Goldstein
2    Society or -- so, from time to time, I see a --
3    usually a white collar crime case or a very
4    interesting case where the individual poses
5    something challenging and unusual
6    pre-sentence-wise.  In other words, guilt has
7    already been established either through a plea
8    bargain or jury verdict.  And so my role would be
9    do an evaluation to -- as an aid to sentencing,
10   basically.
11       Q.   Okay.  Flip side of the coin to make
12   sure I understand you correctly.
13       What makes consulting in an expert capacity
14   in civil cases more interesting or desirable to
15   you than criminal?
16       A.   I think the range of issues is much
17   wider, is much more types of cases and types of
18   issues that come up.  And the litigants on one
19   side or the other are usually much more
20   interesting and not cut out of the same pattern --
21       Q.   Not so one dimensional.
22       A.   -- as the people you see who are
23   charged with crimes.
24       Q.   In your experience, do you find civil
25   litigants to be more or less honest with you --



ROBERT GOLDSTEIN M.D.
Dates vs. Norton

August 25, 2015
34–37

Page 34

1                Goldstein
2   and obviously I'm talking about your clients or at
3   least the individuals whose attorneys retained
4   you, than you did when you were doing criminal
5   work?  Are people more honest or less in civil
6   cases, in your experience?
7        A.   I always, regardless of the context,
8   I always take things with a grain of salt that
9   come from the individual themselves, and that's
10  just one source of data that I use.  I try to have
11  other sources of data that are perhaps more
12  objective than an individual who maybe quite
13  honestly is presenting some point of view that may
14  not be entirely accurate, but not deliberately
15  falsifying.
16       So I usually try to have objective data.
17  Sometimes, most commonly, medical or psychiatric
18  records that have some contemporaneous
19  documentation that will either support or
20  corroborate or the opposite of what I've learned
21  from my examination of the individual.
22       Sometimes there are witness statements,
23  sometimes I might speak to a family member or
24  spouse who's in close contact or daily contact
25  with that individual.  Sometimes psychological

Page 35

1                Goldstein
2   testing is needed.
3        So, I never -- I came across a case just a
4   few weeks ago where the expert on the other side
5   said that the individual he evaluated seemed very
6   honest and sincere.  And since he's worked with
7   drug addicts for 25 years, no one is going to put
8   anything over on him.  He could tell when someone
9   is lying or not.
10       That's not my slant on the issue.  I don't
11  think anyone has that ability.  And as I say, I
12  take with a grain of salt what I learn from a
13  psychiatric examination and try find other sources
14  of information.
15       Q.   Sure.
16       And, in fact in at least one prior case you
17  have testified that it was not appropriate for a
18  psychologist in that case to take at face value
19  what the individual who had retained her was
20  telling her.
21       A.   Yes, you cannot take at face value
22  what you are told by a patient/litigant or even by
23  a patient in a clinical context.
24       Q.   You bring up a good point.  I've
25  taken enough physicians' depositions over the

Page 36

1                Goldstein
2   years that I have heard that the physician feels
3   -- I don't know if it's part of the Hippocratic
4   oath -- that they should give their patient every
5   benefit of the doubt.
6        I said that wrong.
7        Do you subscribe to that in your clinical or
8   treating capacity?
9        A.   I think in a clinical context one
10  assumes that the patient is coming to you for help
11  because they are suffering from either a physical
12  condition, general medicine or other specialties
13  or emotional mental problem in psychiatry, and
14  it's causing them some kind of distress, and they
15  think you can help them, and they want you to help
16  them.  It's 100 percent cooperative.  But you
17  learn with clinical experience that's not always
18  the case.
19       So, patients almost always distort or leave
20  things out or things they're ashamed of, they
21  don't want you to know they beat their wives;
22  whatever it is.
23       So I can't say that in the clinical setting
24  patients are 100 percent honest always, because
25  that would be untrue.  But they don't have what

Page 37

1                Goldstein
2   you find in the forensic, setting where there's
3   some kind of external compensation, whether it's
4   not being found guilty of murder or losing or
5   winning a civil case or getting custody of your
6   kids or whatever it may happen to be.  So that
7   issue of some kind of external incentive or
8   compensation is more prevalent in the forensic
9   area, and should always be considered.
10       Q.   I want to make sure I understood what
11  you said correctly.  If I recite it back to you
12  incorrectly, please correct me, Doctor.
13       If I understood correctly, you don't take
14  the patients that you treat blindly at face value.
15  And even less so than when you are retained in a
16  forensic capacity in a civil or criminal case.
17       A.   Correct.
18       Q.   Did I fairly understand you and we
19  can agree on that?
20       A.   Yes.
21       Q.   You don't take anyone at face value?
22       A.   I think that there are nuances.
23       Q.   Understood.
24       A.   You learn from clinical experience
25  that certain factual issues are perhaps in



ROBERT GOLDSTEIN M.D.
Dates vs. Norton

August 25, 2015
38–41

Page 38

1          Goldstein
2  psychiatric treatment less important.  You know,
3  if the patient distorts or presents more of an
4  exaggerated biased point of view, it's less --
5  the factual issues are less important in that
6  context than in the forensic context where you are
7  trying as accurate as you can the facts straight
8  and find out what actually is going on.
9      So there is legal proof, I guess, and this
10  is the forensic area, and more historical, quote,
11  unquote, "truth" in the clinical area where it's
12  not always factually true, but maybe it's
13  emotionally true.
14      Q.   Right.
15      Can we agree that everybody might have
16  motivators or reasons for, even if it's
17  subconsciously or unconsciously, skewing what they
18  have to say to you from what the actual truth is?
19      A.   In a professional context?
20      Q.   Yes, sir.
21      A.   I always entertain the suspicion.
22      Q.   We all hope -- and I'm sure I don't
23  mean to contradict that there are not plenty of
24  honest patients and litigants out there, Doctor.
25      What I want to establish is that when you

Page 39

1          Goldstein
2  are comparing your patients to your litigants, you
3  look with a little more jaundiced eye at the
4  litigants who have money or incarceration at
5  stake.
6      A.   Yes.  And that's why the issue of
7  corroboration is so much more a matter of
8  necessity in the forensic context than it is --
9  treating patients, I don't generally ask patients,
10  give me a sworn affidavit or something --
11      Q.   Yeah, give me some references.
12      A.   -- something that they mentioned
13  about their marital problem or whatever.  So yes,
14  we try to get more objective outside sources of
15  data that can prove or verify or support or
16  corroborate what you learn from a litigant
17  patient.
18      Q.   In the case that we're here about
19  today, Isha Dates versus Milo's Hamburgers, what
20  objective data did you seek out or find to confirm
21  or corroborate what Ms. Dates told you?
22      A.   The most important or helpful data
23  was the clinical records from the mental health
24  clinic that she's attending and from the general
25  medical clinic that she's attending, because she

Page 40

1          Goldstein
2  has been going for treatment over a period of
3  time.  She's seeking treatment obviously for
4  conditions that are causing her pain or distress,
5  and her doctors are contemporaneously documenting
6  what they find over a period of time.  Those are
7  very helpful.
8      In terms of her functioning, the fact that
9  she has been unable to return to work and there is
10  no documentation or evidence that she's worked or
11  been able to function in a work competitive job
12  market, and this has had adverse consequences that
13  someone would want to avoid if they had other
14  sources of income like being evicted or having
15  your motor vehicle repossessed -- or I think her
16  truck was repossessed.  So that's another
17  corroborating fact or factor that supports some of
18  her claims.
19      Q.   If she is believed when she tells you
20  those things?
21      A.   Yes.  If there is any -- I don't
22  think there is any documentation that she has
23  worked.  In fact, I think she's applied for
24  disability.  I don't know if it's been -- if she's
25  received a determination.  I think Social Security

Page 41

1          Goldstein
2  Disability, I don't know if she's obtained the
3  benefits or not or if that's still in the works.
4      Q.   Doctor, how do you know that Ms.
5  Dates has been unable find work or return to work,
6  as opposed to is holding herself out of work for
7  one or more reasons?
8      A.   I think that the fact that she has a
9  track record of always working over the years, had
10  a variety of different jobs but a track record of
11  fairly regular pattern of working.  The fact that
12  she has four children living with her and has not,
13  you know, her position is that she's unable to
14  function at work because of the physical and the
15  psychological problems that she's had.
16      And I think if you factor in all of the
17  issues here, that she's been going for treatment,
18  she's been seeing a psychiatrist, a therapist,
19  medical doctors, she's receiving authentic
20  treatment for an authentic set of conditions; and
21  but for that, she'd rather be having some income
22  rather than trauma that she described about having
23  to leave, move out of her apartment, whatever,
24  lock stock and barrel, kids.  I find it very
25  credible that if she could go back to work she



ROBERT GOLDSTEIN M.D.
Dates vs. Norton

August 25, 2015
42–45

Page 42

Goldstein
1
2 would, even in some part-time capacity.
3    Q.   So your belief in the credibility of
4 the statements to you that we've talked about is
5 based on her and is not corroborated by any
6 outside source?
7    A.   What is corroborated is that she has
8 a serious psychiatric condition that's been
9 diagnosed as such.  And that alone could be a
10 cause of being unable to return to the job market
11 and function on a daily basis at the job.
12    And she has all these physical problems as
13 well.  Frequent headaches, back and neck pain,
14 fibromyalgia, carpal tunnel syndrome,
15 hypertension.  She has a whole collection of
16 medical conditions, some of them, you know, the
17 ones that cause pain could be relatively disabling
18 depending on how severely constant the pain is.
19    Plus the psychiatric condition, which could
20 by itself, as I said, be disabling.  Serious major
21 depression with psychotic features, hearing
22 voices.
23    It's easy to say that people with that
24 condition might be unable to work on a regular
25 basis.  It wouldn't strain credibility --

Page 43

Goldstein
1
2 credulity.  So I found it very consistent and
3 credible that the medical and psychiatric
4 documentation would lead to an inference that she
5 is unable to work.
6    Q.   And I think we're moving at cross
7 purposes, Doctor.  The question that I'm going to
8 ask a little bit better is:  Would you agree with
9 me that someone who misrepresented their
10 psychological and/or physical ailments or
11 debilities to her treating physicians could and
12 perhaps would also misrepresent them to you?
13    A.   We're talking about in general or?
14    Q.   It's a hypothetical in general.
15    A.   Sure; it's possible.
16    Q.   Then my question becomes, Doctor, how
17 do you know, what objective data do you have that
18 says that Ms. Dates is not lying to her treating
19 doctors and psychologists as well as to you about
20 her psychological and physical ailments?
21    A.   Well, the fact that she has been in
22 treatment, psychiatric and medical, for a period
23 of years now, that she's taken medication, that
24 she is seeing competent physicians who are
25 clinically well-trained and perhaps entertain

Page 44

Goldstein
1
2 suspicions about patients who may be malingering
3 for one reason or another, that these physicians
4 have continued to treat her and continue to
5 document that she has an authentic and
6 consistently been participating in treatment with
7 them for a substantial period of time.
8    So, I think my inference would be that she
9 has not been play-acting with her doctors, for two
10 or three or how many years.  And she hasn't been
11 play-acting about not being able to function or
12 have any income for these many, many long period
13 of time, let's say, three years has it been or
14 approximately.
15    I think it's credible that she has an
16 authentic psychiatric condition.  It's internally
17 consistent.  She's been consistent with different
18 examiners over a period of time.  As far as
19 objective facts go, I think they support that
20 conclusion.
21    Q.   It is your assumption, is it not,
22 Doctor, that she is credible and generally has the
23 symptoms and the diagnoses that her treaters have
24 provided and that you have endorsed?
25    A.   I think it all hangs together pretty

Page 45

Goldstein
1
2 well, that there is objective corroboration that
3 has been consistent over a period of time.
4    Q.   Have you seen any objective
5 corroboration of the reason that she was evicted
6 from her apartment?
7    A.   No.
8    Q.   Have you seen any objective
9 corroboration of whether she has actually sought
10 any work since her termination from Milo's?
11    A.   I haven't seen any documentation to
12 that.
13    Q.   Have you seen any objective
14 corroboration of the symptoms that accompany her
15 alleged psychiatric or psychological injuries?
16    A.   Can you repeat that?  I'm sorry.
17    Q.   Sure.  Same question.  And this is a
18 process of elimination.
19    Have you seen any objective data or
20 corroboration that she is indeed how she
21 represents herself to be:  Socially isolated,
22 unable to function, suffering from hallucinations
23 or any of the other -- I'm calling mental
24 conditions, psychological or psychiatric
25 conditions that she has conveyed to you?



ROBERT GOLDSTEIN M.D.                                    August 25, 2015
Dates vs. Norton                                                46–49

Page 46

1                  Goldstein
2      A.    The only objective information on
3   those issues would be her records, her clinical
4   records.
5      Q.    The records from Cheaha Mental Health
6   and Sylacauga Family Medicine?
7      A.    Family Medical Center, yes.
8      Q.    You had also reviewed her pharmacy
9   records?
10      A.    Yes.
11      Q.    What did those contribute to your
12   opinions or conclusions?
13      A.    Just that she was taking over that
14   period of time, you know, going to the pharmacy
15   and filling prescriptions for various psychotropic
16   medications, antidepressants like Zoloft,
17   anti-anxiety medications like Xanax that she was
18   -- they were prescribed for her and she was
19   filling the prescriptions.
20      Q.    We don't have any objective data to
21   support she actually took those prescriptions?
22      A.    No.
23      Q.    Did your review of the pharmacy
24   records contribute in any other way to your
25   opinions and conclusions in this case?

Page 47

1                  Goldstein
2      A.    I think there were medications that
3   are used for spasms for pain or musculoskeletal
4   conditions, and there were those kinds of
5   medications as well.  And I think there was one or
6   two medications for hypertension as well.
7      Q.    Do you recall ever seeing, Doctor,
8   any notations that she over consumed or
9   underconsumed any of her prescription medications?
10      A.    I didn't find any notations about her
11   noncompliance or being a problem patient in those
12   areas.
13      Q.    Did you find any other hints that she
14   may be a malingerer?
15      A.    No; because the indicia of
16   malingering usually involves individuals who are
17   presenting with conditions that are not either a
18   variance with, you know, what you expect to see in
19   a patient with a certain kind of condition, that
20   they're kind of, if not bizarre, then they're kind
21   of not the typical kind of clinical presentations.
22      That they're not consistent over time, that
23   there are disparities between what the patient is
24   telling and what other facts are available to
25   corroborate or not, so that the credibility is

Page 48

1                  Goldstein
2   cast in doubt because of those disparities of the
3   patient's giving you a fairly accurate
4   presentation.
5      Q.    You are at what I would consider --
6   and forgive me if I sound provincial -- at a very
7   high point of your career, Dr. Goldstein.
8      Are you going to spend your time with
9   patients that you do not find to be credible or
10   believable?
11      A.    It's an interesting question.  I
12   don't know if I can answer it generally.  You're
13   talking about patients I'm treating?
14      Q.    That's a fair question.
15      Let's limit it to when you are retained in
16   an expert capacity.  Have you turned down any
17   referrals because you had questions about the
18   credibility of the litigant, the individual?
19      A.    There have been, you know, over the
20   years plenty of cases where my evaluation failed
21   to support or help the side that retained me.  I
22   didn't continue working on a particular case, but
23   I had already been retained.  I couldn't know
24   before I was involved whether I couldn't support
25   the position of that party.

Page 49

1                  Goldstein
2      Q.    Your answer was better than my
3   question.
4      Have you ever withdrawn or declined to
5   continue to work on a case in an expert capacity
6   when issues have been raised about the credibility
7   of the individual that you are testifying on
8   behalf of?
9      A.    Sure.
10      Q.    Any in the last four years?
11      A.    I can't tell you -- I remember a
12   couple of Social Security Disability evaluations
13   where I couldn't support the claim.  But I'm not
14   sure if there was, I think it was more like five
15   or six or seven years ago.
16      Q.    Okay.  And those were situations
17   where you were retained by the individual or their
18   attorney, not the Social Security Administration?
19      A.    Yes.
20      Q.    Any since then?
21      A.    I don't think so.  I don't think
22   within recent times I've been involved in cases
23   where I felt I should perhaps have withdrawn.
24      (Recess taken.)
25   BY MR. PIERCE:



ROBERT GOLDSTEIN M.D.
Dates vs. Norton

August 25, 2015
50–53

Page 50

1              Goldstein
2      Q.   In those Social Security cases in
3   which you withdrew, Dr. Goldstein, without getting
4   into any health privacy issues, what was it that
5   the patient did or did not do or tell you that
6   caused you to withdraw?  Was the patient lying to
7   you?  Were they exaggerating?  Was it something
8   else?
9      A.   It's pretty hazy in my mind.  I think
10   I vaguely recall one of the cases, the claimant,
11   applicant for the benefits, was telling me blatant
12   lies, didn't square when I got some of the
13   records, either work records, hospital or doctor,
14   I forget.  But he was just outrageously
15   exaggerating or falsifying information.  When I
16   had that information, I couldn't support.  It was
17   pretty blatant.
18      Q.   Sure.  And you walked away from a fee
19   by withdrawing in that case?
20      A.   I would have gotten a fee for writing
21   the report.
22      Q.   Just so we're clear, by making that
23   choice of professional ethics and integrity, I
24   assumed that it financially cost you to some
25   degree?

Page 51

1              Goldstein
2      A.   In that particular case?
3      Q.   Yes?
4      A.   Yes.
5      Because I was paid for the examination and
6   review of the records, but a report -- I couldn't
7   write a report, so I wasn't paid for the report.
8      Q.   Have you seen or heard anything in
9   the case of Isha Dates that would raise any
10   concerns in your mind about her honesty, integrity
11   or truthfulness?
12      A.   I have not, no.
13      Q.   Your written report dated March 23,
14   2015, I'm going to mark as Defendant's Exhibit 4.
15   I'm out of order but I'll correct that later.
16          (Exhibit 4 was so marked and received
17          into evidence.)
18   BY MR. PIERCE:
19      Q.   References, four sources of
20   documentary support of Ms. Dates' claim beyond
21   what she told you.  The Cheaha Regional Mental
22   Health Center records, the Sylacauga Family Health
23   Center records, the Alabama CVS pharmacy patient
24   prescription records, and the EEOC records.
25      As we sit here today, have you sought or

Page 52

1              Goldstein
2   obtained any other support, corroboration or even
3   contradiction of what Ms. Dates has told you?
4      A.   I don't think it's specified there,
5   but I think EEOC records contained a statement by
6   one of her coworkers or someone who was a manager,
7   assistant manager there, I think his name is
8   Jackson, who corroborated some of her claims about
9   issues in the case.
10      Q.   Anything else other than Ms.
11   Jackson's Declaration?
12      A.   Other than Declarations?
13      Q.   Yes, sir.
14      A.   No.  Just the medical site records
15   and that declaration.
16      Q.   You have brought a file folder with
17   you today?
18      A.   Yes.
19      Q.   Does that is have the EEOC records
20   that you reviewed including that statement by Ms.
21   Jackson?
22      A.   Yes.
23      Q.   What else is in your file before you
24   today?
25      A.   I have a copy of my report.

Page 53

1              Goldstein
2      (Indicating.)
3      Q.   Let me ask you this:  Are there other
4   versions of this report, preliminary or draft
5   versions?
6      A.   There was an earlier draft, one
7   earlier draft.
8      Q.   Do you have a copy of that draft in
9   your file today?
10      A.   No.
11      Q.   Is it still on a computer at your
12   office?  How would you access it and provide it to
13   me?
14      A.   I don't think I would.
15      You can get it from Mr. Friedman's office if
16   he agrees to supply it.
17          MS. HUSSAIN:  Under Rule 26B, under
18          26(4)B, prior drafts are protected.  And
19          therefore, we will not be providing the
20          prior drafts.
21          BY MR. PIERCE:
22      Q.   That seems to be the case when he was
23   designated as an expert.  So you do have access to
24   that copy of that draft when the court orders you
25   and Mr. Friedman to provide it?

ROBERT GOLDSTEIN M.D.
Dates vs. Norton

August 25, 2015
54–57

1              Goldstein
2      A.   I'd have to check.  I'm not sure that
3  I have that draft.  I may have used that as a
4  template and just prepared the final version
5  without preserving the original draft.  But I
6  believe Mr. Friedman has the original draft.
7          MR. PIERCE:  All right.  That helps.
8          MS. HUSSAIN:  Once again, we are
9      objecting.  We are not required to provide
10      any prior drafts even if he is a trial
11      expert because under Rule 26(4)B.  Trial
12      preparation protection is -- that's not
13      discoverable, prior drafts, whether expert
14      is designated or not, is not discoverable.
15          MR. PIERCE:  You can have a standing
16      objection on that to save us all time.  I
17      understand your position.  We have the
18      objection on the record for the court to
19      rule on.
20          And feel free to just repeat, say "same
21      objection" to make this more efficient.
22  BY MR. PIERCE:
23      Q.   So you don't know, as you sit here
24  today, Doctor, whether the draft report has been
25  overwritten or not?

1              Goldstein
2      A.   Overwritten?  No, I don't.  I'd have
3  to check.
4      Q.   Would you check on that in
5  anticipation of the court ruling on this?
6      A.   Sure.
7      Q.   You don't have to provide it until
8  the Court does.  But you do believe, Doctor, that
9  Mr. Friedman has a copy of that draft report?
10      A.   Yeah, I'm pretty sure that I provided
11  it to him; or to his office.
12      Q.   As you sit here today, do you know
13  whether there were more than one preliminary or
14  draft reports?
15      A.   There was one.
16      Q.   I will ask -- same objection; that's
17  fine.  I will ask, Doctor, please make sure from
18  today forward that any preliminary drafts until
19  the court rules on this subject are not erased or
20  deleted or overwritten?
21      A.   Absolutely.
22      Q.   Thank you, sir.
23          In any substantive or material ways, did
24  your preliminary or draft report differ from
25  Defendant's Exhibit 4, your final report of March

1              Goldstein
2  of this year?
3      A.   I don't really remember.  I don't
4  remember what changes are -- if there were that
5  many -- I don't remember how it would differ
6  either quantitatively or qualitatively; certainly
7  specifying the sources that I have in the appendix
8  may well have been missing from the preliminary.
9  I'm not sure.
10      Q.   Let me ask it to you in a temporal
11  and chronological fashion, and maybe that will
12  help you answer my question.
13          You have spoken with Ms. Dates twice; is
14  that correct?
15      A.   Yes.
16      Q.   It's my understanding on both of
17  those occasions you spoke remotely, as opposed to
18  a face-to-face meeting or examination; is that
19  correct?
20      A.   Yes.  Through these video call
21  services or Skype.
22      Q.   In that first meeting, which I
23  believe you have dated as May 31, 2013, do you
24  remember how long that interview took?
25      A.   The initial interview was

1              Goldstein
2  approximately an hour-and-a-half to two hours, in
3  that range.  I don't recall precisely, but I
4  believe it was in that range.
5      Q.   Because that's how it typically takes
6  or is there something specific about Ms. Dates'
7  case that brings that to mind?
8      A.   That's the general length of an
9  initial psychiatric exam, and I believe that was
10  well within those parameters.
11      Q.   A psychiatric exam in the context of
12  your capacity as an expert witness or a
13  psychiatric exam in the capacity of you as a
14  treating physician or both?
15      A.   I would say both, but more certainly
16  in the forensic expert context because treatment
17  clinical encounters are so -- they differ so
18  markedly.  They differ one from to the other so
19  markedly.
20      Q.   Do we agree, Ms. Dates wouldn't be
21  coming to see you week after week in order for you
22  to continue the examination and develop more
23  background information?
24      A.   Right.
25      Q.   In this case it wasn't a one and done



ROBERT GOLDSTEIN M.D.                                           August 25, 2015
Dates vs. Norton                                                        58–61

Page 58

1                   Goldstein
2    situation but you -- can we assume you were acting
3    under the assumption that might be your only
4    interview with Ms. Dates?
5        A.   Yes.  So I touched all bases that --
6    and used a very standard kind of approach to cover
7    all bases.
8        Q.   Did you have an outline or did you
9    take notes from that interview of Ms. Dates?
10       A.   Yes.
11       Q.   Do you have those notes or that
12   outline in front of you today?
13       A.   Yes.
14       Q.   We'll come back and mark those.
15       Now, what was the purpose or the reason for
16   your subsequent interview of Ms. Dates on March
17   21st of this year?
18       A.   The only reason was that the
19   attorney, one of the attorneys in Mr. Friedman's
20   office, contacted me and suggested that I do a
21   follow-up evaluation of Ms. Dates to find out her
22   status at that point in time, like a progress note
23   in a clinical setting.  So to find out what, if
24   any, changes or other factors had taken place.
25       Q.   Is it normal and usual in your

Page 59

1                   Goldstein
2    practice for attorneys to prompt you to contact a
3    patient, an individual that you are the expert
4    for?
5        A.   Yes.  In most cases an attorney will
6    request a follow-up if they for whatever reason
7    feel there's some reason to do that, or may
8    request a supplemental report.  That's not
9    unusual.
10       Q.   Was a supplemental report requested
11   in this case?
12       A.   After my second exam that's when I
13   prepared this final report, yes.  I saw her March
14   21st --
15       Q.   Two days later.
16       A.   -- and I prepared this report a
17   couple days later.
18       Q.   I guess what I'm asking, Doctor --
19   and I'm sorry if I'm not being clear -- is, was
20   the second interview and the final report prompted
21   by her attorney?
22       A.   Definitely, sure.
23       Q.   As opposed to on your own initiative?
24       A.   Yes, sure.
25       Q.   What about that second interview did

Page 60

1                   Goldstein
2    you learn that was added to or changed the final
3    report?
4        A.   I learned that in the interval
5    between the two exams, which was almost a two-year
6    period, that there had been some changes in her
7    life.  Her father had passed away, she broke up
8    with her boyfriend, she continues to receive
9    psychiatric and medical treatment.
10       And from a clinical point of view, her
11   mental status or the psychiatric symptoms that I
12   had determined were present first time around were
13   generally unchanged.  Basically, she was still
14   anxious and depressed, sleep problems, and
15   paranoid thoughts and so forth.  There wasn't a
16   significant change one way.  It didn't get worse;
17   it didn't get better after another two years of
18   treatment.
19       Q.   And does the fact that she hasn't
20   gotten any worse or better contributed any to your
21   conclusions or opinions in that report?
22       A.   Yes.  It's mainly to the issue of her
23   prognosis that she -- her condition appeared to be
24   a refractory of treatment.  I'm not questioning
25   the appropriateness of her treatment, but even

Page 61

1                   Goldstein
2    with appropriate treatment there's been no
3    movement, no change.  Maybe it's keeping her from
4    getting worse, you know, from deteriorating more,
5    but it hasn't helped.
6        Q.   Is that consistent with everything
7    else you've seen about Ms. Dates even though she's
8    undergoing this treatment, her condition has not
9    improved any?
10       A.   The main issue there would be the
11   nature of her condition, a fairly large percentage
12   of patients with major depression will not have a
13   significant improvement even with treatment, be it
14   psychotherapy or medication or some combination,
15   that a fairly significant number will not improve.
16   It won't get worse; it won't need hospitalization.
17   Depression is treatment-resistant to some extent.
18       Q.   Can we also agree that there are
19   nonmedical factors that contribute to a patient
20   not improving or even declining?
21       A.   Absolutely.
22       Q.   I was taught very early in my career
23   the term "the greenback poultice."  Have you ever
24   heard of that term before, Doctor?
25       A.   No, but I can get some suspicion of



ROBERT GOLDSTEIN M.D.
Dates vs. Norton

August 25, 2015
62–65

Page 62

1              Goldstein
2  where this is going.
3      Q.   It was explained to me by a physician
4  in that in certain cases, money is the only thing
5  that will make a patient better.
6      A.   Yeah, I think there's a different
7  term for that.
8      Q.   What do you all say in New York?
9      A.   In the north, I can't remember
10  exactly what it is now.
11     Q.   Using the word "poultice" --
12     A.   Maybe when Mr. Green arrived, or
13  something like that.
14     Q.   Can we agree that especially civil
15  litigants, whether in a Social Security case or in
16  a sexual harassment case, can be motivated partly
17  or wholly by the desire for money, by secondary
18  gain?
19     A.   It's possible.
20     Q.   If you believe that Ms. Dates was
21  motivated by money or secondary gain, would you
22  continue to represent her as her expert witness?
23     A.   I certainly wouldn't have reached the
24  conclusions I reached in this report.  One of my
25  conclusions was that I didn't find any evidence of

Page 63

1              Goldstein
2  malingering because of the big picture.
3      Q.   Dr. Goldstein, you are a man of
4  insurmountable professional reputation.  Can we
5  agree that you are going to do everything that you
6  can to protect that professional reputation?
7      A.   I'd hope so.
8      Q.   In what other ways have you attempted
9  to verify that Ms. Dates is telling you the truth
10  and not exaggerating or faking her claims?
11     A.   Well, I -- as I indicate in my report
12  and my general methodology that my findings are to
13  a reasonable degree of psychiatric certainty,
14  based on my exam and review of certain materials.
15     My role is not to go in the field and
16  investigate or surveil the individual, take other
17  detective-like measures.  So I performed a
18  psychiatric evaluation, I had sources of
19  corroboration or the opposite or they might not
20  corroborate, and this is my conclusion to a
21  reasonable degree of psychiatric certainty, but
22  not beyond a reasonable doubt, not based on any
23  further investigation on my part.
24     Q.   Have we talked about already all the
25  sources of corroboration that you have sought or

Page 64

1              Goldstein
2  received?
3      A.   Yes.
4      Q.   Have you sought any sources of
5  corroboration that you have not received?  For
6  instance, have you called Mr. Friedman and said,
7  "Josh, what about all the other folks who were
8  deposed?  Or who have signed declarations or
9  statements in this case, can I see those?  Do I
10  need to see those?"  Anything like that?
11     A.   No.
12     Q.   Nothing that you have initiated?
13     A.   Correct.
14     Q.   Or that you have received without
15  initiating it?
16     A.   Correct.
17     Q.   For the psychiatric evaluation
18  itself, it's my understanding that you were paid
19  $3,000 for that; is that correct?
20     A.   I think there was another bill for
21  $800.  I think the total I was paid by Mr.
22  Friedman's office was $3800.  I think.
23     Q.   Do you have bills or invoices in your
24  file with you today?
25     A.   No.  That's kept in a separate folder

Page 65

1              Goldstein
2  or file.
3      Q.   We will ask, Doctor, for all of your
4  bills and invoices in this case.  We were under
5  the understanding that we had already been provide
6  with them so.
7      If you would provide that to Mr. Friedman or
8  his colleagues --
9          MS. HUSSAIN:  Yes.
10         MR. PIERCE:  -- we would appreciate
11  it.
12     BY MR. PIERCE:
13     Q.   What with the $800 for if the $3,000
14  was for the psychiatric evaluation and report?
15     A.   I don't recall.  It just seems to
16  stick in my mind under this $3800 total.  I'm not
17  100 percent -- I have to check, find those bills.
18     Q.   Please do so.
19     A.   Okay.
20     Q.   Is that consistent with what you
21  charge in other cases in which you are retained as
22  an expert witness?  Is this higher or lower than
23  what you normally charge?
24     A.   No; it's about in the range.  It's an
25  hourly rate, $450 an hour.  So $3800 would be



ROBERT GOLDSTEIN M.D.                                           August 25, 2015
Dates vs. Norton                                                        66–69

1            Goldstein
2    roughly 8-point-something hours, I guess.
3       Q.   I'm glad you're good at math.
4       A.   I'm not that good though.
5       Q.   And you anticipate my next question.
6    Your fee schedule mentions a rate of $450
7    per hour.
8       A.   Right.
9       Q.   The $3800 is a multi-hour aggregation
10   of the hourly rate?
11      A.   Right.
12      Q.   Is that consistent with what you
13   charge in civil and other cases in which you
14   testify as an expert?
15      A.   Yes.
16      Q.   What do you charge your patients in
17   private practice per hour?
18      A.   That varies.  $450 would be the going
19   rate, let's say, in Manhattan.  But there are a
20   number of patients who pay less, who have been
21   patients for a while and haven't -- I don't feel I
22   should raise their fee, et cetera.
23      Q.   I won't ask you the identity of the
24   patients that have paid more than $450 per hour.
25   Are there some?

1            Goldstein
2       A.   No.
3       Q.   As you said, that's the going rate.
4    You understand that your time today, and to
5    prepare for today's deposition, is paid by me and
6    my client?
7       A.   Yes.
8       Q.   What preparation did you do for
9    today's deposition?
10      A.   I prepared a multi-page handwritten
11   summary of my report and a handwritten -- a two or
12   three-page summary of the EEOC materials,
13   basically.
14   So I basically reviewed a report, you know,
15   an outline of the same EOOC documents.  I looked
16   at my contemporaneous notes of the two
17   examinations.  And I read through the medical and
18   psychiatric records, glanced at the pharmacy
19   records.  So I looked at all -- what I had done
20   and the records of other documentation.
21      Q.   I assume you -- just so we're clear
22   on the record.  You reviewed the records again?
23      A.   Yes.
24      Q.   The notes you took, you said it was
25   the EEOC, and what you took contemporaneous notes

1            Goldstein
2    in preparation for -- I shouldn't use
3    contemporaneous.
4       What were the things that you took notes on
5    in preparation for today's deposition?
6       A.   I went through my report and the
7    contemporaneous notes and summarized that.
8       Q.   So it's a distillation of what
9    information you already had?
10      A.   Yes.  So I could organize it and
11   study it to save time here, so I had more
12   familiarity.
13      Q.   How much time did you spend
14   preparing?
15      A.   I'd say in total about four hours,
16   three to four hours.
17      Q.   Doctor, I'd like to mark as
18   Defendant's Exhibit 5 your file materials.  Our
19   court reporter will copy them and he will return
20   the originals to you.  I know physicians, in
21   general, don't like to let go of their files.  So
22   is that okay with you?
23      A.   He looks very trustworthy.
24      MR. PIERCE:  And we will mark it
25   separately, and you will retain it, that

1            Goldstein
2    you are -- and I want you to be specific
3    on what you are refusing to produce and
4    what the bases for those are.  We'll mark
5    those separately.  You all can retain them
6    and we'll have the judge rule on that.
7       MS. HUSSAIN:  Okay.  Sounds good.  Do
8    you want to take a break and I'll look
9    through his file, or you can continue now
10   and we'll come back to his file?
11      MR. PIERCE:  That's a very good
12   question.  No.  And I think Dr. Goldstein
13   does too.  We will come back to that.
14   BY MR. PIERCE:
15      Q.   Dr. Goldstein, I have marked as
16   Defendant's Exhibit 3 what I had received
17   representing your fee schedule and the bills for
18   both your report and your deposition today.
19   You've already testified that that is incomplete.
20   What else may be missing from that stack of
21   invoices and bills?
22      A.   The only possible thing that may be
23   missing is an additional invoice for $800.
24      Q.   As you said, nothing else?
25      A.   No.

ROBERT GOLDSTEIN M.D.                                    August 25, 2015
Dates vs. Norton                                                    70–73

Page 70

Goldstein

1       Goldstein
2       Q.   Have you been paid for everything
3   prior to your deposition today?
4       A.   Yes.
5       Q.   Doctor, one thing I wanted to, just
6   as a housekeeping matter, make clear is, you are
7   actually incorporated or you have a professional
8   corporation; is that correct?
9       A.   Yes.
10      Q.   It is Dr. Goldstein, PC?
11      A.   Correct.
12      Q.   In Alabama we would consider that
13  your alter ego.  Is there anyone who has any
14  ownership interest in Dr. Goldstein PC besides
15  yourself?
16      A.   I'm not sure if it's always set up
17  this way, but the way it's set up for me is there
18  are shares and I'm 100 percent owner of the
19  shares, of the stock.
20      Q.   Do the roads diverge between you and
21  your professional corporation in any way in your
22  private practice or in your expert capacity?
23      A.   No.
24      Q.   If I have referred to you or I
25  referred to you then I'm asking about both you and

Page 71

1       Goldstein
2   Dr. Goldstein PC.
3       Is that fair?
4       A.   Correct.
5       Q.   Doctor, it's my understanding from
6   Mr. Friedman that he sent you -- and I think it
7   was only yesterday, so I'm not judging in any way
8   -- a copy of Isha Date's deposition testimony in
9   her sexual harassment case?
10      A.   Yes, he did.
11      Q.   Is that correct?
12      A.   Yes.
13      Q.   Have you had the opportunity to
14  review it?
15      A.   I haven't reviewed it.
16      Q.   That's fine.  Do you plan to review
17  it between now and trial?
18      A.   Only if there is some reason for me
19  to; I'm requested to.  And if Mr. Friedman can
20  send this to me in a form that I could download,
21  which I couldn't with what he sent -- it was some
22  technical computer thing --
23      Q.   Sure.
24      A.   -- that it could not be downloaded on
25  my computer for some reason, some mysterious

Page 72

1       Goldstein
2   reason.
3       Q.   Doctor, did you request that
4   deposition testimony from Mr. Friedman or did he
5   send it unilaterally?
6       A.   I did not request it.
7       Q.   Why do you think he would not review
8   it on your own initiative before trial?
9       A.   I can't speak for the workings of his
10  mind.  It may have been an afterthought.
11      Q.   I'm not -- only because you said
12  something, and I apologize for interrupting.
13      On your initiative, why would you not have
14  requested Ms. Dates' deposition testimony and why
15  might you not review it before trial?  I don't
16  care -- this has nothing to do with Mr. Friedman.
17      A.   From my point of view, I felt that
18  the documentation I did review was sufficient to
19  reach a final opinion of the case.
20      Q.   Would it also be fair to say that you
21  assume what Ms. Dates told you in your Skype
22  interviews of her are consistent with what she
23  would say under oath in her deposition?
24      A.   I hadn't thought -- I felt that it
25  was consistent with her medical records and some

Page 73

1       Goldstein
2   of the other documentation.  And I didn't feel
3   that I needed to have further corroboration.
4       Q.   You think what you have is
5   sufficient?
6       A.   Yes.
7       Q.   Sufficient both to reach the opinions
8   and conclusions you have in this case and to not
9   imperil your professional credentials and
10  credibility?
11      A.   I don't feel imperilled because I
12  tried to do a thorough evaluation.  Of course,
13  there may be other facts out there in the universe
14  that might affect it one way or the other, but if
15  I had those facts presented to me or I was made
16  aware of them, I would have to consider it.
17      Q.   Have you asked at any point if anyone
18  has contradicted Isha Dates' story about what
19  happened to her on the job at Milo's?
20      A.   Had I specifically addressed that
21  issue?  I never got to that because there is a
22  material on the EEOC papers that present Milo's --
23  I don't know the word you call the --
24      Q.   Position?
25      A.   -- response, or --

ROBERT GOLDSTEIN M.D.                                                    August 25, 2015
Dates vs. Norton                                                                 74–77

Page 74

1                    Goldstein
2        Q.    I wrote it, so.
3        A.    What's it called?
4        Q.    Position statement.
5        A.    Position statement about her claim
6    and there was -- it did contradict many aspects of
7    her claim.
8        Q.    So how do you know that Isha Dates
9    rather than Milo's attorney should be believed as
10   to what happened?
11       A.    That is a fairly easy, because I
12   don't -- you know, my role is not to be the
13   fact-finder in the case. That's the judge or
14   jury's role so I'm not -- in no way I'm making any
15   judgment about whether her version of the facts
16   that, you know, how this evolved at work are
17   accurate or legally accurate or Milo's version is
18   accurate. That's not my -- it's beyond the scope
19   of my role in this case.
20       My role is to see if she has a psychiatric
21   condition that is in some way related to the way
22   she perceived things. It's an important
23   distinction, you know, the way she perceived the
24   events as traumatic and upsetting and stressful,
25   whether or not one side or the other is being more

Page 75

1                    Goldstein
2    accurate in terms of the facts is not sure for me
3    to determine. That would be going beyond my role.
4        Q.    Would it be fair to say that your
5    opinions and conclusions set out in your report
6    are based on the assumption that Ms. Dates has
7    told you and her treating physicians from their
8    records the truth?
9        A.    I would modify that just to say that
10   she presented her version of what happened, how
11   she perceived it. Whether it is the absolute
12   truth or, you know, it's not for me to determine
13   that based on what she perceived, what her
14   responses were to it; is it a kind of situation
15   where these psychological symptoms of stress are
16   known to be causally linked or is it far fetched
17   and kind of strange and bizarre?
18       And I found that it was a reasonable, fairly
19   common kind of response to the kind of situation
20   or stress that she was under.
21       Q.    Let me try again with that question
22   because I appreciate your answer, but I don't
23   think it answered what I asked.
24       You have used the term "perception" on
25   several occasions now. And we all I think agree

Page 76

1                    Goldstein
2    and understand -- let me make sure of that -- that
3    when you're using -- you're referring to something
4    that might be perceived as sexual harassment, that
5    the harasser or even third parties may not realize
6    is perceived that way.
7        Is that what you mean when you're talking
8    about perception?
9        A.    Absolutely.
10       I think in the positions statement, there
11   was some arguments to that effect. One of the
12   examples was rubbing someone's body against Ms.
13   Dates was completely unintentional, part of the
14   crowded workplace scene, jostling back and forth
15   to do the work. So yes, one party might perceive
16   it one way; another party might say no, that
17   wasn't what was really going on. That's why
18   there's going to be a fact finder.
19       Q.    Sure.
20       What I want to make clear between us today,
21   and for the Court down the road is, what we're
22   talking about is an assumption by you that
23   different people had different perceptions about
24   what was going on at Milo's?
25       A.    I think that would be, you know, not

Page 77

1                    Goldstein
2    unusual that both sides would have a different
3    perspective of what happened or didn't happen.
4        Q.    My question is a little broader than
5    that, and let me lay a foundation for it, Doctor.
6    Has anyone told you that multiple witnesses have
7    come forward and stated under oath that Ms. Dates
8    fabricated the entire scenario of sexual
9    harassment at Milo's?
10       A.    Would it surprise me, was that the
11   question?
12       Q.    Has anybody told you?
13       A.    Oh, not specifically, no.
14       Q.    Has anybody told you that multiple
15   witnesses have come forward and testified under
16   oath that Isha Dates offered to bribe them if they
17   would lie on behalf of her in faking or framing
18   Milo's with the sexual harassment claim?
19       A.    No.
20       Q.    Are those things you would want to
21   know as the expert designated by Isha Dates?
22       A.    Well, it would certainly, you know,
23   just be information to put into my computer, so to
24   speak, you know, that whole picture.
25       Q.    You have answered questions regarding



ROBERT GOLDSTEIN M.D.
Dates vs. Norton

August 25, 2015
78–81

Page 78

1            Goldstein
2   perception. What I'm asking you is a more
3   specific question now.
4       Are your opinions and conclusions
5   memorialized in your report -- your report of
6   March 23rd, 2015, premised upon the assumption
7   that Ms. Dates is not lying, has not suborned
8   perjury from witnesses or attempted to suborn it,
9   and has not attempted to bribe witnesses to frame
10  Milo's for sexual harassment that never took
11  place?
12      A.   I would -- it would depend on the
13  accuracy of those other witnesses or, in other
14  words, there are other witnesses that contradict
15  or claim that she went beyond the parameters you
16  would usually see and actually try to inveigle
17  them into -- for monetary gain to support her
18  position, give false testimony, whatever. I don't
19  think I can make that judgment of deciding which
20  side to believe. I think that's for the
21  fact-finder.
22      Q.   We both agree on that, Doctor.
23      A.   If at some point it was determined
24  that that exactly was what happened, of course I
25  would have to reevaluate my conclusions, but it

Page 79

1            Goldstein
2   hasn't reached that point.
3       Q.   In the hypothetical situation in
4   which that evidence is presented at trial and the
5   jury is persuaded by it, in what ways would you
6   revise your report?
7       A.   If it were presented as a engraved in
8   stone fact, then I would have no choice but to
9   reconsider my findings.
10      Q.   Doctor, I understood you the first
11  time you said it.
12      What I'm asking is -- and you've been very
13  careful to use the term "I would have to
14  reconsider or revise my report," as opposed to
15  "withdraw it" or "get the hell out of this case."
16      What I'm asking is, assuming -- and this is
17  a hypothetical, nothing more -- assuming that the
18  proof at trial is persuasive to a jury that Ms.
19  Dates has fabricated her claim of sexual
20  harassment and everything else against Milo's,
21  assume for me that that's true, what is there to
22  revise, as opposed to withdraw, in that report?
23      A.   I would have to put that into the
24  whole picture, and if the whole thing were
25  fabrication, then I would have to lean more

Page 80

1            Goldstein
2   towards the fact that malingering was one of the
3   main conclusions of the psychiatrist who had the
4   whole picture at that point.
5       Q.   Doctor, can we agree, malingering is
6   something that someone who is injured does so --
7   usually for some reason so as not to get better or
8   for secondary gain?
9       A.   For secondary gain.
10      Q.   What I'm asking for you is to assume
11  the hypothetical that Ms. Dates is not
12  malingering. She has fabricated everything
13  substantive that you have been told about her
14  alleged sexual harassment by Carmen Miles at
15  Milo's?
16      A.   Are you finished with your question?
17      Q.   So my question, Doctor, is, what am I
18  misunderstanding that causes you to still apply
19  the label "malingering" to that?
20      A.   Malingering is generally defined as
21  either totally manufacturing it, fabricating
22  certain symptoms or certain difficulties in
23  functioning or exaggerating ones that are present
24  to a much lesser extent, for external gain of some
25  kind.

Page 81

1            Goldstein
2       Q.   Okay.
3       A.   So it could be a total fabrication.
4   That would be covered by the idea of malingering.
5       Q.   I would suggest to you, Doctor, that
6   a complete fabrication is much more than just
7   malingering. But I appreciate you clarifying that
8   definition.
9       So what we are talking about, if this claim
10  of sexual harassment is fabricated, it could or
11  would still be considered malingering by you?
12      A.   Yes. I think that's the generally
13  accepted term of art for the definition and DSM 5
14  and other authoritative texts that is the
15  description or definition of malingering.
16      Q.   What, other than diagnosing Ms. Dates
17  with malingering, would need to be revised in your
18  report if it is proven that the satisfaction of
19  the jury -- and I want you to assume this for me
20  -- that she fabricated this whole thing?
21      A.   I think that would be it. My
22  conclusion would be revised accordingly.
23      Q.   In what ways?
24      A.   As I said, I would have to say that
25  malingering was obviously -- you know, it's like



ROBERT GOLDSTEIN M.D.
Dates vs. Norton

August 25, 2015
82–85

Page 82

1              Goldstein
2   tautological in a way.  If I'm assuming that she
3   was malingering and everything was fabricated,
4   then I'd have to conclude that she's malingering
5   and everything was fabricated, obviously.
6        Q.   That's what I need to clear up.  What
7   I wanted to make sure, Doctor, and maybe I
8   misunderstood you; and if I did, I apologize for
9   badgering you, is:  If it's proven that she has
10  faked this whole thing, you're still not going to
11  say that she has major depressive syndrome with
12  psychotic features and anxiety disorder based on
13  the sexual harassment she underwent at work?
14       A.   Maybe I can just make it -- she may
15  still have those psychiatric --
16       Q.   But at work?
17       A.   -- for reasons, but there wouldn't be
18  a causal link to sexual harassment that never
19  occurred.
20       Q.   Thank you, sir.
21       A.   Put it that way.
22       Q.   Sure. And you explored in her
23  deposition other potential causes, and in fact
24  ruled out other potential contributing causes of
25  her diagnosis; is that correct?

Page 83

1              Goldstein
2        (Brief discussion off the record.)
3   BY MR. PIERCE:
4        Q.   Doctor, in your report, you
5   specifically ruled out other potential causes for
6   her various diagnoses; is that correct?
7        A.   I ruled out medical conditions and
8   malingering.
9        Q.   You can't get inside her brain and
10  look through her eyes and see whether she's
11  telling the truth or not?
12       A.   No.
13       Q.   But there was none that you're aware
14  of, head trauma or abuse that could be another
15  alternative cause of her diagnosis?
16       A.   Correct.
17       Q.   I guess I want to come back and
18  clarify this, Doctor.  I think you were clear on
19  the record but I want to make sure of it.
20       Your opinions as to causation of Ms. Dates'
21  diagnoses must necessarily be tossed out if it is
22  proven that she faked this whole thing?
23       A.   Yes; by definition.
24       Q.   The diagnosis could still be present.
25  We would just have to look to -- can we agree that

Page 84

1              Goldstein
2   we would just have to look to other potential
3   causes for it?
4        A.   The diagnosis conceivably could be
5   accurate and she could really be suffering from a
6   mental disorder of this nature; but as you said,
7   it would not be causally linked to any claimed
8   sexual harassment by definition.
9        Q.   The two can be isolated from each
10  other?
11       A.   Exactly.
12       Q.   Okay.  That's what I wanted to make
13  sure of.
14       A.   Proving that never happened wouldn't
15  necessarily improve --
16       Q.   That she does have issues?
17       A.   -- the fact that she has her issues.
18       Q.   But we can also agree, you didn't
19  find any other -- based on what you'd been
20  provided and what you'd been told by Ms. Dates,
21  any other causes for those psychiatric conditions?
22       A.   Just with the proviso that a number
23  -- not infrequently, psychiatric conditions can
24  have an onset without any obvious, you know, they
25  can appear and come out of the blue without any

Page 85

1              Goldstein
2   obvious trigger.  Sometimes there is an obvious
3   trigger when the person has an accident or the
4   husband dies or they go bankrupt, whatever it is.
5   There could be a million reasons that could
6   trigger a psychiatric condition, but not
7   infrequently there is no obvious cause for the
8   onset.
9        Q.   And your opinion and conclusion at
10  this point is that there was an obvious and
11  definite beginning and cause of Ms. Dates'
12  psychological issues?
13       A.   Yes.
14       (Recess taken.)
15       MS. HUSSAIN:  We will be producing
16  everything in Dr. Goldstein's file, and
17  we're not withholding anything.
18       MR. PIERCE:  Thank you very much.
19  BY MR. PIERCE:
20       Q.   Dr. Goldstein, is Defendant's Exhibit
21  5 the entirety of your paper file on Isha Dates?
22       A.   It definitely is, yes.
23       Q.   Are the only things that are not
24  contained in that file in electronic form at your
25  office?

ROBERT GOLDSTEIN M.D.                                August 25, 2015
Dates vs. Norton                                              86–89

Page 86

1                  Goldstein
2       A.   I can't say definitively that they
3   are, but they might be, and that would be the
4   draft which may or may not have been a typo or the
5   earlier draft, which may or may not have been a
6   typo.  I will have to check, let you know
7   through --
8       Q.   Doctor, there is a charge of
9   discrimination and various records relative to the
10  EEOC process that Ms. Dates had engaged in?
11      A.   Yes.
12      Q.   Is this the entirety of the records
13  that you referenced as the EEOC records you
14  reviewed?
15      A.   Yes.
16      Q.   There's not any additional records
17  that are saved electronically or that you've
18  thrown away that you've also reviewed?
19      A.   No.
20  (Discussion off the record.)
21  BY MR. PIERCE:
22      Q.   Doctor, do you contemplate, based on
23  what we have talked about today, doing anything
24  between now and trial?
25      A.   Not as I sit here today.

Page 87

1                  Goldstein
2       Q.   Are you planning on attending the
3   trial of this case?
4       A.   Only if I'm called.
5       Q.   If Mr. Friedman asks you to?
6       A.   Exactly.
7       Q.   Doctor, I'm going to mark as
8   Defendant's Exhibit 6 the Rule 26 testimony list
9   that we have been provided.
10             (Indicating.)
11             How up to date is that?
12      A.   I believe there has been one
13  subsequent trial appearance since the last one on
14  this list.  I'm pretty sure of that.
15      Q.   Let me ask you this, and maybe it's
16  obvious to somebody other than me.  In what order
17  are the cases found on that list?
18      A.   Chronological.
19      Q.   Okay, in chronological order.  So,
20  the one versus St. Vincent Hospital is the oldest
21  case in which you testified in last four years?
22      A.   Yes.  Except maybe earlier than four
23  years.
24      Q.   Fair enough. Because it doesn't have
25  the index number on it that most of the other

Page 88

1                  Goldstein
2   cases had.
3       A.   I didn't notice that.
4       Q.   Is that something you can fix?
5       A.   I can probably retain -- I may have
6   other earlier lists that I haven't discarded.
7       Q.   What I'm going to ask, Doctor, is
8   that though we have that list, you provide us with
9   a more recent list that reflects that newest case?
10      A.   Sure.
11      Q.   And to the extent three are any other
12  omissions -- and I'm not suggesting anything by
13  that -- omissions on this list, maybe that would
14  be a great opportunity to correct those so that we
15  have complete information?
16      A.   Absolutely.
17      Q.   Now one thing I wanted to ask you is,
18  the title of this is "Trial Testimony in Past Four
19  Years."
20             Are those only trials?
21      A.   Yes.
22      Q.   So they do not encompass any
23  depositions like today?
24      A.   There's a separate list for
25  depositions.

Page 89

1                  Goldstein
2       Q.   I never received a separate list for
3   depositions.
4       A.   No?
5       Q.   Would it be in your file here today?
6       A.   No, I don't have it in my file.  But
7   I believe I sent all the attachments, my fee
8   schedule, my depositions, my CV, along with the
9   report.  They may be inadvertently downloaded.
10      Q.   That's fine.  And I'm not interested
11  in anything other than the fact that there is a
12  deposition testimony list that you have --
13      A.   Yes.
14      Q.   -- that has not been provided to us?
15             (Talking over each other.)
16      Q.   Is it something you can provide to
17  us?
18      A.   Oh, sure.
19      Q.   However we will -- and for some other
20  reasons, let the record reflect that we are going
21  to keep Dr. Goldstein's deposition open, and if we
22  need further testimony, we will figure out whether
23  to do that by telephone or have Mr. Friedman fly
24  you down to Alabama for it to address your
25  deposition testimony.



ROBERT GOLDSTEIN M.D.
Dates vs. Norton

August 25, 2015
90–93

Page 90

Goldstein
1     Goldstein
2     A.   Sure.
3     Q.   Will you please provide that?
4          MS. HUSSAIN:  The documents that you
5     don't currently have, the deposition is
6     open for the purpose of asking Dr.
7     Goldstein questions relating to documents
8     that are not yet produced.
9          MR. PIERCE:  I will let Court decide
10    what the deposition will remain open for.
11    I'm saying that I'm intending to keep his
12    deposition open, period, for whatever
13    reason.
14         MS. HUSSAIN:  We will call the Court
15    when?
16         MR. PIERCE:  After this is all done,
17    we are not going to call them, we're just
18    going to file a motion.
19         MS. HUSSAIN:  Okay.
20    BY MR. PIERCE:
21    Q.   Just as a housekeeping matter,
22    Doctor, is there anything else that you have
23    provided or produced to Mr. Friedman other than
24    that draft report that's not here in front of you
25    today as an exhibit?

Page 91

1          Goldstein
2     A.   I think my fee schedule was produced.
3     (Discussion off the record.)
4     BY MR. PIERCE:
5     Q.   So the fee schedule marked as
6     Defendant's Exhibit 3 completes our record of
7     everything that has been provided to Mr. Friedman
8     other than specific to this case, other than the
9     draft or preliminary report?
10    A.   And the list of depositions.
11    Q.   Thank you, sir.
12    Have you or Mr. Friedman exchanged any
13    correspondence, any letters?
14    A.   No.
15    Q.   Specific to this case?
16    A.   No.
17    Q.   Have you exchanged any e-mails other
18    than the one he has disclosed to us in which he
19    simply referenced and enclosed apparently an
20    unusable copy of Ms. Dates' deposition testimony?
21    A.   Only the very, very -- like a day or
22    so ago e-mail that informed me the deposition will
23    be at my apartment.
24    Q.   The logistical e-mail.
25    A.   Yes, the logistical.

Page 92

1          Goldstein
2     Q.   That raised the issue that we had
3     noticed it for a location that you didn't want it
4     to be at?
5     A.   Exactly.
6     Q.   Any other e-mails exchanged between
7     you and Mr. Friedman?  And by that I mean any that
8     he has sent you or that you had sent him having to
9     do with any of the substance of this case?
10         MS. HUSSAIN:  I'm going to object
11    that under Rule 26 B-4, only
12    communications that are within the scope
13    of those specific sub parts are
14    discoverable, and everything else is not
15    discoverable.  So I'm going to instruct
16    him not to answer as to communications
17    that he has not considered or relied on in
18    his report.
19         MR. PIERCE:  When he was disclosed as
20    the testifying expert, all of the
21    preliminary discussions including the
22    report, any objection to them based on the
23    fact that he was a consulting expert at
24    the time or that it was work product are
25    waived.

Page 93

1          Goldstein
2     In light of that, are you still going
3     to instruct him not no answer?
4          MS. HUSSAIN:  Yes.  Because my
5     understanding is that the Rule 26 4-C
6     continues to apply to experts named as a
7     trial expert, testifying as experts.
8          MR. PIERCE:  And that is another
9     reason, Doctor, that we are going to keep
10    your deposition open until we get to a
11    ruling on these particular issues.
12    BY MR. PIERCE:
13    Q.   The basis of that objection, Doctor,
14    is -- if I could presume to translate, is that
15    prior to the disclosure of your report and
16    accompanying documents on March 23, 2015,
17    everything that occurred before then is
18    privileged, is protected by privilege.
19    Have you had any substantive communications
20    with Mr. Friedman -- not that I'm waiving the
21    right to ask the earlier question, since -- on or
22    since March 23rd?
23         MS. HUSSAIN:  We disagree.  Our
24    position is that privilege continues to
25    cover communications after March 23, 2015,



ROBERT GOLDSTEIN M.D.
Dates vs. Norton

August 25, 2015
94–97

Page 94

Goldstein

1
2    if they fall outside of Rule 26 4C.  So
3    I'm going to instruct him not to answer
4    any questions that relate to
5    communications between the parties and its
6    expert that do not relate to compensation,
7    identifies facts or data that parties'
8    attorney has provided and that Dr.
9    Goldstein has considered in forming his
10   opinions; or number 3, identify a subject
11   that party's attorney has provided and
12   that Dr. Goldstein has relied on in
13   forming the opinions to be expressed.
14        BY MR. PIERCE:
15        Q.   Have you had any communications with
16   Mr. Friedman or his law firm that do not fall
17   within those categories, Doctor?  For instance,
18   have you had any communications with them about
19   the facts of this case?
20        THE WITNESS:  Are you objecting?  Can I
21   answer?
22        MS. HUSSAIN:  You can answer.
23        THE WITNESS:  No.
24        BY MR. PIERCE:
25        Q.   Any exchanges between you all, would

Page 95

Goldstein

1
2    it be fair to say they were without commentary?
3    That was a terrible question.  Let me try again.
4        You can answer, if you understood it.
5        A.   There were no communications relating
6    to anything about this case.
7        Q.   The attorney who contacted you and
8    prompted the follow-up interview of Ms. Dates, it
9    was not Mr. Friedman; is that correct?
10       A.   Correct.
11       Q.   Or his partner Ms. Holding?
12       A.   I believe it was Ms. Holding.
13       Q.   It was Becky Holding.  Thank you.
14   I though you said "he," but I couldn't
15   remember the name.
16       Have you ever spoken with any of the
17   witnesses who allegedly corroborate Ms. Dates'
18   version of what happened at Milo's?
19       A.   No.
20       Q.   Mr. Jackson?
21       A.   No.
22       Q.   Are you aware of any other fact
23   witnesses who allegedly corroborate what happened
24   at Milo's?
25       A.   I believe it was suggested that there

Page 96

Goldstein

1
2    were a couple of witnesses.  I believe Ms. Dates
3    told me that.  It's in my contemporaneous notes
4    that there were witnesses.  But I don't know who
5    they are.  I never saw any documentation.
6        Q.   Has anyone informed you at any point
7    that each of those corroborating witnesses have
8    recanted, they have contradicted what Ms. Dates
9    says they would say?
10       A.   I'm not aware of that.
11       Q.   Are you aware that all of witnesses
12   upon which she bases her claim, other than Mr.
13   Jackson, have contradicted all of her statements
14   about being sexually harassed at Milo's?
15       A.   Not until you earlier suggested that.
16       Q.   Are you aware that a court of law in
17   the State of Alabama, Doctor, has rejected Ms.
18   Dates' claims that she was sexually harassed and
19   retaliated against at Milo's?
20       A.   Am I aware of that?
21       Q.   Yes?
22       A.   No.
23       Q.   Assuming that to be true, does that
24   change your opinions or conclusions to any degree
25   in this case?

Page 97

Goldstein

1
2        The witnesses contradicting her and the
3    court finding her story to be unbelievable or
4    incredible.
5        MS. HUSSAIN:  Are you referring to
6        the unemployment lawsuit?
7        MR. PIERCE:  I am.
8        THE WITNESS:  I would not rush to
9        change my conclusions based on some
10       proceeding that wasn't focused on -- I'm
11       only involved in this litigation, so I
12       don't know what you suggest is, may have a
13       lot of probative or not.
14   BY MR. PIERCE:
15       Q.   Why would you not look elsewhere for
16   information and facts and actual determinations,
17   add to the facts upon which you base your opinions
18   and conclusions?
19       A.   If it's provided to me, I can study
20   it and put in context, possibly be able to form a
21   better judgment about whether it would change my
22   opinion or not.  It seems pretty vague at this
23   point.
24       Q.   Has it been provided to you?
25       A.   No.



ROBERT GOLDSTEIN M.D.
Dates vs. Norton

August 25, 2015
98–101

Page 98

Goldstein

1
2   Q.   Have you asked that it be provided to
3 you?
4   A.   I didn't know about it until you
5 mentioned.
6   Q.   I think that's obvious for the
7 record, and I think I've made my point on that,
8 Doctor.
9       My question is, going back to staking your
10 professional representation to some degree on
11 backing Ms. Dates, wouldn't you want to know that?
12   A.   I don't know if I'd want to know it
13 because there may be a relevant -- it may be very
14 relevant or irrelevant to this proceeding.  I
15 don't know.
16   Q.   You don't know because nobody told
17 you about it.
18   A.   Relevant this proceeding would
19 probably be, you know, wouldn't be ongoing, I
20 guess.
21   Q.   Or Ms. Dates' attorney could be
22 hiding it from you, couldn't he, Doctor?
23   A.   I wouldn't suggest it.
24   Q.   Why not?
25   A.   I wouldn't make that assumption

Page 99

Goldstein

1
2 necessarily.
3   Q.   In your two dozen cases with Mr.
4 Friedman, in the twelve years you've been working
5 with him, have you ever reached a conclusion that
6 was unfavorable to his client?
7   A.   I don't recall any such cases, no.
8   Q.   Have you ever had any conversations
9 in your professional relationship with Mr.
10 Friedman or his firm in which he has withdrawn or
11 withdrawn you as an expert or you have withdrawn?
12   A.   No.
13   Q.   Have there been any cases with Mr.
14 Friedman in which he has terminated your services?
15   A.   I'd say definitely not.
16   Q.   How well do you know Mr. Friedman?
17   A.   Just professional.
18   Q.   Do you all talk about things other
19 than the case for which you are consulted or
20 hired?
21   A.   Not really.
22   Q.   Do you know about his wife or his
23 kids?
24   A.   Not really.
25   Q.   Do you know where he practices or?

Page 100

Goldstein

1
2   A.   Yeah, I know he's in -- what is it,
3 Larchmont.
4   Q.   He's in Alabama in this case.
5   A.   No.  He's somewhere in Westchester.
6 I think it's Mamaroneck.
7   Q.   Does he update you when you have
8 consulted or testified for him on the outcome of
9 the case?
10   A.   Like most of the lawyers that I have
11 had the honor of working with, I have probably
12 half of my file cabinets filled with cases that
13 were resolved years ago, but I was never informed
14 about that, so I was reluctant to throw out
15 anything that may be needed in an appeal.  So most
16 lawyers don't inform me about -- don't think about
17 letting me know how something turned out unless
18 there's a refund due, like a retainer, money
19 that's due back to the client.
20       So Mr. Friedman, like most lawyers, I
21 wouldn't fault him for that if it seems to be a
22 customary practice.
23   Q.   Can you estimate in how many cases in
24 the last four years you have been identified as an
25 expert witness?  That's where you testified at

Page 101

Goldstein

1
2 trial then disclosed as an expert.
3   A.   Before trial?
4   Q.   Yes, sir.
5   A.   I have no idea.  I think at least in
6 New York I think that information is provided 30
7 days before trial, or something like that, so
8 there's a full incentive moving ahead, so it
9 probably would be equal to this.
10   Q.   Can I suggest something for you?
11 Based on your memory, is your deposition list
12 longer than your trial testimony list?
13   A.   No, I think it's shorter.
14   Q.   Really?  About the same?  You said
15 shorter, I'm sorry.
16   A.   I believe.  It may be about the same
17 but I think a little shorter.
18   Q.   Proportionally, how many cases are
19 you retained on that ultimately result in you
20 testifying at deposition or at trial?  Do you
21 understand what I'm asking?
22   A.   Yes.
23   Q.   To get the number of cases you've
24 been retained, do we multiply this times two?  Do
25 we multiply this times five?  What?

ROBERT GOLDSTEIN M.D.                                      August 25, 2015
Dates vs. Norton                                                102–105

Page 102

Goldstein
1
2       A.   I think the overwhelming majority of
3   cases, I just couldn't say because there's so many
4   categories.  I think the overwhelming majority of
5   cases at least reach the deposition phase, maybe
6   not the trial phase.  But I think maybe they're
7   roughly equal, depositions, the number of
8   depositions, the number of cases I originally was
9   retained on.
10      Q.   So there are 15 cases on the first
11  page and another 7 on here; so 22 cases.
12      A.   In four years.
13      Q.   Assuming another 22, let's just
14  double it, that's 44 cases in the last four years.
15  That's 11 cases a year for the last four years.
16      Are you telling me that you've only been
17  retained in 11 cases per year for the last four
18  years?
19      A.   I never said that.  I have no idea.
20      Q.   How many cases were you retained in
21  last year as an expert?
22      A.   I have no idea.
23      Q.   Do you have any sort of accounting or
24  case list that would reflect that?
25      A.   No, because as a requirement of

Page 103

Goldstein
1
2   paper, keeping track of bookkeeping, whatever, the
3   only thing I can really carefully tabulate are
4   cases that come to deposition and trial.  In other
5   words, that's a requirement that that be available
6   if I'm going to testify.
7       Q.   No attorneys ever asked you how many
8   cases you've been retained in as opposed to
9   testified in?
10      A.   Obviously the number is going to be
11  most likely greater, because most cases are
12  settled before trial.  I don't have any reliable
13  statistics on it.
14      Q.   So we're abundantly clear on this.
15  What I'm actually asking is, how many cases have
16  you been retained in as an expert that have not
17  proceeded to deposition or to trial?
18      A.   I understand.  Months could go by
19  without a single case being -- retaining me, then
20  I could have three or four cases the next month or
21  the next six months.  So I'm sure that it could be
22  researched.  If someone wanted to make a
23  contribution to medical science research how many
24  cases --
25      (Discussion off the record.)

Page 104

Goldstein
1
2   BY MR. PIERCE:
3       Q.   How difficult would it be for you to
4   research that, Doctor, provide that information to
5   us?
6       A.   I'm not sure it would be possible.
7   I'm not sure how I would begin to figure out how
8   to do it.
9       Q.   I'm not a fan of statistics, but
10  could you look at how many files you opened last
11  year as a sampling over one year's worth, the
12  number of times you've been hired as an expert
13  witness?
14      A.   I could try to do that.  I'm not sure
15  I could.
16      Q.   If you would, I would appreciate you
17  doing it so.
18      A.   I will make an effort.
19      Q.   Thank you.
20      Have you ever been provided with copies of
21  your testimony?  For instance, you'll finish up
22  the deposition today, did the attorneys ever send
23  you a copy of that testimony for you to look at?
24      A.   Yes, they sometimes do.  They want my
25  signature.

Page 105

Goldstein
1
2       Q.   Read and sign to prove it?
3       A.   Read it, and see if I agree what's
4   there.  But not in every case.
5       Q.   Do you keep those transcripts?
6       A.   Generally not.
7       Q.   Do they get tossed in the trash?
8       A.   Generally, they have to be returned.
9   It cost somebody money, they want them back.
10      Q.   So my question is:  Do you have in
11  your office any prior testimony that you have
12  given?
13      A.   Only in one case that goes back about
14  ten years.  I have my testimony in federal court
15  in a case, and not for any reason other than it
16  has some amusing material.
17      Q.   Is that the one you quoted -- there
18  were several quotes of testimony in your hot seat?
19      A.   This was never quoted.
20      Q.   You're saving it for something good
21  or?
22      A.   I will tell you off the record.
23      Q.   Have you ever been excluded or
24  limited as an expert witness before?
25      A.   No.



ROBERT GOLDSTEIN M.D.                                       August 25, 2015
Dates vs. Norton                                                 106–109

---

Page 106

Goldstein

1           Goldstein
2     Q.    That you are aware, or absolutely no?
3     A.    I'd say absolutely no.
4     Q.    It's not clear from the record that
5  was produced, Doctor, as to when it was you were
6  actually first retained by Mr. Friedman or his
7  firm in this case.  Feel free to look at your file
8  if it's indicated in there.
9     A.    I can only estimate that it was
10  sometime in April or May of 2013.  I can't give
11  you --
12     Q.    Just because that's your first
13  interview?
14     A.    Usually I can arrange to schedule an
15  interview like this one in a few weeks.  Probably
16  sometime after the middle of April, before the
17  31st of May.
18     Q.    Wouldn't there be an invoice or
19  retainer agreement that could confirm that?
20     A.    No.
21     Q.    Is it typical for you to not have a
22  face-to-face examination of a client, or however
23  you would call them, on whose behalf you're
24  testifying as an expert witness?
25     A.    With modern technology, it's becoming

---

Page 107

1           Goldstein
2  increasingly, you know, not uncommon.
3     Q.    In 2013, how many other clients did
4  you interview by Skype or remote means as opposed
5  to meet face to face?
6     A.    Rough estimate, maybe 10 or 12.
7     Q.    Out of approximately how many?
8     A.    That I can't say.
9     Q.    Does that represent a small fraction
10  of them?
11     A.    I wouldn't say a fraction, but the
12  only reason I remember is, Skype is such a -- I
13  remember setting up the Skype things so it stands
14  out in my mind.  I couldn't estimate how many
15  non-Skype cases by comparison, maybe the same.  I
16  can't remember.  Doesn't stand out in my mind.
17     Q.    Because your conclusions and opinions
18  are based in part on your reading of Ms. Dates'
19  remote face to face credibility, you said she was
20  very credible and consistent in her
21  presentation --
22     A.    Yes.
23     Q.    -- is an examination of a patient
24  remotely less reliable, in your opinion?
25     A.    My experience has been that it's not

---

Page 108

1           Goldstein
2  less reliable.  I have a gargantuan computer
3  screen and so I can see the entire, from the waist
4  up, the entire image of that person while I'm
5  interviewing them.  It's larger than if they were
6  sitting six feet or eight feet across from me in
7  my office.  I can see a close-up of their
8  expression and their body movements, or body
9  language, whatever, every little twitch of their
10  eyes.  It's almost magnified.  Like I'm standing
11  on top of them with a magnifying glass.
12       I think it's very good.  It's a very good
13  technology, and I don't think you lose anything by
14  not having -- in terms of an interview.
15       Maybe treatment, you might lose some of that
16  intangibles.  But for interview purposes, I think
17  it's fine because you can see the person, you can
18  see their emotional reactions, you can read the
19  body language and the communication is fine.
20     Q.    Could you see if Ms. Dates was
21  sweating with your gigantic screen?
22     A.    Yes.
23     Q.    How big is that screen?
24     A.    I'm bad with estimating -- I'd say
25  about as big as that frame.

---

Page 109

1           Goldstein
2     (Indicating.)
3     MR. PIERCE:
4     Q.    If this were put on it's edge?
5     A.    Turned it 60, 90 degrees.
6     Q.    90 degrees.  I would tell you,
7  Doctor, I'm an expert on TV screens.  That would
8  be about a 32-inch.
9       Does that sound right?
10     A.    I'm very bad at measuring.
11     Q.    About 32 inches on the perpendicular?
12     A.    It's roughly that size.  And the way
13  the image is projected, it's larger, probably
14  enlarges.  I don't know by what factor it enlarges
15  the image of the person's face so you can see
16  every pore practically.
17     Q.    Depending on the camera that she has
18  on her computer?
19     A.    Yes.  I don't remember any cases
20  where there was any problem with the other side's
21  camera.
22     Q.    Were there any recording, audio or
23  visual, of your interviews of Ms. Dates?
24     A.    No.
25     Q.    The only records of those would be

---

ROBERT GOLDSTEIN M.D.                                   August 25, 2015
Dates vs. Norton                                            110–113

Page 110

1              Goldstein
2   the notes you've taken here?
3       A.   Correct.
4       Q.   Has anyone assisted you at any point
5   in any of work and the analysis you have done on
6   your end?
7       A.   No.
8       Q.   You don't have a secretary or a
9   resident or somebody helping you out?
10      A.   No.
11      Q.   Have you spoken at any point with any
12  of Ms. Dates' healthcare providers?
13      A.   No.
14      Q.   Cheaha, Sylacauga?
15      A.   No.
16      Q.   We talked earlier about malingering
17  and you expanded on, and I appreciate that, my
18  understanding of its definition.
19      Is there any way to test to see if a patient
20  or a client is malingering?
21      A.   Well, there are certain psychological
22  tests that purport to shed some light on whether
23  that is a malingering scale in the MNPI, or maybe
24  there are some other psychological tests.  But
25  many of them have been discredited for having a

Page 111

1              Goldstein
2   very large number of false positive findings, and
3   I don't find that they are too useful, maybe
4   they're counterproductive.
5       Q.   What is had a PAI?
6       A.   The PAI, I have seen that somewhere.
7       Q.   Personality Assessment Inventory.
8       A.   That's probably one of the tests that
9   purports to measure malingering.  I think it's one
10  of the tests.
11      Q.   Have you ever utilized or relied on a
12  PAI before?
13      A.   You know, from time to time, cases
14  come up where psychological testing is done.  I
15  never use it to just look for malingering because
16  of the false positive findings with these tests,
17  but maybe some other reason for the psychological
18  test.
19      Q.   Have you ever criticized someone for
20  not taking into the account the PAI in the context
21  of alleged malingering?
22      A.   It's possible.
23      Q.   Can you give me examples of when you
24  have done so?
25      A.   I'm not going to say it's possible.

Page 112

1   I don't specifically recall.
2       Q.   You don't know one way or another?
3       A.   No.
4       Q.   Fair enough.
5       There are a lot of -- adverbs found in your
6   report.
7       A.   Adverbs?
8       Q.   I shouldn't even name them.
9   "Constantly," "repeatedly," "frequently,"
10  frequency descriptors.  Is that an adverb?
11      A.   Yes, anything that ends in an L-Y.
12      Q.   In your report, Dates claimed that
13  Carmenade unwelcome sexual comments, constantly
14  asked her out, frequently touched her on the
15  breasts and buttocks.  She says she repeatedly
16  told Carmen his behavior was unwelcome.
17      Ms. Dates said she repeatedly complained
18  about the offensive behavior to her superiors.
19  "Constantly," "frequently," "repeatedly" and the
20  other adverbs, are those words that you chose or
21  words that Ms. Dates used?
22      A.   I would probably conclude that that's
23  my use of language, which is my style of writing,
24  perhaps which is based on what she told me in

Page 113

1              Goldstein
2   different words.
3       Q.   What words did she use that you
4   extrapolated "constantly," "frequently"?
5       A.   Every day, she had "all the time she
6   was rubbing against me," or "every time I came to
7   work."  I don't think she used those adverbs, she
8   would perhaps speak more colloquially.
9       Q.   Those are your adverbs?
10      A.   Definitely.
11      Q.   "Relentless harassment"?
12      A.   Yes, that's definitely mine.
13  (Recess taken.)
14      MS. HUSSAIN:  We're not consenting to
15  keeping the deposition open.  The trial
16  list that we provided, the resume, the CV
17  that we provided on behalf of
18  Dr. Goldstein, was accurate as of the time
19  the report was given to opposing counsel,
20  to Sean, and that is our obligation under
21  the rules.
22      Also, the deposition list is not
23  required to be provided under Rule 26.
24  It's not a basis for keeping the
25  deposition open.



ROBERT GOLDSTEIN M.D.
Dates vs. Norton

August 25, 2015
114–117

Page 114

```
1              Goldstein
2        And also the draft, the earlier
3    preliminary draft, like I stated before,
4    is not discoverable under Rule 26 4B,
5    which protects trial preparation
6    protection for draft, reports,
7    disclosures.
8        And for those reasons, we're not
9    agreeable to keeping the deposition open.
10       MR. PIERCE:  Objection so noted.
11    BY MR. PIERCE:
12    Q.   Dr. Goldstein, there are a lot of
13   notations -- I've got it on page 5 if you all want
14   to look at it -- regarding Ms. Dates' alleged
15   paranoia.
16    A.   Yes.
17    Q.   Let's lump hallucinations in there,
18   but you can tell me if that's correct or not.
19       She hears voices almost daily telling her
20   she is worthless.  She has paranoiac thoughts
21   about people from Milo's coming to get her.  She
22   has suicidal ideation at times.  When she leaves
23   home, she's hypervigilant, on guard, looking over
24   her shoulder, fearing someone from Milo's may want
25   to harm her.
```

Page 115

```
1              Goldstein
2        Are you aware of any basis in fact for
3    Ms. Dates' paranoia or hallucinations?
4    A.   I'm not aware of any factual basis
5    for those --
6    Q.   Doctor, I'm sorry to interrupt.
7        What I'm asking is, are you passing on
8    things that she has said or are you actually
9    rubber stamping or endorsing the legitimacy of
10   them?
11    A.   No.  I'm saying it's -- paranoid
12   implies very strongly that it's a psychiatric
13   symptom, that it's an unrealistic perception for
14   her part about possibly being in danger from
15   enemies that want to harm her.
16       I can't say that there's definitely no
17   factual basis, because maybe even paranoids have
18   enemies or words to that effect.  It's possible
19   something happened that may have triggered this
20   off and someone made a comment or she saw someone
21   on the street and they may be following her.
22       I don't know what the -- it generally seems
23   to be paranoid because no one -- it seems to be in
24   her head.  She's looking over her shoulder.
25   Someone is coming after me.  But in fact, nobody
```

Page 116

```
1              Goldstein
2    ever has.  As far as I know.
3    Q.   Has she given you any specific
4    examples of something that would make her vigilant
5    as opposed to paranoid, something that Milo's has
6    done or its employees?
7    A.   As I say, I don't think there's any
8    tangible fact that you could link it to.  I think
9    it's her pathological perception.
10    Q.   Is that perception, if true,
11   consistent with the only individual involved in
12   this case who has been accused of a crime?  Is
13   this an example, potentially an example, of the
14   guilty or alleged guilty party crying wolf?
15    A.   I'm not sure I understand.
16    Q.   Are you aware that Ms. Dates is the
17   only one involved in this case, witnesses or
18   parties, who has been accused of a crime?
19    A.   Officially or?
20    Q.   Yes, sir.
21    A.   No, I'm not aware.
22    Q.   Did anybody tell you that?
23    A.   No.
24    Q.   Would it be consistent with paranoia,
25   which was the manifestation of what she claims
```

Page 117

```
1              Goldstein
2    with sexual harassment, if she accused Milo's of
3    being out to get her?
4    A.   I don't see any direct relationship
5    there.
6    Q.   Would it be consistent with the fact
7    that she is the only one who has been cited as
8    committing a criminal act?
9    A.   Again, I don't see any necessary link
10   there.
11    Q.   We talked earlier about malingering,
12   and I don't mean to belabor the point.  You say in
13   your reports specifically that you considered and
14   ruled out malingering.  Have we talked about all
15   the ways you considered and ruled out malingering?
16    A.   I think so.  Just in terms of the big
17   picture, the documentation, medical records,
18   psyche records, pharmacy records.
19    Q.   Really quickly, I want to go through
20   your testimony list that I do have in front of me,
21   Defendant's Exhibit 6.
22       (Indicating.)
23       That list does not reflect whether you were
24   testifying on behalf of the employer or employee
25   or plaintiff or defendant.
```

ROBERT GOLDSTEIN M.D.
Dates vs. Norton

August 25, 2015
118–121

Page 118

1              Goldstein
2      As we sit here today, can you tell me who
3  you represented in those cases?
4      A.   You mean, defense or plaintiffs?
5      Q.   Plaintiff or defense, prosecution or
6  defense, or someone else.  For instance, I know
7  there's the probate proceeding, estate of Ralph
8  Besdansky.
9      A.   That was appointed by the court so I
10  was --
11      Q.   Didn't represent either party?
12      A.   I didn't represent.
13      Q.   Doctor, if it's easier for you, you
14  can read them or you can do what I started to do
15  with a few cases I could find, you can put a
16  triangle for defendant and a P for plaintiff or D
17  for defendant, however you want to so mark those.
18      A.   I'll put a D for defendant and a P.
19           (Indicating.)
20      Q.   Thank you, sir.
21  Miller, you represented the defendant.
22  Reyes, you represented the defendant.
23      A.   No.  This is a P.
24      Q.   It's however you're most comfortable.
25  That's why I'm reading it back to you.

Page 119

1              Goldstein
2      A.   This one doesn't ring a bell.
3      Q.   P for Whitfield; plaintiff in
4  Frederick; is that a P for Linso and Berry?
5      A.   Yes.
6      Q.   Bogota was for the defendant.
7  Against Mr. Friedman, I believe?
8      A.   Actually, yes.  That was the famous
9  waitress case.
10      Q.   You said your relationship has gone
11  back 12 years, so Im guessing that was not the
12  beginning of you all's relationship?
13      A.   No, no.  We had worked on cases
14  before.
15      Q.   Do you know how he first came to have
16  a professional relationship with you?
17      A.   I don't.  Probably word of mouth, I
18  guess.
19      Q.   You obviously have a substantial
20  literature of published materials.  Have you read
21  any of Mr. Friedman's published materials?
22      A.   No, I didn't know.
23      Q.   Particularly his one on:  How to
24  utilize a psychiatric expert witness?
25      A.   No, I'd like to see that.

Page 120

1              Goldstein
2      Q.   Not in Bogota, because you were
3  adverse to him, in any of these other cases, were
4  you working on behalf of Mr. Friedman or his
5  client?
6      A.   Working on behalf of him?
7      Q.   Yes.  Were you hired by him in any of
8  those cases?
9      A.   No; none of the other cases.
10      Q.   Any particular reason you have not
11  testified in cases with Mr. Friedman as opposed to
12  other attorneys?
13      A.   No reason I know of.
14      Q.   Is Mr. Friedman going to be appearing
15  more frequently on your deposition list?
16      A.   I can't predict.
17      Q.   On your deposition list, the Ps or
18  the Ds have it?  More plaintiff or more defense
19  work?
20      A.   I can't remember.
21      Q.   Let me ask you this, Doctor.  When
22  you put Ps and Ds on this list, are those all
23  civil cases?
24      A.   Yes; everything was civil.
25      Q.   You said you don't do criminal work?

Page 121

1              Goldstein
2      A.   Just pre-sentence reports.
3      Q.   Those wouldn't be trial testimony?
4      A.   No.
5      Q.   They wouldn't be listed on here?
6      A.   Definitely not.
7      Q.   This is essentially a list of civil
8  cases like this in which you've testified?
9      A.   Yes.
10      Q.   From medical malpractice to sexual
11  harassment?
12      A.   Yes.
13      Q.   All the notations in your report of
14  history -- patient feels isolated, doesn't leave
15  her apartment, had her truck foreclosed on, was
16  evicted from her apartment -- all of that comes
17  from Ms. Dates, not from her attorney or some
18  other source?
19      A.   Everything comes from what I learned
20  from her during my examination.  In other words,
21  she's the one that gave me that history.
22      Q.   She is your source for that
23  information?
24      A.   Yes.
25           MR. PIERCE:  I appreciate your time



ROBERT GOLDSTEIN M.D.
Dates vs. Norton

August 25, 2015
122–125

Page 122

```
1              Goldstein
2    today.  Thank you for your patience.
3    Any follow-up?
4         MS. HUSSAIN:  No, no follow-up.
5    (Discussion off the record.)
6    (Matter concluded.)
7    (Time noted:  4:38 p.m.)
8
9

10         _____
           ROBERT GOLDSTEIN, M.D.
11
12   Subscribed and sworn to before me
     this _____ day of _____, 20___.
13   _____.
     NOTARY PUBLIC
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 123

```
1              Goldstein
2
3              I N D E X
4    WITNESS        EXAMINATION BY        PAGE
5    DR. GOLDSTEIN    DIRECT / PIERCE        3
6
7              E X H I B I T S
8    DEFENDANT'S DESCRIPTION               PAGE
9    1      Short resume                    5
10   2      CV                              6
11   3      Fee schedule and bills         68
12   4      3/23/15 report                 50
13   5      Doctor's file materials        67
14   6      Rule 26 testimony list         86
15
16     INFORMATION AND/OR DOCUMENTS REQUESTED
17   INFORMATION AND/OR DOCUMENTS          PAGE
18   Colloquium notes                       9
19   Previous report drafts                54
20   Bills and invoices                    64
21   Doctor's file materials               67
22   List of cases giving testimony        87
23   Yearly amount of being retained as an expert   103
24
25
```

Page 124

```
1
2          C E R T I F I C A T I O N
3         I, Jeffrey Shapiro, a Shorthand Reporter
4    and notary public, within and for the State of New York,
5    do hereby certify:
6         That ROBERT GOLDSTEIN, M.D., the witness
7    whose examination is hereinbefore set forth, was first
8    duly sworn by me, and that transcript of said testimony
9    is a true record of the testimony given by said witness.
10        I further certify that I am not related to
11   any of the parties to this action by blood or marriage,
12   and that I am in no way interested in the outcome of
13   this matter.
14
15        IN WITNESS WHEREOF, I have hereunto set my
16   hand this _____ day of _____, 2015.
17
18
19              [signature]
20
21              _____
                JEFFREY SHAPIRO
22
23
24
25
```

Page 125

```
1    DEPOSITION ERRATA SHEET
2
3    Our Assignment No. J0173784
4    Case Caption:  Dates vs. Norton
5
6    DECLARATION UNDER PENALTY OF PERJURY
7         I declare under penalty of perjury
8    that I have read the entire transcript of
9    my Deposition taken in the captioned
10   matter or the same has been read to me,
11   and the same is true and accurate, save
12   and except for changes and/or corrections,
13   if any, as indicated by me on the
14   DEPOSITION ERRATA SHEET hereof, with the
15   understanding that I offer these changes
16   as if still under oath.
17
18
19        _____
20        Robert Goldstein, M.D.
21
22   Subscribed and sworn to on the _____ day of
     _____, 20_____ before me,
23
24   Notary Public,
     In and for the State of _____
25
```

